UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER JEROME, an individual,
LEO JEROME, an individual, and STORY
COMPANIES, LLC, a Michigan limited
liability company,

          Plaintiffs,

v.

JOEL FERGUSON, an individual, VIRGIL
BERNERO, the Mayor of the City of Lansing,
in his individual capacity, LANSING
ECONOMIC AREA PARTNERSHIP, INC., a
Michigan non-profit corporation, ROBERT L.
TREZISE, JR., an individual, CLARK
CONSTRUCTION SERVICES, LLC, a
Michigan limited liability company,
CHARLES CLARK, an individual, FRANK
KASS, an individual, CONTINENTAL
DEVELOPMENT, INC., an Ohio corporation,
HALLMARK CAMPUS COMMUNITIES, an
Ohio partnership, FERGUSON
DEVELOPMENT, LLC, a Michigan limited
liability company, CHRISTOPHER
STRALKOWSKI, an individual,
FERGUSON/CONTINENTAL LANSING,
LLC, a Delaware limited liability company,
and RED CEDAR INVESTOR, LLC, a
Michigan limited liability company,

          Defendants.

Case No. 1:16-cv-01116

Hon. Janet T. Neff

---

**BRIEF IN SUPPORT OF DEFENDANTS'
UNIFIED MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................... 1

FACTS ..................................................................................................................................... 2

STANDARD FOR DISMISSAL ............................................................................................ 6

ARGUMENT ........................................................................................................................... 8

   I.    Plaintiffs Lack Standing to Pursue this Action ............................................................. 9

     A.  The RFQP and RFQP Response Do Not Confer Any Legal Rights on Any Developer. 10

     B.  Plaintiffs Cannot Have Any Legally Protected Rights under the RFQP or RFQP Response because Plaintiffs Are Not Parties to These Documents. ............................. 12

     C.  Plaintiffs Lack Standing because Their Alleged Injury Cannot Be Redressed by a Favorable Decision. ................................................................................................. 14

   II.   Plaintiffs Fail to State a RICO Claim as a Matter of Law ............................................ 15

     A.  Plaintiffs Fail to Sufficiently Allege that the RICO Defendants Violated 18 U.S.C. § 1962(c). ............................................................................................................... 16

       1.  Plaintiffs Cannot Maintain that Ferguson Development, LLC is both a "Person" and an "Enterprise." ................................................................................................. 16

       2.  Plaintiffs Fail to Allege a "Pattern" of "Racketeering Activity." ............................ 18

       3.  Plaintiffs Have Not Sufficiently Pleaded Mail or Wire Fraud. ................................ 23

       4.  Plaintiffs Have Failed to Plead All Elements of Extortion. ..................................... 26

       5.  Plaintiffs Have Not Adequately Pleaded a RICO Violation Regarding the Sale of Land to Developer A ............................................................................................. 27

     B.  Plaintiffs Fail to State a Conspiracy Claim under 18 U.S.C. 1962(d) ........................... 28

   III.  Count III Fails to Sufficiently Allege a Property Deprivation in Violation of Due Process. ................................................................................................................... 37

   IV.  Plaintiffs' Tortious Interference Claims Must be Dismissed. ....................................... 39

     A.  Plaintiffs Fail to Sufficiently Allege Tortious Interference under Count IV. ................ 40

       1.  Plaintiffs Fail to Sufficiently Allege a Business Expectancy under the RFQP as a Matter of Law. .................................................................................................... 41

       2.  Plaintiffs Fail to Sufficiently Allege any Tortious Acts. ......................................... 43

       3.  Plaintiffs Cannot Maintain an Independent Tort Action for What Amounts, if Anything, to a Breach of Contract Claim. ................................................................. 45

     B.  Plaintiffs Fail to Sufficiently Allege Tortious Interference under Count V .................. 45

Page

     1.   Plaintiffs Fail to Sufficiently Allege a Business Expectancy with Developer A as a Matter of Law .......................................................................................................... 46

     2.   Plaintiffs Fail to Sufficiently Allege any Tortious Acts Relating to Developer A. .... 47

   V.    Defendants Bernero, LEAP, and/or Trezise Are Entitled to Immunity. ........................ 48

CONCLUSION .................................................................................................................... 50

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*American Eagle Credit Corporation v. Gaskins*, 920 F.2d 352 (6th Cir. 1990)........................... 20

*Amini v. Oberlin College*,
   259 F.3d 493 (6th Cir. 2001)................................................................. 3

*Andersons, Inc. v. Horton Farms, Inc.*,
   166 F.3d 308, 315 (6th Cir. 1998)........................................................ 14

*Angelo DiPonio Equipment Company v. State, Department of State Highways & Transportation*,
   309 N.W.2d 566 (Mich. App. 1981) .................................................... 11

*Armstrong v. Andrews,*
   67 N.W. 567 (Mich. 1896) ................................................................ 14

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................... 7, 48

*Baisden v. I'm Ready Products, Inc.,*
   693 F.3d 491 (5th Cir. 2012)............................................................. 13

*Bassett v. National Collegiate Athletic Association*
   528 F.3d 426 (6th Cir. 2008)........................................................ 3, 5, 6

*Begala v. PNC Bank, Ohio National Association,*
    214 F.3d 776 (6th Cir. 2000) ........................................................... 17

*Bell Atlantic Corporation v. Twombly,*
   550 U.S. 544 (2007) ................................................................... 7, 48

*Bender v. Southland Corporation*
   749 F.2d 1205 (6th Cir. 1984)........................................................... 24

*Betulius v. Hanna,*
   No. 4:96-CV-92, 1996 WL 900413, (W.D. Mich. Dec. 10, 1996) .................... 30, 37

*Bogan v. Scott–Harris,*
   523 U.S. 44 (1998) ..................................................................... 50

*BPS Clinical Labs. v. Blue Cross & Blue Shield of Michigan,*
   552 N.W.2d 919 (Mich. Ct. App. 1996) ................................................ 44

*Cedric Kushner Promotions, Limited v. King,*
   533 U.S. 158 (2001) ..................................................................... 17

*Cedroni Association, Inc. v. Tomblinson Harburn Associates, Architects & Planners Inc.,*
   821 N.W.2d 1 (Mich. 2012) ......................................................... passim

*Craighead v. E.F. Hutton & Company,*
   899 F.2d 485 (6th Cir. 1990)............................................................. 29

Page(s)

*Cullinan v. Abramson*,
128 F.3d 301 (6th Cir. 1997)................................................................... 49

*DLX, Inc. v. Kentucky*,
381 F.3d 511(6th Cir. 2004).................................................................... 6

*Durham v. Nu'Man*,
97 F.3d 862 (6th Cir. 1996)..................................................................... 49

*EBI-Detroit, Inc. v. Detroit*,
279 F. App'x. 340 (6th Cir. 2008)............................................................ 42

*EJS Properties, LLC v. City of Toledo*,
698 F.3d 845 (6th Cir. 2012)............................................................. 37, 39

*Feldman v. Green*,
360 N.W.2d 881 (Mich. Ct. App. 1984) ................................................. 44

*Formall, Inc. v. Community National Bank of Pontiac*,
421 N.W.2d 289 (Mich. App. 1988) ....................................................... 44

*Frank v. D'Ambrosi*,
4 F.3d 1378 (6th Cir. 1993) ..................................................................... 13

*Frank v. Dana Corporation*
547 F.3d 564 (6th Cir.2008)..................................................................... 24

*George v. LochenHeath Props.*,
No. 1:07-cv-426, 2008 WL 437797 (W.D. Mich. Sept. 23, 2008) .......................................... 24

*Giesse v. Secretary of HHS*,
522 F.3d 697 (6th Cir. 2008).................................................................... 6

*Gotham Print, Inc. v. American Speedy Printing Centers, Inc.*,
863 F. Supp. 447 (E.D. Mich. 1994) .................................................. 24, 26

*Griffin v. NBD Bank*,
43 F. Supp. 2d 780 (W.D. Mich. 1999)..................................................... 20

*Grubbs v. Sheakley Group, Inc.*,
807 F.3d 785 (6th Cir. 2015)................................................... 18, 19, 20, 21

*H.J., Inc. v. Northwestern Bell Telephone Company*,
492 U.S. 229 (1989) ............................................................... 18, 19, 20, 21

*Hansen v. Catsman*,
123 N.W.2d 265 (Mich. 1963) ................................................................. 11

*Hart v. Ludwig*,
79 N.W.2d 895 (Mich. 1956) ................................................................... 45

*Hecht v. Commerce Clearing House, Inc.*,
897 F.2d 21  (2d Cir. 1990) ....................................................... 29, 32, 33, 37

<u>Page(s)</u>

*Heinrich v. Waiting Angels Adoption Services, Inc.*,
  668 F.3d 393 (6th Cir. 2012) ............................................................... passim

*Henslee, Monek & Henslee v. D.M. Central Transportation, Inc.*,
  870 F. Supp. 764 (E.D. Mich. 1994) ................................................................ 44

*Holmes v. Sec. Investor Protection Corporation*,
  503 U.S. 258 (1992) ................................................................... 9, 12, 14

*In re ClassicStar Mare Lease Litigation*,
  727 F.3d 473 (6th Cir. 2013) ........................................................... 16, 17

*In re Omnicare, Inc. Securities Litigation*,
  769 F.3d 455 (6th Cir. 2014) .................................................................... 3

*Jackson v. Sedgwick Claims Management. Services., Inc.*,
  731 F.3d 556 (2013) ............................................................................... 9

*Jasinski v. Tyler*,
  729 F.3d 531 (6th Cir. 2013 ................................................................... 49

*Jepsen, Incorporated v. Makita Corporation*,
  34 F.3d 1321 (7th Cir. 1994) ................................................................. 26

*K.B.A. Construction, LLC v. Home Acres Building Supply Company*,
  No. 1:05-cv-264, 2005 WL 2243098 (W.D. Mich. Sept. 14, 2005) ....................... 25

*Kerrigan v. ViSalus, Inc.*,
  112 F. Supp. 3d 580 (E.D. Mich. 2015) ................................................... 23

*Kerrigan v. Visalus, Inc.*,
  2016 WL 892804 (E.D. Mich. Mar. 9, 2016) ............................................ 32

*Lakeshore Community Hospital, Inc. v. Perry*,
  538 N.W.2d 24 (Mich. Ct. App. 1995) .................................................... 47

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................ 9, 12, 14, 15

*Mago Construction Company v. Anderson, Eckstein & Westrick*,
  No. 183479, 1996 WL 33348794 (Mich. App. 1996) .................................. 42, 43

*Marshall v. Nationstar Mortgage, LLC*,
  No. 1:12-CV-852, 2015 WL 1042197 (W.D. Mich. Mar. 10, 2015) ....................... 8

*McGee v. City of Cincinnati Police Department*,
  No. 1:06–CV–726, 2007 WL 1169374 (S.D. Ohio Apr.18, 2007) .......................... 8

*Med Corporation, Inc. v. City of Lima*,
  296 F.3d 404 (6th Cir. 2002) ................................................................. 37

*Moon v. Harrison Piping Supply*,
  465 F.3d 719 (6th Cir. 2006) ........................................................... passim

Page(s)

*Mulbarger v. Royal Allstar Associates, Inc.*,
   10 F. App'x 333 (6th Cir. 2001) ...................................................................... 8, 13

*Papasan v. Allain*,
   478 U.S. 265 (1986) ............................................................................................ 7

*Paycom Billings Services, Inc. v. Payment Resources International*,
   212 F. Supp. 2d 732 (W.D. Mich. 2002).......................................................... 25

*Puckett v. Tennessee Eastman Company*,
   889 F.2d 1481 (6th Cir. 1989).......................................................................... 18

*QQC, Inc. v. Hewlett-Packard Company*,
   258 F. Supp. 2d 718 (E.D. Mich. 2003) .......................................................... 45

*Richardson v. Twp. of Brady*,
   218 F.3d 508 (6th Cir. 2000)............................................................................ 39

*Riddle v. Lacey & Jones*,
   351 N.W.2d 916 (Mich. Ct. App. 1984) .......................................................... 14

*Rose v. Bartle*,
   871 F.2d 331 (3d Cir.1989)............................................................................... 29

*Saab Automobile AB v. General Motors Company*,
   770 F.3d 436  (6th Cir. 2014)........................................................................... 48

*Salem Springs, LLC v. Salem Township*,
   880 N.W.2d 793 (Mich. Ct. App. 2015) .......................................................... 13

*Seaton v. TripAdvisor LLC*,
   728 F.3d 592 (6th Cir. 2013).............................................................................. 8

*Socony-Vacuum Oil Company v. Waldo*,
   286 N.W. 630 (Mich. 1939) ............................................................................. 11

*Taylor Acquisitions LLC v. City of Taylor*,
   313 F. App'x. 826 (6th Cir. 2009).......................................................... 35, 38, 39

*Tenney v. Brandhove*,
   341 U.S. 367 (1951) ......................................................................................... 50

*Trepel v. Pontiac Osteopathic Hospital*,
   354 N.W.2d 341 (Mich. Ct. App. 1984) .......................................................... 42

*Tucker v. City of Richmond, Kentucky*,
   388 F.3d 216 (6th Cir. 2004)............................................................................ 50

*U.S. ex rel. Garst v. Lockheed-Martin Corporation*,
   328 F.3d 374 (7th Cir. 2003).............................................................................. 2

*United States v. Sinito*,
   723 F.2d 1250 (6th Cir. 1983)................................................................... passim

Page(s)

*United States v. Weimert*,
    819 F.3d 351 (7th Cir. 2016)...................................................................... 25, 26

*Vemco, Inc. v. Camardella*,
    23 F.3d 129 (6th Cir. 1994)............................................................ 18, 19, 20, 21

*Vild v. Visconsi*,
    956 F.2d 560 (6th Cir. 1992)...................................................................... 19, 20

*Waeschle v. Dragovic*,
    576 F.3d 539 (6th Cir. 2009)...................................................................... 49, 50

*Wall v. Michigan Rental*,
    852 F.3d 492 (6th Cir. 2017).............................................................................. 9

*Ward v. Alternative Health Delivery Systems, Inc.*,
    261 F.3d 624 (6th Cir. 2001).............................................................................. 6

*Warren v. Manufacturers National Bank of Detroit*,
    759 F.2d 542 (6th Cir. 1985)............................................................................ 13

*Williams v. CitiMortgage, Inc.*,
    498 F. App'x 532 (6th Cir. 2012) ....................................................................... 8

*Women's Medical. Professional Corporation v. Baird*,
    438 F.3d 595 (6th Cir. 2006)............................................................................ 49


**Federal Statutes**

18 U.S.C. § 1961 .................................................................................... 17, 18, 23

18 U.S.C. § 1962 ............................................................................................ passim

18 U.S.C. § 1964 ................................................................................................... 9


**Federal Rules**

Federal Rules of Civil Procedure 8 ........................................................... 2, 7, 21, 48

Federal Rules of Civil Procedure 9 ................................................................... 24, 27

Federal Rules of Civil Procedure 12 ............................................................... 2, 6, 7, 8

Federal Rules of Civil Procedure 56 ........................................................................ 3

## INTRODUCTION

All proposed real estate development projects involve the risk of failure. When that risk is realized, a party may seek intervention of the court only where the failure was caused by an actionable wrong.

Plaintiffs Chris Jerome, Leo Jerome, and Story Companies, LLC, were unsuccessful in their efforts to become involved in a real estate development project known as the Red Cedar Renaissance Project (the "Project") in Lansing, Michigan.  At the time the events alleged in the Amended Complaint occurred, the Project was at a highly preliminary stage—Plaintiffs did not even have any contracts in place for acquiring or developing the underlying property, let alone any of the other plans and permits that would have been required to proceed with a development of the contemplated scope.  In short, Plaintiffs never acquired a legally protectable interest in the Project, and their injury here is nothing more than the kind of disappointed hopes that are an intrinsic risk of any proposed real estate project.

Plaintiffs' first attempt to conjure an actionable interest out of those disappointed hopes resulted in an order directing them to re-plead.  Their second attempt only serves to confirm that the task is impossible.  In an obvious effort to distract from the core deficiency of their case—the lack of a legally recognizable interest in pursuing or developing the real estate projects[1] described in the Amended Complaint—Plaintiffs vaguely allege a grand criminal racketeering conspiracy involving ten defendants, including the Mayor of Lansing and a local non-profit organization.

---

[1] In addition to the Project, Plaintiffs vaguely claim that the Defendants unlawfully interfered with their interest in an alleged second "$90 million" real estate project, where they hoped to partner with "Developer A" to pursue a development.  But Plaintiffs do not identify who "Developer A" is, nor do they describe any specific negotiations, discussions, proposals, or contracts under which they expected to partner with "Developer A," or any particulars whatsoever regarding the alleged project they hoped to pursue with Developer A.

In supposed support of that contention, Plaintiffs loaded their 47 page, 213 paragraph Amended Complaint with lurid, hyperbolic, and conclusory allegations that Plaintiffs were somehow defrauded by a criminal bribery, extortion, mail and wire fraud "scheme"—the details of which are, unsurprisingly, not supported by well-pleaded facts.

The Amended Complaint cannot be maintained as a matter of law.  As a threshold matter, Plaintiffs lack standing to pursue this action.  Furthermore, even if they had standing, none of the five counts in the Amended Complaint sufficiently state a claim as a matter of law.  Plaintiffs cannot get past the pleading stage by cramming their complaint with irrelevant facts, hyperbole, and bald characterizations; and melodramatic innuendo cannot substitute for legally sufficient allegations of fact.  As the Seventh Circuit astutely observed, "Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud."  *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003).  Here, Defendants and the Court could spend weeks trying to "fish a gold coin" from the Amended Complaint, but will only come back with mud.

## FACTS

### *The Request for Qualifications and Proposals ("RFQP") for the Project*

On June 6, 2012, the City of Lansing and the Lansing Economic Development Corporation ("LEDC") issued a Request for Qualifications and Proposals (the "RFQP") for the "Sale and Development of 'Red Cedar Renaissance Site.'"  (Am. Compl. at PageID.260, ¶ 50; Defendants' Exhibit 1.)[2]  The RFQP was issued "to make potential developers and other

---

[2] Because this is a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the facts discussed are those relevant facts alleged by the Plaintiffs, together with those established in the documents on which their claims are based.  When ruling on a Rule 12(b)(6) motion, courts "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."  *Bassett v. Nat'l*

interested parties aware of a great development opportunity." (Defendants' Exhibit 1 at 1.) This opportunity related to an approximately 12-acre parcel on the border between Lansing and East Lansing, adjacent to Michigan State University, and fronted on East Michigan Avenue (identified as "the main travel corridor between the Cities and the University"). (*Id.*)

The stated objective of the RFQP was to identify a developer with the "vision, experience, capacity and financial wherewithal" to purchase and develop the site. (*Id.*) Once such a developer was identified, "[t]he selected developer will *enter into a planning and negotiation process* with the LEDC and City that *should* ultimately result in a Comprehensive Development Agreement." (*Id.* (emphasis added).)

The RFQP makes clear that selection of a developer would not create or confer any enforceable right or expectation but instead merely constituted entry into a process of further negotiations. In particular, the RFQP states:

> Acceptance of Proposal Content. Notwithstanding the identification of a proposed Developer for the purpose of further negotiations, such selection *does not* constitute acceptance of its proposal.

(*Id.* at 9 (emphasis added).)[3] In fact, the public entities were not even required to select a single developer to negotiate with, but rather "may select one or more developers with which to continue negotiations toward reaching a mutually agreeable CDA." (*Id.*) The RFQP further

---

*Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (*citing Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). Considering such documents will not convert this motion to dismiss to one for summary judgment under Fed. R. Civ. P. 56. *See In re Omnicare, Inc. Securities Litig.,* 769 F.3d 455, 466 (6th Cir. 2014).

[3] In a clumsy effort to avoid this provision, and virtually all of the other provisions cited below that conflict with their theory of recovery, Plaintiffs simply omit the pages containing these provisions from the exhibit to their Amended Complaint. (*See* Amended Complaint, Exhibit 2 (attaching only 3 nonconsecutive pages of the 14 page RFQP).) But problematic facts cannot so easily be avoided. Defendants have attached the complete RFQP as Exhibit 1 to this Brief, and the Court may consider it in ruling on this motion as it is expressly referred to in the Amended Complaint and is absolutely central to the claims contained therein. *Bassett*, 528 F.3d at 430.

provided that:  "THE PUBLIC ENTITIES ARE NOT LIABLE FOR ANY COSTS INCURRED

BY ANY PROPOSED DEVELOPER PRIOR TO THE SUCCESSFUL COMPLETION OF

NEGOTIATIONS AND EXECUTION OF THE CDA OR PRIOR TO CLOSING ON THE

SALE AND PURCHASE OF THE PROPERTY." (*Id*. (emphasis in original).)  And in the event

a CDA was executed (though one never was here), the RFQP required that such a CDA "will

contain provisions granting the City the right to disqualify any development team member(s)

found to be unacceptable during development of the project."  (*Id.*)

Moreover, in another section of the RFQP titled "RESERVATION OF THE

DISCRETION OF THE PUBLIC ENTITIES," the RFQP provides:

Notwithstanding any other provision in this RFQP, the Public Entities reserve the
right to:

Reject any and all proposals.

Waive any errors or irregularities in the solicitation process or in any
proposal.

Re-solicit proposals for the project.

Negotiate with any developer for a reduced price, or for an increased price
to include any alternates that any Developer may propose.

Reduce or revise the scope of the project, and re-solicit or negotiate with
any Developer regarding the revised project.

Defer or abandon the project.

(*Id.* at 12)

### *The July 9, 2012 Proposal Submitted in Response to the RFQP*

Plaintiffs allege that on July 9, 2012, Chris Jerome submitted a proposal in response to

the RFQP.  (Am. Compl. at PageID.263, ¶ 64.)  Chris Jerome, however, did not submit the

proposal on his own behalf, nor did he submit it on behalf of Plaintiffs Leo Jerome or Story

Companies, LLC.  Plaintiffs acknowledge this much, alleging that Chris Jerome submitted the proposal as an "Authorized Agent" (*id*. at PageID.263, ¶ 65.)  But they attempt to ignore the obvious question that follows: *whose* Authorized Agent?

The July 9, 2012, proposal submitted by Chris Jerome directly answers that question, though Plaintiffs elected not to attach this central document to their Amended Complaint (presumably because the answer completely undermines their claims).[4]  The RFQP required any proposal to "provide the full name and address" of the developer firm, and identify the "authorized agent" with authority to bind the developer.  (Am. Compl., at PageID.260, ¶ 52; Defendants' Exhibit 1, RFQP at 7.)  The RFQP Response provides this information on page 9, identifying "Christopher Jerome" as the Authorized Agent for the "Capital Gateway Project LLC," and providing that LLC's registered address.  (Defendants' Exhibit 2, RFQP Response, at 9; *see also* Defendants' Exhibit 3, Capital Gateway Project, LLC Public Filings.)  Earlier, the RFQP Response indicated that Chris Jerome was acting "On Behalf of the Story and Ferguson Families."  (Defendants' Exhibit 2, RFQP Response, at p.2; 5 (stating that "the Story and Ferguson families are founding shareholders" of the developer); and 26 (stating that the team is "lead by the Story and Ferguson families").)  Nowhere does the RFQP Response ever indicate that Chris Jerome is submitting a proposal on his own behalf, or on behalf of any of the named Plaintiffs.

Capital Gateway Project, LLC is a Michigan limited liability company formed on July 9, 2012 – the same day that the RFQP Response was submitted.  (Defendants' Exhibit 3, Capital

---

[4] Again, however, bad facts cannot so easily be avoided.  Defendants attach the RFQP Response as Exhibit 2 to this Brief, and because it is referenced in and central to the claims asserted in the Amended Complaint, it is properly considered by the Court when ruling on this motion.  *Bassett*, 528 F.3d at 430.

Gateway Project, LLC Public Filings.)[5]  Though Plaintiffs allege that there had been some discussion regarding equity, control, and other terms related to this LLC prior to submission of the RFQP Response (Am. Compl. at PageID.264-265, ¶¶ 71, 75-77), none of those matters were resolved at the time of submission of the RFQP Response.  In fact they were never resolved. Plaintiffs' Amended Complaint recounts various draft Operating Agreements for the LLC, and proposals and counterproposals regarding ownership, voting rights, and various other matters, but acknowledges that ultimately (and after many months of negotiation) no agreement was ever reached among its would-be members regarding any of these essential terms.  (Am. Compl. at PageID.265-270, 306-312, ¶¶ 78, 82, 83, 88, 91-95 & Exs. 3 & 4.)  With no operative Capital Gateway Project, LLC to work with, the City ultimately moved on without it, as the RFQP reserved the right to do.

Additional factual allegations are discussed below to the extent they are relevant to the claims asserted.

## STANDARD FOR DISMISSAL

This motion is brought pursuant to Fed. R. Civ. P. 12(b)(1) and (6).  Rule 12(b)(1) motions challenge the existence of subject-matter jurisdiction.  A motion under this rule attacks the claim of jurisdiction on its face, taking Plaintiff's jurisdictional assertions as true.  *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).  Plaintiff has the burden of proving jurisdiction when challenged.  *Giesse v. Sec'y of HHS*, 522 F.3d 697, 702 (6th Cir. 2008).  Standing is a jurisdictional defense and is properly raised in a 12(b)(1) Motion.  *Ward v. Alternative Health Delivery Sys., Inc.*, 261 F.3d 624, 626 (6th Cir. 2001).

---

[5] The Court may consider public records in ruling on a Rule 12(b)(6) motion.  *Bassett,* 528 F.3d at 430.

A complaint cannot survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (*citing Twombly*, 550 U.S. at 556). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id*. (*citing Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not "show[n] that the pleader is entitled to relief" and should therefore be dismissed.  *Id*. at 679 (citing Fed. Rule Civ. Proc. 8(a)(2)).

Notably, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id*. at 678; *see also Twombly*, 550 U.S. at 555 ("courts are not bound to accept as true a legal conclusion couched as a factual allegation" (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Indeed, Rule 8(a)(2) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 555).  Therefore, a complaint that merely offers "labels and conclusions"; "a formulaic recitation of the elements of a cause of action"; or "naked assertion[s] devoid of further factual enhancement" cannot survive a motion to dismiss.  *Id*. (*citing Twombly*, 550 U.S. at 555, 557) (internal quotations omitted).

For a Rule 12(b)(6) motion, "[a] court is not bound to accept . . . unwarranted inferences, including allegedly inferable 'facts' or conclusions which contradict documentary evidence appended to, or referenced within, the plaintiff's complaint."  *Mulbarger v. Royal All. Assocs.,*

*Inc.*, 10 F. App'x 333, 335 (6th Cir. 2001) (unpublished).  This Court has similarly recognized that "[o]n a Rule 12(b)(6) motion, the Court is not bound to accept as true . . . allegations 'contradicted by public records and other evidentiary materials of which the Court may take judicial notice.'"  *Marshall v. Nationstar Mortg., LLC*, No. 1:12-CV-852, 2015 WL 1042197, at *3 (W.D. Mich. Mar. 10, 2015) (unpublished) (*citing McGee v. City of Cincinnati Police Dep't*, No. 1:06–CV–726, 2007 WL 1169374, at *2 (S.D. Ohio Apr.18, 2007)); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006).  Instead, such properly considered documents and public records must prevail over any contradictory allegations.  *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (unpublished) (upholding dismissal where plaintiffs' claims were squarely contradicted by her mortgage's payoff statement); *see also Seaton v. TripAdvisor LLC*, 728 F.3d 592 (6th Cir. 2013) (upholding dismissal of complaint alleging defamation and other business torts based on plaintiff's inclusion on TripAdvisor's list of "2011 Dirtiest Hotels" because actual list undermined such claims).

## ARGUMENT

Plaintiffs' pleadings contain multiple fundamental, incurable defects that warrant dismissal of this action.  First, for all of Plaintiffs' broad, vague, and conclusory accusations of political corruption, they have failed to allege that they have suffered any legally recognized injury, and accordingly lack standing to maintain this action.  Second, Counts I and II of the Amended Complaint purport to assert civil claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Ch. 96 ("RICO") arising from the failure of Plaintiffs' heated negotiations with Joel Ferguson over their respective control and/or ownership of Capital Gateway Project, LLC.  For all of Plaintiffs' wild and conclusory accusations that these negotiations indicate a vast criminal racketeering scheme to defraud Plaintiffs joined by ten different defendants (including, *inter alia*, the Mayor of Lansing and a local nonprofit

corporation), Plaintiffs have failed to sufficiently allege actionable civil RICO claims as a matter of law.  Third, Count III of the Amended Complaint fails to sufficiently state a claim that Plaintiffs' due process rights were violated as a matter of law.  Fourth, Counts IV and V of the Amended Complaint fail to state a claim for tortious interference under Michigan law.  Finally, to the extent that any claim survives, Defendants Bernero, LEAP, and Trezise should be dismissed from this action based on qualified and/or absolute immunity.

## I.      Plaintiffs Lack Standing to Pursue this Action

Plaintiffs must establish standing in order to satisfy the case or controversy requirement of U.S. Const. art. III, § 2.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-60 (1992).  To have Article III standing, Plaintiffs must, among other things, demonstrate that they have suffered an "injury in fact," *i.e.*, an invasion of a legally protected interest that is "concrete and particularized."  *Id.* at 560.  It must also be likely, as opposed to merely speculative, that the injury will be "redressed by a favorable decision."  *Id.*; *see also Wall v. Michigan Rental*, 852 F.3d 492, 495 (6th Cir. 2017)

To obtain standing as to Counts I and II, Plaintiffs must also satisfy the statutory prerequisites for bringing a civil RICO action set forth in 18 U.S.C. § 1964(c).  Specifically, Plaintiffs must plead facts sufficient to show that they were "injured in [their] business or property by reason of a violation of [18 U.S.C. § 1962]."  18 U.S.C. § 1964(c); *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 563-64 (2013).  "[T]he requirement of injury in one's 'business or property' limits the availability of RICO's civil remedies to those who have suffered injury in fact."  *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 279 (1992).

Under these standards, Plaintiffs have three insurmountable standing problems: (1) the RFQP and RFQP Response do not grant any rights whatsoever, (2) even if they did, Plaintiffs were not a party to these documents, and (3) any redress sought by Plaintiffs based on the RFQP

and RFQP Response would be entirely speculative.

**A.    The RFQP and RFQP Response Do Not Confer Any Legal Rights on Any Developer.**

Plaintiffs allege that the RFQP Response was selected by the City of Lansing as the "RFQP winner" (Am. Compl., PageID.263, ¶ 66), and that this vested Plaintiffs with a valuable right in the "award of the Project and all expected attendant profits," and in being the "selected developer" for the Project.  (*Id*., PageID.286, 295, ¶¶ 163, 207.)  These contentions are contradicted by the unambiguous language of the RFQP and RFQP Response.  The RFQP states that "the selected developer will enter into a planning and negotiation *process* with the LEDC and City that *should* ultimately result in a Comprehensive Development Agreement ["CDA"]." (RFQP at 1 (emphasis added).)  Plaintiffs' suggestion that being the "selected developer" conferred any rights is expressly refuted by the RFQP, which states:

> Acceptance of Proposal Content.   Notwithstanding the identification of a proposed Developer for the purpose of further negotiations, such selection does *not* constitute acceptance of its proposal. (Ex. 1, RFQP at 9 (emphasis added).)

As discussed in the statement of facts above, the RFQP states over and over again that the City's selection of a proposal does not confer any legal rights on the developer.  The public entities reserved the right to disqualify any development team members they found to be unacceptable, (*id*. at 10) and included extensive provisions reserving their right to, *inter alia*, "reject any and all proposals," "re-solicit proposals for the project," "revise the scope of the project," "defer or abandon the project," and/or "negotiate with any developer."  (*Id*. at 12.)  The RFQP also disclaimed any liability to "any proposed developer prior to the successful completion of negotiations and execution of the CDA or prior to closing on the sale and purchase of the property."  (*Id*. at 9.)

Accordingly, by its express terms the RFQP does not grant property or contract rights to anyone.  A contract cannot arise under Michigan law "where one party to the proposed agreement manifests an intent not to be bound until execution of the contract." *Angelo DiPonio Equip. Co. v. State, Dep't of State Highways & Transp.*, 309 N.W.2d 566, 569 (Mich. App. 1981).  Here, the RFQP states that it is not a binding contract, and provides that the public entities will not incur any legal obligations unless and until a CDA is successfully negotiated and executed, or an agreement is reached and a sale is closed on the property.  Plaintiffs do not, and cannot, allege that either of these events occurred.

Second, even if the RFQP did not contain these unambiguous disclaimers, the RFQP and response thereto do not contain any material terms regarding the proposed project.  It is well-established under Michigan law that "[i]f the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract to make a contract' is not a contract at all." *Hansen v. Catsman*, 123 N.W.2d 265, 266 (Mich. 1963); *see also Socony-Vacuum Oil Co. v. Waldo*, 286 N.W. 630, 632 (Mich. 1939) ("To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations.")

The RFQP and the RFQP Response do not contain any material terms on which the City would agree to sell the property or on which the developer would agree to develop the property.  To the contrary, they expressly leave these items open to future negotiations.  A cursory review of the RFQP Response indicates that it is nothing more than a preliminary conceptual proposal.  It doesn't contain any specific proposals regarding key items, such as the price at which the

11

property would be sold, the agreed-upon development plan, the use of the property, or any other material terms that would need to be negotiated.

For all of these reasons, Plaintiffs lack standing. By their terms, the RFQP and RFQP Response do not confer contract or property rights on any developer as a matter of law. Because the alleged rights that Plaintiffs seek to vindicate in this action cannot exist under these documents as a matter of law, Plaintiffs cannot establish either Article III standing or an injury to their "business or property" as required to establish standing under RICO. *See Lujan*, 504 U.S. at 560; *Holmes*, 503 U.S. at 279.

> **B.**    **Plaintiffs Cannot Have Any Legally Protected Rights under the RFQP or RFQP Response because Plaintiffs Are Not Parties to These Documents.**

Even if the Court could overlook the express language in the RFQP and RFQP Response, Plaintiffs cannot avoid the fact that they were not parties to the RFQP Response. Plaintiffs' allegation that "Plaintiffs were selected as the 'selected developer' ... in response to Plaintiffs' submission and bid for the RFQP" (Am. Compl., PageID.290, ¶ 181), is directly contradicted by the RFQP Response and by Plaintiffs' own substantive pleadings.

The RFQP required any responsive proposal to "provide the full name and address" of the developer firm, and identify the "authorized agent" with authority to bind the developer. (Ex. 1, RFQP at 7; *see also* Am. Compl., PageID.263, ¶ 65.) Nowhere does the RFQP Response ever identify the developer firm as the named Plaintiffs. Instead, it identifies "Capital Gateway Project, LLC" as the developer firm, providing the LLC's registered address and identifying Christopher Jerome as its authorized agent.[6] (Ex. 1, RFQP at 9.) Indeed, Plaintiffs affirmatively allege that the RFQP response identifies Christopher Jerome as the authorized agent. (Am.

---

[6] This is consistent with Capital Gateway Project, LLC's corporate filings, which identify Christopher Jerome as its registered agent. (Ex. 3, Public Corporate Filing Information.)

Compl., PageID.263, ¶ 65.)  Accordingly, to the extent there ever was a "selected developer" under the RFQP Response, it was the non-party Capital Gateway Project, LLC,[7] with Christopher Jerome acting as its authorized agent.

Plaintiffs cannot establish standing by contradicting the unambiguous language in the RFQP Response and their own affirmative allegations.  *Mulbarger*, 10 F. App'x at 335. Plaintiffs also cannot establish standing based on any alleged ownership stake in Capital Gateway Project, LLC, because such rights are merely derivative and can only be asserted through the corporation.  *See Warren v. Manufacturers Nat. Bank of Detroit*, 759 F.2d 542, 544 (6th Cir. 1985) (affirming dismissal of RICO claims brought by shareholder alleging injury sustained by corporation); *Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993) (same); *see also Salem Springs, LLC v. Salem Twp.*, 880 N.W.2d 793, 800-801 (Mich. Ct. App. 2015) (finding that suit premised on corporation's standing must be brought in corporation's name rather than in the name of the corporation's owner or manager); *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 509-10 (5th Cir. 2012) ("We agree with the district court that this claim was properly dismissed for lack of standing. Baisden was not a party to the contract and thus cannot assert a claim for tortious interference.")

Likewise, Christopher Jerome cannot assert standing based on his allegation that he was the "authorized agent" of the developer, Capital Gateway Project, LLC.  (RFQP Resp. at 9; Am.

---

[7] Although Plaintiffs attempt to plead around the fact that Capital Gateway Project, LLC was the actual "developer" for the Project, even they cannot avoid this fact in their own pleadings.  For example, Plaintiffs allege that the dispute between Ferguson and the Jeromes was over their respective control of and ownership in Capital Gateway Project, LLC. (*See* Am. Compl., PageID.265, 269, ¶¶ 77-78, 91-92.)  Plaintiffs specifically allege that Ferguson presented them with a draft operating agreement for Capital Gateway Project, LLC that "contained new terms that essentially gave Ferguson control of the Project." (*Id.*, PageID.265, ¶ 78.)  Control of the Project could not have hinged on the terms of Capital Gateway Project, LLC's operating agreement, of course, unless it was the developer.

Compl., PageID.263, ¶ 65.)  The general rule under Michigan law is that "[u]nless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract."  *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 315 (6th Cir. 1998) (quoting *Riddle v. Lacey & Jones,* 351 N.W.2d 916, 919 (Mich. Ct. App. 1984) (quoting 2 Restatement Agency, 2d, § 320)); *see also Armstrong v. Andrews,* 67 N.W. 567, 568 (Mich. 1896) ("where it clearly appears that the contract is made for and on behalf of a principal, the agent will not be bound").  Christopher Jerome was not a party to the RFQP Response, and therefore has no standing to assert any rights thereunder as a matter of law.

Plaintiffs' claims are entirely premised on a deprivation of the "rights" they allegedly obtained through the RFQP Response, but they are not even parties to that document. Accordingly, even if the RFQP and RFQP Response created an enforceable interest (and they did not), Plaintiffs could not establish Article III standing or an injury to their "business or property" as required to establish standing under RICO.  *See Lujan*, 504 U.S. at 560; *Holmes*, 503 U.S. at 279.

### C.     Plaintiffs Lack Standing because Their Alleged Injury Cannot Be Redressed by a Favorable Decision.

Plaintiffs also lack standing for the reason that it is entirely speculative that their alleged injury could be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560.  Even if this Court could recognize Plaintiffs as parties to the RFQP Response who obtained legal rights thereunder, Plaintiffs' theory is that they were deprived of their right to "enter into a planning and negotiation process with the LEDC and City that should ultimately result in a Comprehensive Development Agreement."  (Am. Compl. ¶ 51, PageID.260 (quoting RFQP at 1).)

This Court cannot possibly find any coherent and non-speculative basis for awarding Plaintiffs damages to compensate them for the loss of their right to "enter into a planning and

negotiation process." This would require layer upon layer of unbridled speculation. The factfinder would first have to determine what the "planning process" was, and what type of project would have resulted from that process. Then, it would need to speculate as to what terms and conditions would have emerged from the "negotiation process" with the LEDC and the City. Finally, it would need to speculate as to the success of the hypothetical project – including, *inter alia*, whether Plaintiffs would have satisfactorily performed, what expenses they would have incurred, and what profits they would have realized. The problem with Plaintiffs' theory is that the RFQP Response merely reflects a broad vision for a project that had not gone through any planning processes whatsoever, and did not even contain any proposed deal terms.[8] Ascertaining any damages under the RFQP Response would require layer upon layer of speculation. Because any damages to compensate Plaintiffs for their alleged loss of the ability to "enter a planning and negotiation process" would be entirely speculative, Plaintiffs cannot establish standing. *Lujan*, 504 U.S. at 560.

## II.  Plaintiffs Fail to State a RICO Claim as a Matter of Law

Plaintiffs' RICO claims are asserted under Count I against three defendants: Ferguson, Stralkowski, and Ferguson Development (together, the "RICO Defendants"), and in Count II against ten defendants: Ferguson, Stralkowski, Ferguson Development, Mayor Virgil Bernero, LEAP, Robert Trezise, Chuck Clark, Clark Construction, Red Cedar Investor, LLC, and Ferguson/Continental Lansing, LLC (together the "Conspiracy Defendants"). Plaintiffs' Amended Complaint is entirely deficient. Plaintiffs fail to sufficiently allege any primary violation of 18 U.S.C. § 1962(c) by the RICO Defendants, and their Conspiracy claim under 18

---

[8] This uncertainty is compounded further by the multiple disclaimers and reservations of rights in the RFQP. (Ex. 1, RFQP at 9-10, 12.) Plaintiffs cannot claim a "right" to negotiate, or that such a "right" has any value whatsoever, when the other negotiating party is free to negotiate with other developers, propose any terms that they want, or walk away at any time, for any reason.

U.S.C. § 1962(d) therefore also necessarily fails.  And even if Plaintiffs could maintain their § 1962(c) claim – which they cannot – their conspiracy claim would still fail for the independent reason that Plaintiffs have failed to sufficiently allege that the ten Conspiracy Defendants agreed to and engaged in a criminal racketeering conspiracy.

### A.   Plaintiffs Fail to Sufficiently Allege that the RICO Defendants Violated 18 U.S.C. § 1962(c).

Count I of the Amended Complaint alleges that the RICO Defendants violated 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c).  To state a claim for a violation of this section with respect to each RICO Defendant, Plaintiffs "must plead the following elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity."  *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 483 (6th Cir. 2013).  Failure to allege even one of these required elements is fatal to Plaintiffs' RICO claims.  *See Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) ("A plaintiff must allege each element to properly state a claim.").  Plaintiffs have failed to state a claim that any of the RICO Defendants violated 18 U.S.C. § 1962(c).

### 1.   *Plaintiffs Cannot Maintain that Ferguson Development, LLC is both a "Person" and an "Enterprise."*

To establish RICO liability, a plaintiff must plead that a "*person*" conducted the affairs of an "*enterprise*" through a pattern of racketeering activity.  *See* 18 U.S.C. § 1962(c); *In re ClassicStar*, 727 F.3d 473 at 490.  "The enterprise itself is not liable for RICO violations; rather, the 'persons' who conduct the affairs of the enterprise through a pattern of racketeering activity are liable."  *In re ClassicStar*, 727 F.3d at 490.  Though entities may be RICO persons, *see* 18

U.S.C. § 1961(3), the plaintiff must plead that the RICO person and enterprise are distinct

entities. *In re ClassicStar*, 727 F.3d at 490 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533

U.S. 158, 161 (2001)). In other words,

> Under the "non-identity" or "distinctness" requirement, a
> corporation may not be liable under section 1962(c) for
> participating in the affairs of an enterprise that consists only of its
> own subdivisions, agents, or members. An organization *cannot*
> join with its own members to undertake regular corporate activity
> and thereby become an enterprise distinct from itself.

*Begala v. PNC Bank, Ohio Nat. Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000) (emphasis added).

Here, Plaintiffs allege that Ferguson, Stralkowski, and Ferguson Development are the

only three members of the "Ferguson Enterprise." (*See* Am. Compl., PageID.254, ¶ 24.) But

Plaintiffs admit in their Amended Complaint that Ferguson and Stralkowski are members and

agents of Ferguson Development. (*Id.*, PageID.254-255, 284-285, ¶¶ 25, 26, 155-157.)

Although Plaintiffs superficially attempt to separate Ferguson from Ferguson Development, in

substance they allege that Ferguson Development is the ***enterprise*** through which its members,

Ferguson and Stralkowski, committed their alleged racketeering activities. Ferguson

Development is not alleged to be a distinct ***person*** participating in the enterprise; indeed,

Plaintiffs describe Ferguson Development as "Ferguson's instrument of corruption and improper

political influence for personal financial gain for over two decades." (*Id.* PageID.255, ¶ 25.)

Most importantly, Plaintiffs specifically allege that Ferguson and Stralkowski committed all of

the alleged RICO predicate acts "operating the enterprise through Ferguson Development." (*Id.*,

PageID.272-274, ¶ 102.)

Because Plaintiffs' only allegations against Ferguson Development involve it acting

through its own members, under *In re ClassicStar*, 727 F.3d 473, the Amended Complaint fails

on its face to state a RICO claim against Ferguson Development, LLC. *See also Begala*, 214

F.3d 776; *Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481, 1489 (6th Cir. 1989) (finding plaintiffs could not plead a corporation was liable as both a person and an enterprise acting in association with its employees, since the complaint "contemplated only *one* entity, the corporation, acting in the only manner it is possible for a corporation to act, through its employees") (emphasis in original).

2.      *Plaintiffs Fail to Allege a "Pattern" of "Racketeering Activity."*

The heart of any civil RICO claim brought under 18 U.S.C. § 1962(c) is sufficient, well-pled factual allegations showing a "pattern of racketeering activity." This is because RICO was not enacted to redress individual or isolated crimes; rather, "Congress was concerned in RICO with long-term criminal conduct." *H.J., Inc. v. Nw. Bell Tele. Co.*, 492 U.S. 229, 242 (1989). Indeed, it is the "pattern" of ongoing criminal conduct – and not the individual alleged predicate crimes – that RICO is intended to address. For this reason, the Sixth Circuit has, time and time again, affirmed dismissal of civil RICO claims where the plaintiff failed to sufficiently allege a "pattern of racketeering" in violation of the statute. *See, e.g., Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785 (6th Cir. 2015); *Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006); *Vemco, Inc. v. Camardella*, 23 F.3d 129, (6th Cir. 1994).

For purposes of the statute, a "pattern of racketeering" consists of at least two predicate acts—*i.e.*, certain offenses enumerated in 18 U.S.C. § 1961(1)—that occur within a ten-year period. *See Moon*, 465 F.3d at 723. The predicate acts must be related and amount to or pose a threat of continued criminal activity. *See H.J.*, 492 U.S. 237. This requirement is based on RICO's statutory text, as "the term pattern itself requires the showing of a relationship between the predicates and of the threat of continuing activity. It is this factor of *continuity plus relationship* which combines to produce a pattern." *Moon*, 465 F.3d at 724 (internal citations omitted, emphasis original). Courts consider a number of factors in assessing relatedness and

continuity, including (1) the number and variety of predicate acts, (2) the length of time over which they are committed, (3) the number of victims, (4) the presence of separate schemes, and (5) the occurrence of distinct injuries.  *Grubbs*, 807 F.3d at 804.

Thus, it is critical to sufficiently plead and prove continuity in order to show a "pattern" of racketeering under 18 U.S.C § 1962(c).  "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  *H.J., Inc.*, 492 U.S. at 241.  "Continuity may be established at the pleading stage by alleging facts of either closed- or open-ended racketeering activity."  *Moon*, 465 F.3d at 724.  Plaintiffs have failed to allege facts sufficient to state a claim under either theory.

a.     <u>Plaintiffs Have Failed to Plead Closed-Ended Continuity.</u>

Plaintiffs' Amended Complaint falls woefully short in pleading any of the requisite factors necessary to establish closed-ended continuity.

To establish a closed period of continuity, a plaintiff must plead "a series of related predicates extending over a substantial period of time."  *H.J., Inc.*, 492 U.S. at 242.  Though there is no hard and fast rule as to what constitutes a "substantial period of time," racketeering activities lasting "a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."  *Id.; see also Vemco,* 23 F.3d at 134 (predicate acts over 17 months insufficient); *Vild v. Visconsi*, 956 F.2d 560, 569 (6th Cir. 1992) (predicate acts over 6-7 months insufficient).

Although Plaintiffs only allude vaguely to the predicate acts which allegedly constitute the pattern of racketeering activity purportedly committed by the RICO Defendants, at most Plaintiffs allege predicate acts lasting for no more than seven months.  Plaintiffs list the alleged "predicate acts" on which they base Count I in Exhibit 7 of the First Amended Complaint.  (Am.

19

Compl., PageID.322-329, Ex. 7 at 2-9.) There, Plaintiffs list sixteen statements and/or events that they characterize as predicate acts, all of which allegedly occurred between June 18, 2012 and January 15, 2013.  (*Id.*)  Accordingly, at most Plaintiffs allege predicate acts over the course of seven months.

Such a brief cluster of alleged predicate acts is insufficient to establish closed-ended continuity as a matter of law.  Courts consistently dismiss claims based on alleged RICO enterprises lasting less than two years. *See Am. Eagle Credit Corp. v. Gaskins*, 920 F.2d 352, 354 (6th Cir. 1990) (predicate acts occurring over 18 months insufficient); *Vemco*, 23 F.3d at 134 (predicate acts occurring over 17 months insufficient); *Vild*, 956 F.2d at 569 (predicate acts occurring over 6-7 months insufficient); *Griffin v. NBD Bank*, 43 F. Supp. 2d 780, 788 (W.D. Mich. 1999) (predicate acts occurring over 11 months insufficient).

In line with RICO's concern with "long-term criminal conduct," *H.J.,* 492 U.S. at 242, Courts also typically require that a "pattern of racketeering" involve multiple different victims. *See Vemco*, 23 F.3d at 135 (finding no pattern of criminal conduct when the complaint alleged only one victim); *Grubbs*, 807 F.3d at 805 (holding same).  In *Vemco* – a case remarkably similar to this one – the Sixth Circuit held: "[w]e do not find that a defendant who engages in several different forms of fraud for a single purpose, to defraud a single victim *through activities surrounding one construction project*, without more, has engaged in more than one criminal scheme." *Vemco*, 23 F.3d at 135 (emphasis added).  The Sixth Circuit reached a similar conclusion in *Moon,* finding that all of the predicate acts were directed to a single victim over the course of two and a half years, and the claims thus failed to "bear the markings of the 'long-term criminal conduct' about which 'Congress was concerned' when it enacted RICO.  465 F.3d at 725-26; *see also Grubbs*, 807 F.3d at 805 (finding no pattern of racketeering where the

complaint alleged only one victim).

Likewise, here, Plaintiffs are the only alleged victims, they allege only one racketeering scheme (a plan to "steal" the alleged proposal to develop the Project), and allege only one injury—their inability to participate in the Project.  (*See* Am. Compl., PageID.284-286, ¶¶ 153-159.)[9]  Plaintiffs' allegations are manifestly insufficient to demonstrate the type of "pattern of racketeering" prohibited by RICO as a matter of law.

b.   <u>Plaintiffs Have Failed to Plead Open-Ended Continuity.</u>

Parties can plead open-ended continuity by presenting facts that show "a distinct threat of long-term racketeering activity," or by showing "that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."  *H.J., Inc.*, 492 U.S. at 242.  Open-ended continuity is not pled when the complaint alleges an "inherently terminable scheme." *Heinrich*,\668 F.3d at 410-11 (citing *Vemco*, 23 F.3d at 134).  The same factors discussed in the preceding section regarding closed-ended continuity are relevant here, and consideration of each again supports dismissal for failure to plead continuity.

Plaintiffs pled a single scheme, with a single victim, and a single injury; such allegations obviously fail to establish open-ended continuity.  *See Grubbs*, 807 F.3d at 805 (finding

---

[9] Plaintiffs make conclusory allegations that "racketeering activities" continued when Ferguson allegedly interfered with Plaintiffs' alleged attempts to enter into a different partnership with the unidentified "Developer A," but fail to allege any predicate acts whatsoever relating to these events.  (*See* Am. Compl., PageID.322-329, Ex. 7 at 2-9.) As discussed in greater detail in Sections II.A.5 and IV.B below, the allegations in the Complaint regarding the alleged "second scheme" are utterly deficient - Plaintiffs allegations here fail to satisfy Fed. R. Civ. P. 8, let alone make any attempt to describe with particularity any predicate crimes that allegedly occurred during this "scheme."  Plaintiffs have not identified Developer A, have not alleged that Developer A paid any money to Ferguson Enterprise or its members, and – most importantly – because Plaintiffs fail to describe any allege RICO predicate acts relating to the alleged "second scheme," it cannot be any basis for demonstrating any RICO violation or "pattern of racketeering" as a matter of law.  *See H.J.*, 492 U.S. at 241-42 (stating that RICO requires proof of multiple related and continuous predicate acts.)

complaint was insufficient to establish open-ended continuity where plaintiffs alleged no facts indicating threat of future criminal conduct and only a single victim of a single scheme).  The predominant scheme alleged by Plaintiffs involves Ferguson's alleged attempt to take control of the bid for the Project in order to develop it himself: a single scheme with a finite purpose that ended once achieved.  And Plaintiffs admit that this alleged scheme is complete and, therefore, "inherently terminable."  (*See* Am. Compl.. PageID.278, ¶ 118 (stating that, in December 2013, Lansing awarded the Red Cedar Renaissance Project to Ferguson/Continental Lansing, LLC).) Because the Amended Complaint contains no other allegations concerning the RICO Defendants allegedly engaging in mail or wire fraud or extortion upon the awarding of the Project, the alleged "scheme" is clearly not open-ended.

Plaintiffs nonetheless attempt to plead open-ended continuity by including allegations related to Ferguson's other business dealings, completely unrelated to the Plaintiffs or the business deal at issue in the Amended Complaint.  Specifically, Plaintiffs allege the following: Ferguson interfered with Plaintiffs' business relationship with Developer A (Am. Compl., PageID.279-281, ¶¶ 121-133), and Ferguson is currently seeking economic incentives in connection with the Project, which the RFQP indicated might be available.  (*Id.*, PageID.281, ¶ 136.)  These allegations do not establish continuity or otherwise support Plaintiffs' Amended Complaint and are entirely irrelevant to the RICO claims (indeed Plaintiffs do not even include any allegations with respect to Developer A and Ferguson in Exhibit 7, which outlines the supposed predicate acts).

First, the allegations regarding Ferguson and Developer A are entirely conclusory and abbreviated: Plaintiffs allege that Ferguson and Developer A met twice over the course of three weeks roughly one and a half years ago (and years after the RFQP and RFQP Response at issue

in the Amended Complaint) and that, at the meetings, Ferguson attempted to get information

from Developer A and to extort Developer A.  (*See id.*, PageID.279-280 ¶¶ 125-129.)  Plaintiffs

do not allege that Ferguson received any money or property from Developer A or Plaintiffs as a

result of these conversations.  Nor do Plaintiffs allege that Developer A and Ferguson had any

further contact, or that Ferguson continues to contact other potential developers with whom

Plaintiffs seek to work.  In short, these allegations fail to allege any harm, much less future harm,

as is required to establish open-ended continuity.  *See Moon*, 465 F.3d at 727-28 (court found

allegations that the defendant had used a doctor to fraudulently deny the plaintiff's worker

compensation benefits and that the defendant had used the doctor for the same purpose in the

past were insufficient to show continuing threat of racketeering activity).

Second, Plaintiffs fail to present any allegations whatsoever to show any wrongdoing –

let alone criminal conduct – relating to Ferguson seeking economic incentives in conjunction

with the Project.  Seeking economic incentives for a real estate development is hardly illegal –

indeed it is contemplated by the RFQP – nor does it constitute a predicate act.  Plaintiffs have

failed to allege open-ended continuity, and have failed to plead a pattern of racketeering activity.

3.      *Plaintiffs Have Not Sufficiently Pleaded Mail or Wire Fraud.*

A "pattern of racketeering activity" consists of at least two predicate acts—i.e., certain

offenses enumerated in 18 U.S.C. § 1961(1)—that occur within a ten-year period.  *See Moon*,

465 F.3d at 723.  The inquiry is defendant specific: "in order to sufficiently allege that a

defendant violated § 1962(c), a plaintiff must allege that *that particular defendant* committed a

pattern of predicate acts."  *See Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 605 (E.D. Mich.

2015) (emphasis in original).

Plaintiffs primarily assert predicate acts of mail or wire fraud, but have failed to plead

any such acts with the required specificity.  "When pleading predicate acts of mail or wire fraud,

23

in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Heinrich*, 668 F.3d at 404 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir.2008)); *see also Gotham Print, Inc. v. Am. Speedy Printing Ctrs.*, *Inc.*, 863 F. Supp. 447, 458 (E.D. Mich. 1994) (finding that civil RICO plaintiff is required to "assert factual allegations stating with particularity the time, place, subject matter, and precise individuals who, through use of the mails or telephone, made the purportedly fraudulent statements").

Plaintiffs do not even try to meet this heightened standard in any meaningful way, instead relying on generalizations and vague accusations.  Indeed, Plaintiffs fail to identify ***any*** specific statements made by the RICO Defendants that were fraudulent, nor do Plaintiffs provide the dates of such statements.  *See Bender v. Southland Corp.*, 749 F.2d 1205, 1215 (6th Cir. 1984) ("To satisfy FRCP 9(b), a plaintiff must at minimum allege ***the time, place and contents*** of the misrepresentation(s) upon which he relied." (Emphasis added)).

Despite the length of the Amended Complaint, Plaintiffs speak primarily in generalities, alleging, for example, that "Ferguson feigned cooperation with Jerome on the Project, yet over the next year, Ferguson and Kass hammered out details of their own operating agreement for the Ferguson/Continental Lansing, LLC, which was finally executed on June 28, 2013."  (*See* Am. Compl., PageID.284, ¶ 150.)  Such broad generalizations are insufficient to satisfy Rule 9(b). *See George v. LochenHeath Props.*, No. 1:07-cv-426, 2008 WL 437797, at *5 (W.D. Mich. Sept. 23, 2008) (finding that defendant's nondisclosure of property taxes and representations that it would resell the lots purchased were "general allegations" and thus insufficient to state a claim for mail or wire fraud); *see also Paycom Billings Servs., Inc. v. Payment Res. Int'l*, 212 F. Supp.

2d 732, 739 (W.D. Mich. 2002) ("Despite the comprehensive nature of Plaintiff's Complaint—
64 pages and 217 numbered paragraphs—it is not insignificant that Plaintiff has failed to identify
a single person at AmTrade who allegedly communicated anything to Paycom, what specifically
was communicated, when and where it was communicated, or how it was misleading.").

Further, Plaintiffs fail to specify how any statements made by the RICO Defendants to
Plaintiffs were allegedly fraudulent.  Plaintiffs generally allege that Ferguson was also
negotiating with Kass in connection with the Project, but the Amended Complaint does not
explain how this claimed conduct was in any way fraudulent.  Indeed, Plaintiffs concede that
they knew about these negotiations, because Ferguson and Kass had offered to include the
Jeromes in their joint venture.  (Am. Compl., PageID.276-277, ¶ 114.)  Therefore, based on the
Plaintiffs' own allegations, there clearly was no material omission.  Regardless, it is well
established that deceptive statements, none of which have been alleged here, regarding a party's
negotiating positions cannot constitute fraud as a matter of law.  *See United States v. Weimert*,
819 F.3d 351, 370 (7th Cir. 2016) ("Deception and misdirection about a party's values, priorities,
preferences, and reserve prices are common in negotiation. We must be wary of criminalizing
these tactics, at least without much clearer direction from Congress.").

In addition, Plaintiffs have not identified any mailings, emails, or telephone calls between
Plaintiffs and the RICO Defendants in which the RICO Defendants made any fraudulent
misrepresentations.  "'[L]oose references to mails and telephone calls in furtherance of a
purported scheme to defraud will not do.  Instead, the plaintiff must, within reason, describe the
time, place and content of the mail and wire communications, and . . . identify the parties to the
communications.'"  *K.B.A. Const., LLC v. Home Acres Bldg. Supply Co.*, No. 1:05-cv-264, 2005
WL 2243098, at *2 (W.D. Mich. Sept. 14, 2005) (quoting *Jepsen, Inc. v. Makita Corp.*, 34 F.3d

1321, 1328 (7th Cir. 1994)).  In this case, the majority of the alleged communications between the Plaintiffs and the RICO Defendants occurred in face to face meetings.  (*See* Am. Compl., PageID.267-269, 274-275, 276, 279-280, ¶¶ 84, 87-88, 90-91, 104-106, 113, 125.)  Such face to face, oral communications cannot form the basis of a claim for mail or wire fraud.  *See Gotham Print*, 863 F. Supp. at 458 (dismissing RICO claim where "the specific allegations upon which Plaintiff purports to base his wire fraud and mail fraud claims involve allegations of fraud *in face to face* meetings, not in telephone conversations or letters or documents received in the mail") (emphasis in original).  Though Plaintiffs do allege that they exchanged emails, letters, and phone calls with the RICO Defendants, Plaintiffs fail to allege what—if any—statements in those communications were fraudulent.  (*See* Am. Compl., PageID.322-329, Ex. 7, 2-9.)

A common theme throughout the Amended Complaint plays out as follows: Plaintiffs describe Ferguson's negotiating positions, and then characterize them as "fraudulent."   Plaintiffs do not identify any specific statement that was allegedly fraudulent, and more importantly do not explain how any such statement was fraudulent.  *See Weimert*, 819 F.3d at 370 (clarifying that deception involving a party's negotiation position is not criminal fraud).  Plaintiffs have failed to plead their mail and/or wire fraud claims with the necessary specificity, and their RICO claims necessarily fail.

### 4.       *Plaintiffs Have Failed to Plead All Elements of Extortion.*

In order to state a claim for extortion, "plaintiffs must allege facts and circumstances that show (1) that the defendants ***obtained the plaintiffs' property*** (2) through the wrongful use of (3) threats or fear of physical or economic harm."  *Heinrich*, 668 F.3d at 407 (6th Cir. 2012) (emphasis added).  If the defendants did not obtain the plaintiffs' property, then the claim must be dismissed.  *Id.*  Here, Plaintiffs assert extortion on the grounds that the RICO Defendants deprived the Plaintiffs of the opportunity to develop the Project.  But as thoroughly discussed in

Section I, *supra*, Plaintiffs had no property rights under the RFQP and Response.  Furthermore,

Plaintiffs never owned the red cedar golf course property, so Defendants' acquisition of that

property could not possibly constitute the taking of Plaintiffs' property.  *See Cedroni Ass'n, Inc.*

*v. Tomblinson Harburn Assocs., Architects & Planners Inc.*, 821 N.W.2d 1, 3 (Mich. 2012)

(finding no property right or valid business expectancy to a government bid, even if the plaintiff

is the lowest bidder).  Plaintiffs have therefore clearly failed to plead extortion as a predicate act.

5.     *Plaintiffs Have Not Adequately Pleaded a RICO Violation Regarding the Sale of Land to Developer A*

a.     <u>Plaintiffs Fail to Plead Mail or Wire Fraud as Predicate Acts</u>

A plaintiff asserting mail or wire fraud as a RICO predicate act must plead those crimes

with the specificity required by Fed. R. Civ. P. 9(b).  *See supra* Section II.A.3.a.  Plaintiffs have

failed to plead any fraudulent statements relating to "Developer A," let alone plead them with

particularity.  In just three paragraphs of the Plaintiffs' lengthy Amended Complaint, Plaintiffs

make allegations regarding meetings between Developer A and Ferguson.  Plaintiffs concede

that these meetings had nothing whatsoever to do with the Project as they occurred, if at all,

years later, and such alleged meetings are not included in the claimed predicate acts that

supposedly form the basis of the RICO claim.

First, Plaintiffs allege that Developer A and Ferguson met on May 14, 2015, and that, at

that time, Ferguson supposedly requested information regarding Plaintiffs' proposed new project

with Developer A, informed Developer A that he had convinced MSU to assist in financing the

Project, and told Developer A that MSU and Ferguson had entered into a joint venture.  (*See* Am.

Compl., PageID.279-280, ¶¶ 125-127.)  Plaintiffs do not allege that these statements were false

or that these statements occurred through the mail or wires.  Second, Plaintiffs allege that the

RICO Defendants called Developer A asking for details of the project between Plaintiffs and

Developer A.  (*Id.*, PageID.280, ¶ 129.)  Again, Plaintiffs do not allege that this is a false statement (in fact, it is not even a "statement," let alone a false one).  Third, Plaintiffs allege Ferguson met with Developer A around June 5, 2015, and that, at the meeting, Ferguson demanded $147,000 or the proposed new project would be dead, and asked Developer A to assist with convincing Plaintiffs to drop a lawsuit against Ferguson.  (*Id.*, PageID.281, ¶ 132.)  Once again, Plaintiffs do not allege how these statements were fraudulent, much less with specificity, and Plaintiffs have not pleaded predicate acts of mail or wire fraud related to the dealings with Developer A.

b. <u>Plaintiffs Fail to State a Claim for Extortion</u>

As discussed, to state a claim for extortion, "plaintiffs must allege facts and circumstances that show (1) that the defendants ***obtained the plaintiffs' property*** (2) through the wrongful use of (3) threats or fear of physical or economic harm."  *Heinrich*, 668 F.3d at 407 (emphasis added).  Plaintiffs allege that, due to the RICO Defendants' extortion, Developer A "withdrew from the proposed joint project with the Jeromes."  (Am. Compl., PageID.281, ¶ 133.)  Nowhere do Plaintiffs even attempt to articulate how exactly the RICO Defendants "extorted" anyone at all.  But setting that aside, in any event Plaintiffs fail to make any allegation that the RICO Defendants obtained any property belonging to Plaintiffs (or anyone else, for that matter) through extortion.  Accordingly, this claim must fail.[10]

**B.      Plaintiffs Fail to State a Conspiracy Claim under 18 U.S.C. 1962(d).**

Count II of the Amended Complaint alleges that the ten Conspiracy Defendants violated 18 U.S.C. § 1962(d), which provides: "[i]t shall be unlawful for any person to conspire to violate

---

[10] Although Plaintiffs vaguely allege bribery (*see* Am. Compl., PageID.285, ¶ 159), the Amended Complaint does not contain any substantive allegations describing any act of bribery, and Plaintiffs do not identify any act of bribery as a predicate act.  (*See* Am. Compl., PageID.322-329, Ex. 7 at 2-9.)

any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).  The key elements of a RICO conspiracy claim are (1) a primary RICO violation (in this case, a violation of § 1962(c)), and (2) an illicit agreement by the conspirators to commit that primary violation. *See Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990) (concluding that conspiracy claim is not actionable in absence of primary violation); *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983) (finding that RICO conspiracy requires proof of "an illicit agreement to violate the substantive RICO provision"); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990) ("[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement"); *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989) (must plead agreement to commit predicate acts and knowledge that those acts were part of a pattern of racketeering activity in violation of section 1962(a)–(c)).  Plaintiffs acknowledge that they must sufficiently allege these elements.  (*See* Am. Compl., PageID.329, Ex. 7 at 9.)

Plaintiffs have failed to adequately allege either element here, and their conspiracy claim therefore fails as a matter for law.  First, as thoroughly detailed in the Section II.A, *supra*, Plaintiffs have failed to sufficiently allege a primary violation of 18 U.S.C. § 1962(c). Accordingly, Plaintiff's Count II for RICO Conspiracy necessarily also fails as a matter of law. *Craighead*, 899 F.2d at 495.

Second, Plaintiffs fail to sufficiently allege that any of the Conspiracy Defendants entered into "an illicit agreement to violate the substantive RICO provisions."  *Sinito*, 723 F.2d at 1260. An agreement can be shown where "the defendant ... objectively manifested an agreement to participate directly or indirectly in the affairs of an enterprise through the commission of two or more predicate crimes."  *Id*. at 1261.  Although the Amended Complaint alleges in a conclusory

fashion that the Conspiracy Defendants "intentionally agreed and conspired to violate 18 U.S.C. § 1962(c)," this is not enough.  A plaintiff cannot satisfy the illicit agreement requirement by relying on conclusory allegations. *See Betulius v. Hanna*, No. 4:96-CV-92, 1996 WL 900413, at *6 (W.D. Mich. Dec. 10, 1996) (dismissing RICO conspiracy claim because "[p]laintiffs' allegations do not contain sufficient facts evincing each defendant's agreement to participate in a collective venture toward a common goal.")  The conspiracy allegations against the ten Conspiracy Defendants are almost entirely conclusory.  (*See*, *e.g.*, Am. Compl., PageID.288, ¶ 169 ("[t]he [Conspiracy Defendants] agreed to Ferguson and/or Stralkowski making fraudulent representations to the Plaintiffs regarding Ferguson's intentions and Plaintiffs' status as the 'selected Developer' on the Project"), ¶ 170 ("[a]dditionally and alternatively, the [Conspiracy Defendants] also intentionally agreed and conspired to engage in bribery and extortion ...").)

This Court recognized the vague, conclusory, and generally incoherent nature of Plaintiffs' conspiracy claims against the ten Conspiracy Defendants in reviewing Plaintiffs' first deficient complaint, and required Plaintiffs to chart out specifically what they claim each of the Conspiracy Defendants allegedly did to violate RICO.  Plaintiffs attached this chart as Exhibit 7 of their Amended Complaint,[11] but it only serves to demonstrate how woefully inadequate the RICO Conspiracy claims are with respect to each of the Conspiracy Defendants.  The following section analyzes Plaintiffs' conspiracy claims by groups of Conspiracy Defendants, and demonstrates Plaintiffs' failure to state any conspiracy claims whatsoever.

*Ferguson, Stralkowski, Ferguson Development, Red Cedar Investor LLC, and Ferguson/Continental Lansing LLC*

---

[11] Plaintiffs initially failed to include Trezise in their Exhibit 7 with respect to Count II. Plaintiffs submitted a supplemental Count II chart for Trezise after his counsel pointed out this omission.  (*See* Dkt. No. 73-1, PageID.384-386.)

According to Plaintiffs, Ferguson, Stralkowski, and Ferguson Development are the only three defendants who allegedly committed primary RICO violations under § 1962(c). One would think that Plaintiffs would explain in detail how, when, why, and for what purpose these three defendants brought the other seven Conspiracy Defendants into their alleged scheme. One would think that Plaintiffs would explain the basic terms on which they agreed to commit criminal racketeering with the other seven Conspiracy Defendants, and why those defendants allegedly agreed to commit criminal racketeering for the apparent purpose of benefiting Ferguson. But Plaintiffs don't do any of this – they simply rely on conclusory allegations. For example, for Joel Ferguson, Plaintiffs allege in an entirely conclusory fashion that he "agreed with [other Conspiracy Defendants] to facilitate the operation of the Enterprise through a pattern of racketeering . . . ." (Am. Compl., PageID.330, Ex. 7 at 10.) Plaintiffs recite the same conclusory allegations for Stralkowski. (*Id*.) With regard to Ferguson Development, Plaintiffs allege that Ferguson has ownership and/or control of this entity, and then pair those allegations with conclusory assertions that "Ferguson Development is and has been Ferguson's instrument of corruption and improper political influence for personal financial gain for over two decades." (*Id*.)

If one hoped to find clarity as to how exactly the RICO Defendants conspired with the other Conspiracy Defendants to commit the alleged § 1962(c) violations, they will not find it anywhere in the Amended Complaint or in Exhibit 7.[12] Plaintiffs' Conspiracy allegations are

---

[12] Plaintiffs have also named Red Cedar Investor, LLC and Ferguson/Continental Lansing LLC as Conspiracy Defendants, alleging that they are entities that Ferguson allegedly has an ownership stake in. Why and how the Amended Complaint accuses these Defendants of violating RICO is a mystery. Plaintiffs merely allege that Red Cedar Investor LLC was "formed to represent Ferguson's interests in the stolen Project, and is a member of Ferguson/Continental LLC," (Am. Compl., PageID.335, Ex. 7 at 15), and allege that "Ferguson/Continental LLC identified in an operating agreement as the joint venture owner of 100% of the Project, presented on September 13, 2013 to the Jeromes at Mayor Bernero's office." (Am. Compl., PageID.277,

entirely conclusory, and fail to allege the existence of an illicit agreement as a matter of law.  *See Sinito*, 723 F.2d at 1260-61; *Hecht*, 897 F.2d at 25.

The Amended Complaint also pleads itself out of a RICO conspiracy claim against Ferguson/Continental Lansing LLC ("FCL"). The Amended Complaint acknowledges that FCL came into existence on June 28, 2013. (Am. Compl., PageID.277, ¶ 114(b)). Yet it alleges that the final predicate act of racketeering activity occurred on January 15, 2013--months before FCL existed. (*Id.*, PageID.329, Ex. 7 at 9). Accordingly, there was no conspiracy left to join by the time FCL was formed.  On its own allegations, Plaintiffs cannot reasonably contend that FCL agreed to further a RICO conspiracy. In addition, the fact that the Amended Complaint alleges that the individuals controlling FCL engaged in "racketeering activity" is insufficient to state a RICO conspiracy claim against FCL itself: the relevant law requires that Plaintiffs allege specific facts showing FCL, *as an entity*, agreed to further a RICO conspiracy. *See Kerrigan v. Visalus, Inc.*, 2016 WL 892804, at *10 n.13 (E.D. Mich. Mar. 9, 2016) ("The [corporate] Entity Defendants are alleged to be wholly-owned and/or controlled by certain of the individual Defendants, but Plaintiffs have not pleaded factual allegations to support a finding that these entities entered into any agreement to violate Section 1962(c).").

### *Charles Clark and Clark Construction*

Defendant Charles Clark is an individual Plaintiff alleges is a principal of defendant Clark Construction (together, "Clark").  The allegations identified by Plaintiffs in their Exhibit 7 against Clark do not involve any actions or statements by them at all, let alone acts, words or conduct indicating that they agreed to participate in criminal racketeering. (*See* Am. Compl.,

---

335, ¶ 114(b), Ex. 7 at 15.)  These vague and conclusory statements do not allege much of anything at all, let alone an illicit agreement by these entities to engage in a pattern of criminal racketeering in violation of 18 U.S.C. § 1962(c).

PageID.333-334, Ex. 7 at 14-15.)  Plaintiffs' allegations against Clark are that he worked with Ferguson from time to time (Am. Compl., PageID.262, ¶¶61-63), that he was mentioned or copied on correspondence exchanged between Ferguson and the Jeromes when they were attempting to negotiate the ownership/control of Capital Gateway Project, LLC (*id.*, PageID.269, ¶¶ 91, 94-95), that he participated in meetings regarding the Project where the Jeromes weren't present (*id.*, PageID.275, ¶ 106), that Bernero told Jerome that Ferguson and Clark sat in his office and asked the Mayor to cut the Jeromes out of the Project (*id.*, PageID.275, ¶ 107), and that he has participated in asking the Ingham County Board of Commissioners for public financing.  (*Id.*, PageID.282, 334-335, ¶ 138, Ex. 7 at 14-15.)

All of these allegations describe relatively innocuous or meaningless facts, paired with conclusory allegations that they indicate Clark's participation in a criminal conspiracy.  The fact that Clark was copied on a letter, or attended a meeting where the Plaintiffs were not present, is meaningless and does not describe criminal activity.  Similarly, Plaintiffs don't explain how or why it was wrongful or fraudulent for Clark to allegedly ask the mayor to "cut Plaintiffs out" of the Project.  Finally, if asking a governmental unit to provide public financing for a real estate project is now considered a criminal act, then virtually every real estate developer in the state of Michigan should expect to be indicted on RICO charges in the near future.  These allegations simply do not come close to alleging facts indicating a criminal agreement to participate in predicate acts.  *See Sinito*, 723 F.2d 1250, 1260-61; *Hecht*, 897 F.2d at 25.

*Mayor Bernero, Robert Trezise, and LEAP – Red Cedar Project*

Mayor Bernero is the current mayor of the City of Lansing, and Robert Trezise is the Chief Executive Officer of LEAP.  (Am. Compl., PageID.252, ¶¶ 5, 7.)  Plaintiffs' Conspiracy allegations against Bernero, Trezise, and LEAP rely on virtually identical theories and facts.  The

chart provided by Plaintiffs alleges that Plaintiffs had an ongoing dispute with Ferguson

regarding their respective control of and ownership stakes in Capital Gateway Project, LLC, over

the course of approximately one year (December 2012 to December 2013).  (*See* Am. Compl.,

PageID.331-332, Ex. 7 at 11-12; Supplemental Chart for Trezise, Dkt. No. 73-1, **PageID.384-**

**386.**)  As with Clark, Plaintiffs allege that the fact that the Mayor and/or Trezise were copied on

letters during these negotiations somehow evidences the Mayor's and/or Trezise's "knowledge

of and agreement to facilitate the operation of the Enterprise through a pattern of racketeering."

(*Id.*)  Plaintiffs then go on to allege that Bernero and/or Trezise met with the Jeromes and/or

Ferguson to try and facilitate a resolution of their ongoing equity dispute over ownership/control

of Capital Gateway Project, LLC.

It is utterly absurd for Plaintiffs to characterize any of this conduct as indicative of these

defendants agreeing to participate in criminal racketeering.  Again, the fact that the Mayor or

Trezise were copied on correspondence sent to Plaintiffs is meaningless, and does not suggest

that the Mayor or Trezise were somehow complicit in an undefined conspiracy with Ferguson to

allegedly defraud Plaintiffs.  Similarly, the fact that the Mayor and/or Trezise unsuccessfully

attempted on several occasions to mediate a resolution between the Jeromes and Ferguson is not,

nor can it be indicative of, any criminal racketeering conduct.  The Mayor and Trezise represent

the public entities that issued the RFQP (*i.e.*, the City of Lansing and the LEDC), and the entire

purpose of the RFQP was to find a well-qualified and viable developer that the City could work

with constructively, in a collaborative process that might ultimately result in a mutually

acceptable development agreement.  (*See* Ex. 1, RFQP at 6 (describing an "open, public, and

transparent planning process"), 7 (requesting information, qualifications, and references from the

developer) and 10 (reserving the City's right to "disqualify any development team member(s)

found to be unacceptable during development of the project").)  Under these circumstances, where the process envisioned by the RFQP was stalled for months because the developer's owners are embroiled in a dispute regarding who controlled and owned the potential developer, it is only to be expected that Bernero and Trezise would seek to advance the interests of the City and the LEDC by attempting to mediate a resolution dissolving the logjam.

Finally, Plaintiffs' allegations that Bernero and/or Trezise "threatened" and then ultimately decided to discontinue working with Capital Gateway Project, LLC and/or Plaintiffs, is not an allegation that can be characterized as evidence of their complicity in any alleged criminal racketeering by Ferguson.[13]  The RFQP explicitly and repeatedly stated that the identification of a proposed developer (here, the Capital Gateway Project, LLC) "does not constitute acceptance of its proposal" (RFQP at 9), and the City and the LEDC had the right to (1) stop working with any developer at any time, (2) reject any and all proposals, (3) re-solicit proposals for the Project, (4) revise the scope of the Project, (5) defer or abandon the Project, and/or (6) negotiate with any developer.  (RFQP at 12.)  Plaintiffs had no property interest in the process described in the RFQP, *see Taylor*, 313 F. App'x at 832, and even if they did, they cannot accuse the City and/or LEAP of being parties to "an illicit agreement to violate the

---

[13] In an effort to make the "award" to Ferguson sound nefarious, Plaintiffs repeatedly characterize it as being "on a no-bid basis," paired with a conclusory allegation that in doing so the City violated Chapter 206 of Lansing's Ordinance.  (Am. Compl., PageID.278, ¶ 118.)  Plaintiffs make no attempt whatsoever to explain how or why the City's decision to work with Ferguson but not with Plaintiffs violated the Ordinance.  Lansing Ordinance 206.02 provides for a bidding process applicable where the City purchases "supplies, service and construction items" exceeding $15,000.  By its terms Section 206.02 cannot apply here, because the RFQP is not an offer by the City to purchase any "supplies, service[s], [or] construction items."  Rather, the RFQP solicits proposals by developers interested in engaging in "a planning and negotiation process" with the City, with the ultimate goal being that the City will eventually reach a development agreement with and *sell* real property the City *already owns* to the developer. (RFQP at 1.)  Lansing Ordinance 206.02 governs procurement – *i.e.*, the city purchasing (rather than selling) items – and therefore it can't apply here.

substantive RICO provisions" based on those entities' exercise of rights expressly reserved by the City/LEDC under the unambiguous terms of the RFQP.[14]  *See Sinito*, 723 F.2d at 1260.

*LEAP and Trezise – "Developer A"*

Finally, Plaintiffs make nebulous claims that Trezise and/or other LEAP officers acted in a manner that harmed Plaintiffs in relation to Plaintiffs' efforts to partner with "Developer A" on an entirely different real estate project.  Among other things, Plaintiffs claim that LEAP's COO told a Developer A representative that "it was probably best if the Jeromes were not involved" with any potential development project, because it could undermine the project's ability to obtain approvals from the City, (Am. Compl., PageID.279, 333, ¶ 122, Ex. 7 at 13), and that Trezise suggested that Developer A meet with Mr. Ferguson regarding this project.  (Am. Compl., PageID.279, ¶ 124; Supplement, Dkt. No. 73-1, PageID.384-386.)

Here, Plaintiffs again deviate far afield from what the RICO statute actually prohibits. Nowhere do Plaintiffs describe any alleged predicate crimes committed by the RICO Defendants relating to Developer A, and nowhere do Plaintiffs explain how or why the statements by LEAP's COO and/or CEO show the existence of an "illicit agreement" with Ferguson to commit bribery, extortion, or mail/wire fraud.  Indeed, as discussed above, Plaintiffs do not even allege any acts of bribery, extortion, or mail/wire fraud relating to Developer A.  RICO does not criminalize making negative or disparaging statements about another person.  Accepting everything that Plaintiffs allege as true, they have failed to allege that LEAP and/or Trezise made

---

[14] Plaintiffs also vaguely allege that Trezise is working with Bernero, Clark and Kass "to convince the Ingham County Board of Commissioners to bond an additional $35 million in public tax dollars to fund the Project."  (Supplement, PageID.384-386, Dkt. No. 73-1 at 3; Am. Compl., PageID.282, ¶ 138.)  Taking this allegation at face value, Plaintiffs make no attempt to explain how or why it is illegal or even inappropriate for the CEO of an economic development nonprofit to be supportive of a developer's request for bonding towards an economic development project.

an illicit agreement to violate 18 U.S.C. § 1962(c) by committing a pattern of criminal

racketeering relating to Developer A, in violation of RICO.  *See Sinito*, 723 F.2d 1250, 1260-61;

*Hecht*, 897 F.2d at 25; *Betulius*, 1996 WL 900413, at *6.

### III.   Count III Fails to Sufficiently Allege a Property Deprivation in Violation of Due Process.

Count III of the Amended Complaint fails for reasons similar to those discussed in

Section I, *supra*.  In Count III, Plaintiffs allege that they had a constitutionally protected property

interest in being chosen as a "selected developer," and allege that Chris Jerome "invested time

and money to proceed toward development" after being identified as the "authorized agent" of

the developer.  (Am. Compl., PageID.291, ¶¶ 186-187.)  Plaintiffs allege that Defendants

Bernero, Trezise, and LEAP therefore unconstitutionally deprived them of a property right when

they "conspired to rescind the Plaintiffs' selected Developer status."  (*Id.* ¶ 188.)

First, these claims all fail for the reasons discussed in Section I.B above.  Plaintiffs were

not the "selected developer," and Christopher Jerome did not acquire any substantive property

rights from the mere fact that he was an agent of Capitol Gateway Project, LLC. (*See* Section

I.B, *supra*.)

Second, the idea that the RFQP could confer any constitutionally protected property

interest on Plaintiffs is absurd on its face, and legally frivolous.  "[A] party cannot possess a

property interest in the receipt of a benefit when the state's decision to award or withhold the

benefit is wholly discretionary."  *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 856 (6th

Cir. 2012) (quoting *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002)).  As

discussed, the RFQP explicitly stated that selection conferred no rights on the "selected

developer;" and repeatedly advised any developer submitting a proposal that the Public Entities

retained the right and full discretion to, among other things, negotiate with other developers,

refuse to work with any developer, revise the Project, or abandon it completely.  (RFQP at 1, 9, 12.)  The RFQP unambiguously reserved the public entities' full discretion as to whether to move forward with any proposed Project with any developer, and therefore Plaintiffs cannot assert that they – or anyone else – obtained a constitutionally protected property interest thereunder as a matter of law.

The absolute deficiency of Plaintiffs' constitutional claim is further demonstrated by *Taylor Acquisitions LLC v. City of Taylor*, 313 F. App'x. 826 (6th Cir. 2009).  Like this case, *Taylor* involved claims by a disgruntled developer after its real estate project with a city fell apart.  Unlike Plaintiffs, the developer in *Taylor* was at the final stages of project approval.  *Id*. at 829.  The city council had approved and executed an actual purchase agreement for the developer to buy six city-owned parcels of land, had voted to approve several amendments to facilitate the project, and had scheduled a meeting for final approvals needed to facilitate the project, including the final site plan approvals and amendments to the zoning ordinance.  *Id*. at 828-29.  But before the meeting for final approvals occurred, a new mayor was elected who terminated the entire project, without giving the developer any hearing or reason for the termination.  *Id*. at 829.  The *Taylor* developer sued, claiming unconstitutional deprivation of its alleged property rights in the purchase agreement and in the approvals.  *Id*.

The Sixth Circuit rejected these claims, finding that the developer had no constitutionally protected property interest in building the proposed development.  *Id*. at 832.  "Insofar as [developer] argues that it should have been permitted to *develop* the property, neither the purchase agreement nor any equitable interest that could have vested in [developer] as a result granted [developer] any such right."  *Id*. at 832 (emphasis in original).

Here, Plaintiffs' claims are even weaker than those of the unsuccessful *Taylor* developer. Plaintiffs do no allege that they had even started negotiating for an agreement to buy the property from the City, nor do they claim that they had obtained any necessary approvals for their proposed project.  "[A] property interest cannot arise where a decisionmaker's power is wholly discretionary."  *Taylor*, 313 F. App'x. at 832.  Here, the alleged Project was entirely preliminary, and faced many layers of decisions by the City that were wholly discretionary, such as whether and on what terms the City would agree to sell the property, and to whom, the scope of the proposed project and whether the City would grant necessary zoning changes and/or land use approvals.

Plaintiffs admit as much, describing their property interest as the right to "enter into a planning and negotiation process with the LEDC and the City [of Lansing] ..."  (Am. Compl., PageID.260, ¶ 51) (quoting the RFQP).  This fails to describe a property interest as a matter of law, because "a person cannot have a property interest in a procedure itself," *Taylor*, 313 F. App'x. at 832 (citing *Richardson v. Twp. of Brady*, 218 F.3d 508, 518 (6th Cir. 2000)).

Finally, the speculative innuendo peppered throughout the Amended Complaint suggesting that the City's decision not to work with Plaintiffs was the product of "corruption" cannot save Plaintiffs' due process claims.  The Sixth Circuit has rejected specifically the argument "that a benefit ceases to be discretionary depending on whether the discretion is exercised free of corruption." *EJS Properties*, 698 F.3d at 857.  Under the foregoing precedent, the facts set forth in the Amended Complaint fail to adequately allege that Plaintiffs were unconstitutionally deprived of any property, and Count III fails as a matter of law.

## IV.    Plaintiffs' Tortious Interference Claims Must be Dismissed.

Plaintiffs' tortious interference claims in Count IV and V are deficient for many of the same reasons already discussed, and fail to state claims as a matter of law.

**A.     Plaintiffs Fail to Sufficiently Allege Tortious Interference under Count IV.**

Plaintiffs allege that Kass, Continental, and Hallmark (the "Count IV Defendants") tortiously interfered with two alleged business expectancies: their "business relationship and expectancy with Joel Ferguson for the Project," and their "business expectation and property rights" associated with their "win of the RFQP" and "selection as the 'selected developer.'" (Am. Compl., PageID.294, ¶¶ 201, 203.)

These contentions only rely on a handful of alleged facts.  Plaintiffs vaguely allege that they had a business relationship with Kass, and that under that relationship they entered into a confidentiality agreement, pursuant to which Kass obtained unspecified information from the Jeromes regarding the Project.  (*see* Am. Compl., PageID.341, Ex. 7 at 21.)  Plaintiffs allege that Kass terminated its relationship with the Jeromes on June 29, 2012.  (*Id.*)  Subsequently, the Count IV Defendants entered into a joint venture with Ferguson, which joint venture was ultimately awarded the Project.  (*Id.*)  Plaintiffs generally allege (without any detail) that the plans that the Count IV Defendants used to obtain the award of the Project "largely appropriate in form and substance the proprietary plans and specifications originally developed by the Jeromes and shared with [the Count IV Defendants] in reliance on the Confidentiality Agreement."  (*Id.*)  This constitutes the entirety of Plaintiffs' tortious interference claim against the Count IV Defendants.  (*See* Am. Compl., PageID.341-342, Ex. 7 at 21-22.)

This claim fails for three reasons: first, Plaintiffs do not sufficiently allege a business expectancy; second, Plaintiffs fail to sufficiently allege that the Count IV Defendants wrongfully or maliciously interfered with that alleged "expectancy;" and third, Plaintiffs' claims under Count IV sound (if anything) in breach of contract, and cannot be maintained as an independent tort action under Michigan law.

1.      *Plaintiffs Fail to Sufficiently Allege a Business Expectancy under the RFQP as a Matter of Law.*

As a threshold matter, Plaintiffs cannot maintain any "expectancy" under the RFQP or as "selected developer," for all of the reasons discussed in Section I, *supra*.  Plaintiffs were not parties to the RFQP, and would not have obtained any property, contract, or other rights thereunder even if they were.  Similarly, Plaintiffs cannot claim that they had a business expectancy with Joel Ferguson, based on vague references to the "various offers and operating agreements" (Am. Compl., PageID.294, ¶ 201) that Plaintiffs mention throughout the Amended Complaint.  According to Plaintiffs' own allegations, Plaintiffs did not want to work with Ferguson at all, and the "various offers and operating agreements" wherein Ferguson offered "to provide assistance ... in exchange for ... equity" (*see id.*, PageID.267, ¶ 85) were allegedly all fraudulent and made for the sole purpose of "stealing" the Project from Plaintiffs.  (*See*, *e.g.*, *id.*, PageID.264-267, ¶¶ 71, 75, 76, 79, 82, 83, 85.)

As previously discussed, the RFQP and Response do not even reflect what anyone could call a "bid," because they plainly are not bids, and contain no material terms whatsoever.  But even if the RFQP response was a "bid," it would not create a business expectancy as a matter of Michigan law.  The Michigan Supreme Court recently analyzed the elements of tortious interference in *Cedroni Association*, *Inc*. *v*. *Tomblinson, Harburn Associates*, finding that an essential element of tortious interference is "the existence of a valid business relationship or expectancy."  821 N.W.2d 1, 3 (Mich. 2012).  The *Cedroni* plaintiff was a contractor who – unlike Plaintiffs – submitted an actual bid to a school on a public works project.  *Id*. at 2.  It was the lowest bid, but the school nevertheless refused it.  *Id*.  The contractor sued the schools' architecture firm, alleging that it had tortiously interfered with the contractor's "expectation" that it would be awarded the public works project as the lowest bidder.  *Id*. at 2-3.

The Michigan Supreme Court unequivocally rejected the argument that the submission of a proposal in the form of a bid creates a "business expectancy."  *Cedroni*, 821 N.W.2d at 3-5. "In order to establish [a valid business expectancy], "'[t]he expectancy must be a reasonable likelihood or probability, not mere wishful thinking.'"  *Id*. at 3 (quoting *Trepel v. Pontiac Osteopathic Hosp.*, 354 N.W.2d 341, 377 (Mich. Ct. App. 1984)).  The *Cedroni* court stated that "it is difficult to fathom how plaintiff's submission of the lowest bid could have created a valid business expectancy in light of the highly discretionary process of awarding governmental contracts."  *Id*.  The court found its conclusion further supported by the fact that the documents provided by the school district before the contractor submitted his bid made perfectly clear that submitting a bid created no business expectancy.  *Id*. at 4.  Among other things, the bid instructions expressly stated that the school district "reserves the right to accept or reject any offers."  *Id*.

The *Cedroni* opinion also discussed with approval *Mago Constr. Co. v. Anderson, Eckstein & Westrick*, No. 183479, 1996 WL 33348794 (Mich. App. 1996).  In *Mago*, the court rejected a tortious interference claim in the context of a bid for a public works project, finding that "the award of the contract was a highly discretionary governmental activity in which too many factors [were] in play to be able to reasonably infer that . . . plaintiff [by virtue alone of being the lowest bidder] would have obtained the desired [contract]."  *Cedroni*, 821 N.W.2d at 6 (quoting *Mago*).  Because the school district in *Cedroni* retained a "broad discretionary right to reject the lowest bidder, plaintiff could not have had a valid business expectancy."  *Id*. at 6; *see also EBI-Detroit, Inc. v. Detroit*, 279 F. App'x. 340, 352 (6th Cir. 2008) ("Michigan courts have already rejected the idea that a disappointed bidder has a valid business expectancy in a potential government contract").

42

Here, the RFQP and RFQP response are so preliminary in nature that they provide even less basis for a claim than the bids submitted by the contractors in *Cedroni* and *Mago*. The RFQP did not purport to solicit bids – it merely requested a broad and preliminary conceptual proposal. Consistent with this, the RFQP Response does not propose or offer any essential contract terms whatsoever. And, like the bidding instructions in *Cedroni* and *Mago*, the RFQP fully reserves the right of the City and LEDC to discontinue the "planning and negotiation process" with any selected developer, and sets forth a litany of reservations of rights and disclaimers that have been previously discussed, including the right to "re-solicit proposals for the project," re-solicit or negotiate with "any" developer regarding the Project, and "defer or abandon the project." (RFQP at 12.)

Plaintiffs cannot distinguish *Cedroni* and *Mago*. Under these cases, no reasonable reading of the RFQP and RFQP Response can lead to the conclusion that Plaintiffs obtained anything more than "wishful thinking" that they would be awarded a comprehensive development agreement or purchase agreement for the City's property. At most, the Amended Complaint reflects Plaintiffs' "wishful thinking" that they would have successful negotiations resulting in a contract with the City at some point in the distant future, which is insufficient to state a valid business expectancy as a matter of law. *Cedroni*, 821 N.W.2d at 3.

        2.    *Plaintiffs Fail to Sufficiently Allege any Tortious Acts.*

Plaintiffs also fail to state a claim under Count IV because they fail to allege that the Count IV Defendants committed any tortious acts. As explained by the Michigan Court of Appeals:

> [O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act[15] or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship. Under the latter instance, <u>plaintiff necessarily must demonstrate, with specificity, affirmative acts by the interferor which corroborate the unlawful purpose of the interference</u>.

*Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. Ct. App. 1984) (per curiam) (emphasis added).

Plaintiffs "bear[] the burden of showing that the defendants' acts were unlawful or malicious **and** unjustified in law. 'Unethical' conduct alone does not meet this burden." *Henslee, Monek & Henslee v. D.M. Cent. Transp., Inc.*, 870 F. Supp. 764, 767 (E.D. Mich. 1994) (emphasis in original).

Plaintiffs' tortious interference theory fails for many of the same reasons Plaintiffs' conspiracy claims fail. First, nothing described by Plaintiffs alleges a per se wrongful act by the Count IV Defendants, or that they acted with malice and without justification in law to invade any legitimate business expectancy of Plaintiffs. Plaintiffs had no legitimate business expectancy in the Project, and the mere fact that Kass formerly worked with the Jeromes on the Project, and then over a year later partnered with Ferguson instead, does not sufficiently allege any "per se wrongful" or malicious act. *See BPS Clinical Labs. v. Blue Cross & Blue Shield of Michigan*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996) ("Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference"). Plaintiffs have failed to sufficiently allege any unlawful or malicious conduct by the Count IV defendants, and Count IV necessarily fails.

---

[15] "A 'per se wrongful act' is an act that is inherently wrongful or one that is never justified under any circumstances." *Formall, Inc. v. Cmty. Nat. Bank of Pontiac*, 421 N.W.2d 289, 293 (Mich. App. 1988)

3.      *Plaintiffs Cannot Maintain an Independent Tort Action for What Amounts, if Anything, to a Breach of Contract Claim.*

Plaintiffs' tortious interference theory under Count IV is based on the vague assertion that Kass "misappropriate[d] the Jeromes' intellectual property" in a manner that violated a confidentiality agreement between Kass and Plaintiffs.  (Am. Compl., PageID.341-342, Ex. 7 at 21-22.)  If that's the case, then Plaintiffs' remedy is to file breach of contract claims pursuant to that agreement.  Michigan law does not allow them to maintain a tort action for what is in substance a breach of contract claim.  *Hart v. Ludwig*, 79 N.W.2d 895, 897 (Mich. 1956) (holding that an action sounding in tort cannot be founded on nonfeasance in performance of a contract); *QQC, Inc. v. Hewlett-Packard Co.*, 258 F. Supp. 2d 718, 722 (E.D. Mich. 2003) (dismissing tort claims as not actionable under Michigan law, where the tort claims "simply alleg[e] that Defendant breached certain contractual confidentiality provisions," and such claims would not exist in the absence of the contract between the parties).

In short, Plaintiffs' tortious interference claim under Count IV fails to state any actionable claim as a matter of law for numerous reasons, and must be dismissed.

**B.      Plaintiffs Fail to Sufficiently Allege Tortious Interference under Count V.**

The tortious interference claim against LEAP, Trezise, and Ferguson in Count V of the Amended Complaint fails for similar reasons.  Here, Plaintiffs vaguely allege that they had a "business expectancy and relationship" with an unidentified third party that they call "Developer A," "for the sale and development of one of the Jeromes' parcels as a stand-alone $90 million project."    (Am. Compl., PageID.279, 344, ¶ 121, Ex. 7 at 24.)  Plaintiffs allege that in March 2014, LEAP's Chief Operating Officer "informed Developer A that Jeromes' involvement in the project would risk losing the necessary government approvals." (*Id.*, Ex. 7 at 24.)  Plaintiffs allege that over a year later, on May 7, 2015, Trezise "told the Developer A representatives that

45

Mayor Bernero wanted them to meet with Joel Ferguson" regarding the anticipated development. (*Id*., PageID.279, 344, ¶ 124, Ex. 7 at 24.) Finally, Plaintiffs allege that "in May and June 2015, Ferguson met with Developer A and threatened Developer A into not following through on the proposed development on the Jerome parcel to the detriment of Jeromes." (*Id*., PageID.279-280, 345, ¶¶ 125-131, Ex. 7 at 25.) According to Plaintiffs, "as a result of Ferguson's threats and demands, the Jeromes lost a business expectancy and opportunity with Developer A." (*Id*., PageID.345, Ex. 7 at 25.)

1. *Plaintiffs Fail to Sufficiently Allege a Business Expectancy with Developer A as a Matter of Law*

Plaintiffs' vague and ambiguous allegations under Count V fail to state a tortious interference claim against the Count V Defendants as a matter of law. Like the tortious interference claim in Count IV, the allegations underlying this count fail to demonstrate a legitimate business expectancy that rises to "a reasonable likelihood or probability, not mere wishful thinking." *Cedroni*, 821 N.W.2d at 3.

Here, the Amended Complaint is so vague that it is impossible to determine what Plaintiffs' business expectancy with "Developer A" allegedly was. Plaintiffs theoretically assert two expectancies: their expectancy to partner with Developer A on a development project, and their expectancy in that project. But Plaintiffs do not identify who "Developer A" is, nor do they describe any specific negotiations, discussions, proposals, or contracts under which they expected to partner with "Developer A" on a project. Plaintiffs also fail to describe what the alleged "$90 million project" was, what stage of development it was in, or whether it would have complied with local ordinances, provided a return on investment, or was otherwise viable or likely to happen. Furthermore, Plaintiffs admit that they ultimately did make a different deal with "Developer A," because they sold the property to them. (Am Compl., PageID.279, ¶ 123.)

The only conclusion that can be drawn from Plaintiffs' deficient and vague pleading is that they are unable to allege facts demonstrating a legitimate business expectancy, because their initial discussions with "Developer A" were too preliminary to result in anything beyond "mere wishful thinking." *Cedroni*, 821 N.W.2d at 3.

Plaintiffs also cannot claim that Ferguson interfered with their alleged business expectancy by "threatening" Developer A that if the Jeromes were involved, he would cause governmental entities to deny approvals. Even if Ferguson was capable of, and had in fact followed through on such alleged "threats," the Michigan Supreme Court has rejected the notion that a third party can be liable for tortious interference for procuring an adverse decision by a governmental entity, where that entity's decision is entirely discretionary. "In terms of whether a valid business expectancy is created, a plaintiff's expectations are entirely the same regardless of whether it alleges that the government has wrongfully denied it the contract or, as here, that a third party has interfered and caused a denial of the contract" *Cedroni*, 821 N.W.2d at 3–4. Plaintiffs have not sufficiently alleged any business expectancy with "Developer A" or the alleged second "project" as a matter of law.

2.  *Plaintiffs Fail to Sufficiently Allege any Tortious Acts Relating to Developer A.*

As with Plaintiffs' Count IV claims, Plaintiffs have failed to allege any malicious or wrongful acts by the Count V Defendants relating to Developer A. Taking the allegations as true, the fact that LEAP's COO offered his opinion to Developer A that the Jeromes' involvement in the project would risk losing the necessary government approvals does not, and cannot, constitute a tortious act. *See Lakeshore Cmty. Hosp., Inc. v. Perry*, 538 N.W.2d 24, 27 (Mich. Ct. App. 1995) (noting that "expressions of opinion are protected from defamation actions . . . including actions alleging interference with business"); *see also Saab Auto. AB v.*

*Gen. Motors Co.*, 770 F.3d 436, 442 (6th Cir. 2014) (finding that statements motivated by legitimate business concerns "do not constitute improper motive or interference"). Likewise, there is nothing wrongful or malicious in Trezise suggesting that Developer A meet with Joel Ferguson. Nowhere do Plaintiffs explain how this suggestion was allegedly illegal, wrongful, or malicious.

Finally, the substantive allegations against Joel Ferguson regarding Developer A border on the incoherent. Plaintiffs allege that Ferguson met with Developer A and "threatened Developer A into not following through on the proposed development on the Jerome parcel to the detriment of Jeromes," and "told Developer A that the project was dead" unless certain conditions were met. (Am. Compl. PageID.354, Ex. 7 at 25.) Plaintiffs do not allege that Ferguson owned or otherwise controlled the Jerome property, so his alleged "threats" to "not follow[] through on the proposed development on the Jerome parcel" or to "kill" the project do not make any logical sense. (*Id.*) Plaintiff cannot satisfy Fed. R. Civ. P. 8 requirements by alleging in a vague and conclusory fashion that Ferguson has political influence, and therefore can, in some unexplained fashion, "force" the City of Lansing or other governmental entities to withhold approvals for any given development project. The plausibility standard of Rule 8 demands more than Plaintiffs' conclusory accusations of corruption paired with innuendo and speculation. *See Twombly*, 550 U.S. at 555-56; *Iqbal*, 556 U.S. at 678. Plaintiffs have failed to state a claim for tortious interference under Count V as a matter of law.

## V.     Defendants Bernero, LEAP, and/or Trezise Are Entitled to Immunity.

Plaintiffs allege that Bernero is the Mayor of Lansing, that LEAP "acts as an agent of or on behalf of the Lansing city government," and that Trezise is LEAP's CEO. (Am. Compl. PageID.252, ¶¶ 5-7.) The claims against Bernero and Trezise in Count III arise from actions

taken in their official roles: the alleged interference with Plaintiffs' alleged "development rights."

To establish their procedural due process claim under Count III, Plaintiffs must show that "'(1) [they] had a . . . property interest protected by the Due Process Clause; (2) [they were] deprived of this protected interest; and (3) the state did not afford [them] adequate procedural rights prior to depriving [them] of the ... interest.'" *Jasinski v. Tyler*, 729 F.3d 531, 541 (6th Cir. 2013 (quoting *Women's Med. Prof'l Corp. v. Baird,* 438 F.3d 595, 611 (6th Cir. 2006)).  To overcome the additional hurdle of qualified immunity, Plaintiffs must allege the violation of a constitutional right that is clearly established.  *Jasinski v. Tyler*, 729 F.3d 531, 538 (6th Cir. 2013); *see also Cullinan v. Abramson*, 128 F.3d 301, 309-10 (6th Cir. 1997).

Bernero and Trezise are entitled to qualified immunity because, as demonstrated above, Plaintiffs had no protected property interest to vindicate under the RFQP, RFQP Response, or with respect to Developer A as a matter of law.  For a right to be clearly established for purposes of qualified immunity, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Waeschle v. Dragovic*, 576 F.3d 539, 550 (6th Cir. 2009) (quoting *Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996)).  When the alleged property right is state-created, courts will look to state law to determine whether the underlying property interest is sufficiently clear under state law.  *See Dragovic*, 576 F.3d at 550.

Here, Plaintiffs cannot cite any legal authority that would put Bernero and Trezise on notice that Plaintiffs had a protected property interest.  As discussed above, Michigan law in fact refutes any notion that Plaintiffs acquired any protected property rights under the RFQP or RFQP Response, or with respect to "Developer A."  Accordingly, Bernero and Trezise could not have

understood that their alleged actions set forth in the Amended Complaint violated any property rights held by Plaintiffs, and are therefore entitled to qualified immunity.  *Dragovic*, 557 F.3d at 379.

Alternatively, Mayor Bernero is entitled to absolute immunity, because the "official action" that Plaintiffs complain about consists of Bernero's failure to support the various agreements, ordinance changes, and other legislative approvals that would have authorized Plaintiffs' proposed Project.  *See* Am. Compl., PageID.276, ¶ 110 (describing the City Council's ability "to derail the project").  "'Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan v. Scott–Harris,* 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove,* 341 U.S. 367, 376 (1951)).  "Absolute immunity extends to local mayors who are acting in official legislative capacity, and passing an ordinance is an example of an action taken in official legislative capacity." *Tucker v. City of Richmond, Ky.*, 388 F.3d 216, 224 (6th Cir. 2004) (internal quotations omitted).  For these reasons, even if Plaintiffs could overcome all of the fatal flaws with their Amended Complaint discussed above, Bernero and Trezise must be dismissed based on qualified and/or absolute immunity.

## CONCLUSION

The Amended Complaint's exhausting and voluminous allegations reflect nothing more than Plaintiffs' effort to mask the severe and fundamental defect underlying all of their claims: that Plaintiffs obtained no rights under the RFQP and RFQP Response whatsoever, and never acquired any legally protected interest in the Project.  No conclusory allegations, innuendo, or rhetorical flourishes can overcome this indisputable fact.  Plaintiffs lack standing to pursue this action and have failed to state any claim upon which relief may be granted as a matter of law. Accordingly, Defendants respectfully request that this Court dismiss the Amended Complaint in its entirety and with prejudice.

Dated: July 5, 2017

/s/ Dean F. Pacific
Dean F. Pacific (P57086)
Jeffrey W. Bracken (P25648)
Thomas M. Amon (P72351)
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, N.W.
Grand Rapids, Michigan 49503-2487
616.752.2000

*Attorneys for Lansing Economic Area Partnership and Trezise, and lead counsel for purposes of Defendants' Unified Motion and Brief pursuant to Order dated May 5, 2017*

Counsel for Co-Defendants:

/s/ Patrick A. Facca
Patrick A. Facca
Facca Richter & Pregler PC
6050 Livernos
Troy, MI 48098
(248) 398-9900
Email: pfacca@frplaw.com
*Attorneys for Charles Clark and Clark Construction Services, LLC*

/s/ David K. Otis
David K. Otis
Plunkett Cooney (Lansing)
325 E Grand River, Ste. 250
East Lansing, MI 48823
(517) 333-6598
Email: dotis@plunkettcooney.com
*Attorneys for Virgil Bernero*

/s/ John D. Pirich
John D. Pirich
Andrea L. Hansen
Honigman Miller Schwartz and Cohn LLP
222 N Washington Sq., Ste. 400
Lansing, MI 48933-1800
(517) 377-0709
Email: jpirich@honigman.com
ahansen@honigman.com
*Attorneys for Joel Ferguson, Ferguson Development, LLC, Christopher Stralkowski, and Red Cedar Investor, LLC*

/s/ Todd J. Ohlms
Todd J. Ohlms
Freeborn & Peters LLP
311 S Wacker Dr., Ste. 3000
Chicago, IL 60606
(312) 360-6000
Email: tohlms@freeborn.com
*Attorneys for Frank Kass, Continental Development, Inc., Hallmark Campus Communities, and Ferguson/Continental Lansing, LLC*

15929020-6