# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CHRISTOPHER JEROME, an individual,
LEO JEROME, an individual, and
STORY COMPANIES, LLC,
a Michigan limited liability company,

                           Plaintiffs,

v.                                             Case No. 1-16-cv-01116
                                            Hon. Janet T. Neff

JOEL FERGUSON, an individual,
VIRGIL BERNERO,
the Mayor of the City of Lansing, in his individual capacity,
LANSING ECONOMIC AREA PARTNERSHIP, INC.,
a Michigan non-profit corporation,
ROBERT L. TREZISE, JR., an individual,
CLARK CONSTRUCTION SERVICES, LLC,
A Michigan limited liability company,
CHARLES CLARK, an individual,
FRANK KASS, an individual,
CONTINENTAL DEVELOPMENT, INC., an Ohio corporation,
HALLMARK CAMPUS COMMUNITIES,
an Ohio partnership,
FERGUSON DEVELOPMENT, LLC,
A Michigan limited liability company,
CHRISTOPHER STRALKOWSKI, an individual,
FERGUSON/CONTINENTAL LANSING, LLC,
A Delaware limited liability company, and
RED CEDAR INVESTOR, LLC, a Michigan limited liability company,

                           Defendants.

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' UNIFIED MOTION TO DISMISS

### ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

INDEX OF AUTHORITIES…………………………………………………………… iii

INTRODUCTION……………………………………………………………………… 1

STATEMENT OF PERTINENT FACTS REGARDING STANDING…………………. 2

   Intellectual Property………………………………………………………………… 2

   Project Award……………………………………………………………………… 4

     The RFQP Chronology…………………………………………………………… 4

     Defendants' Treat Plaintiffs' Project Award as a Valuable Property Asset………. 6

   Substantive Counts………………………………………………………………… 7

STANDARD OF REVIEW…………………………………………………………… 8

ARGUMENT………………………………………………………………………… 9

  I.  Plaintiffs Have Standing to Pursue this Action………………………………… 9

    A. Plaintiffs Have Standing to Pursue this Action Based on the Injury to their
       Intellectual Property and Based on the Injury to their Property Interests in
       the Project Award………………………………………………………… 10

      1.  Intellectual Property………………………………………………………… 10

        i.  Plaintiffs Suffered an Injury in fact to their Concrete and Particular
            Intellectual Property……………………………………………………… 10

        ii.  Defendants' Conduct Caused Injury to Plaintiffs' Intellectual
            Property……………………………………………………………… 11

        iii.  Plaintiffs' Injury will be Redressed by a Favorable Court Decision……. 11

      2.  Project Award…………………………………………………………… 12

        i.  Plaintiffs Suffered an Injury in fact to their Concrete, Particular, and
            Exclusive Project award………………………………………………… 12

    B. Plaintiffs Have Legally Protected Rights under the Project Award even if
       Plaintiffs are not Parties to the Documents……………………………………… 14

    C. Plaintiffs' Injury will be Redressed by a Favorable Court Decision………….. 19

  II.  Plaintiffs Adequately Pled the RICO Counts in the FAC………………………… 20

i

A. Plaintiffs Adequately Pled that the RICO Defendants Violated 18 U.S.C. §1962(c) ……………………………………………………………….. 20

   1. Ferguson Development LLC is Distinct Person Subject to RICO Liability…………………………………………………………….. 21

   2. Plaintiffs Sufficiently Allege a "Pattern" of "Racketeering Activity"……... 22

      i. Plaintiffs Have Adequately Pled Open-Ended Continuity…………….... 24

   3. Plaintiffs Have Sufficiently Pled Mail and Wire Fraud Predicate Acts……. 28

   4. Plaintiffs Pled Sufficient Facts for the RICO Predicate Offense of Extortion…………………………………………………………… 30

   5. Plaintiffs Have Adequately Pled a RICO Violation Regarding the Sale of Land to Developer A……………………………………………… 31

B. Plaintiffs Have Amply Demonstrated the Sprawling Conspiracy by the Count II Defendants under 18 U.S.C. 1962(d) ……………………………….. 32

III. Count III Sufficiently Alleges a Property Deprivation in Violation of Due Process……………………………………………………………….. 39

IV. Plaintiffs Have Sufficiently Alleged Claims of Tortious Interference…………….. 42

A. Plaintiffs Have Sufficiently Alleged Tortious Interference Under Count IV…. 42

B. Plaintiffs Have Sufficiently Alleged Torgious Interference Under Count V….. 45

V. No Defendant is Entitled to Immunity……………………………………………...46

VI. Conclusion……………………………………………………………… 49

## <u>INDEX OF AUTHORITIES</u>

**Federal Cases**

*Angelo DiPonio Equip. Co. v. State Dep't of State Highways & Transp.*,
  107 Mich.App. 756; 309 N.W.2d 566 (Mich. App. 1981)…………………………………12

*Ashcroft v. Iqbal*, 556 U.S. 662; 129 S.Ct. 1937; 173 L.Ed.2d 868 (2009)…………………….. 9

*Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491 (5th Cir. 2012)…………………………..16, 18

*Baisch v. Galina*, 346 F.3d 366, (2d Cir. 2003) (quoting *Salinas*, 522 U.S. at 66)……………32

Bogan v. Scott–Harris, 523 U.S. 44; 118 S.Ct. 966; 140 L.Ed.2d 79 (1988)…………………..48

*Brown v. Cassens Transport Co.*, 546 F.3d 347 (6th Cir. 2008)……………………… 22, 26, 27

*Cedroni Association, Inc. v. Tomblinson, Harburn Associates*, 492 Mich 40;
  821 N.W.2d 1 (Mich. 2012)…………………………………………………………………...43

*Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101(6th Cir. 1995)……………… 8, 9, 22

*Digizip.com, Inc. v. Verizon Services Corp.*, 139 F.Supp.3d 670  (S.D. N.Y. 2015)……..... 17, 18

*DLX, Inc. v. Kentucky*, 381 F.3d 511 (6th Cir. 2004)…………………………………………….8

*EJS Properties, LLC v. City of Toledo*, 698 F.3d 845 (6th Cir. 2012)…………………………41

*Ensley v. Cody Resources, Inc.*, 171 F.3d 315 (5th Cir. 1999), reh., *en banc,* den.,
  181 F.3d 98 (5th Cir. 1999)……………………………………………………....14, 15, 16

*Frank v. D'Ambrosi*, 4 F.3d 1378 (6th Cir. 1993)…………………………………… 16, 17

*Grubbs v Sheakley Group, Inc.*, 807 F.3d 785 (6th Cir. 2015)…………………………………23

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229; 109 S.Ct. 2893;
  106 L.Ed.2d 195 (1989)………………………………………………....21, 24, 26, 27

*Heinrich v. Waiting Angels Adoption Servs., Inc.,* 668 F.3d 393 (6th Cir. 2012)…………….... 32

*Hillgraeve Corp. v. Symantec Corp.*, 212 F.R.D. 345 (E.D. Mich. 2003)……………………...18

*In re ClassicStar Mare Lease Litig.*, 727 F.3d 473 (6th Cir. 2013)………………………...21, 22

*In re Sumitomo Copper Litig.*, 995 F.Supp. 451 (SDNY 1998)………………………………… 29

*In re Van Dresser Corp.*, 128 F.3d 945(6th Cir. 1997)…………………………………….....17

*Lujan v. Defs. of Wildlife,* 504 U.S. 555; 112 S. Ct. 2130; 119 L.Ed.2d 351 (1992)..............9

*Mino v Clio Sch. Dist.*, 255 Mich. App. 60; 661 N.W.2d 586 (2003)............................42

*Moon v Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006)................................22, 24

*Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884 (3rd Cir.1977)… …………………….. 8

*Nali v Phillips,* 681 F3d 837 (6th Cir. 2012)…………... ………...………...………… 24, 31, 32

*Ohio Nat. Life Ins. Co. v. United States*, 922 F2d 320(6th Cir. 1990)… ………...…………... 8

*Paycom Billing Servs., Inc. v. Payment Res. Int'l*, 212 F. Supp. 2d 732
   (W.D. Mich. 2002)………………… ………...………...………...………...………..……….20

*Peterson Enters., Inc. v. Ohio Dept. of Mental Retardation*, 890 F.2d 416
   (6th Cir. 1989)….. ………...………...……...………...………...………...………...………...13

*Phillips v. DeWine*, 841 F.3d 405 (6th Cir. 2016)… ………...………...……...………...……… 8

*Ralph Gonnocci Revoc. Living Trust v. Three M Tool & Mach., Inc.*, Case No.
   02-74796, 2006 WL 89867, *3 (E.D. Mich. Jan. 13, 2006)……………………………….. 18

*Salem Springs, LLC v. Salem Township*, 312 Mich.App. 210; 880 N.W.2d 793
   (2015)…………………………………………………………………………16, 17, 18

*Salinas v. United States*, 522 U.S. 52 (1997)….. ………...………...………...………………..32

*Schellenberg v. Rochester Michigan Lodge No. 2225, of Benev. & Protective
   Order of Elks of U.S.A.*, 228 Mich. App. 20; 577 N.W.2d 163 (1998)…………………..47

*Schmuck v United States*, 489 U.S. 705; 109 S.Ct. 1443; 103 L.Ed.2d
   734 (1989)………………… ………..………..………..……..………..………..……….29

*Taylor Acquisitions LLC v. City of Taylor*, 313 F. App'x. 826 (6th Cir. 2009)…. ……….. 39, 40

*Trepel v. Pontiac Osteopathic Hospital*, 135 Mich. App. 361; 354 N.W.2d
   341 (1984)……………… ………..………..……..………..………..……..……..……….43

*United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31 (6th Cir. 1992)…. ………..………… 13

*United States v. Adamo*, 882 F.2d 1218 (7th Cir. 1989)………… ………..………..……..…33

*United States v. Cassity*, 631 F.2d 461(6th Cir.1980)………... ………..………..……...…… 33

*United States v. Shanshan Du*, 570 F. App'x 490 (6th Cir. 2014)…… ………..……………… 29

*United States v. U.S. Gypsum Company*, 333 U.S. 364, 68 S.Ct. 525,
92 L.Ed. 746 (1948)………………………………… ……..………..………..…………..  33

*United States v. Williams,* 544 F.3d 683 (6th Cir.2008)……… ……….……..………..…………46

*Waeschle v. Dragovic*, 576 F.3d 539 (6th Cir. 2009)…… ……..………..………..……….47

*Warren v. Manufacturers Nat. Bank of Detroit*, 759 F.2d 542 (6th Cir. 1985)…. ………..…..16

*Warth v Seldin,* 422 U.S. 490 (1975)…… ……..………..………..………..………..……… 8

*Whelan v. Abell*, 953 F.2d 663 (D.C. Cir. 1992), cert. den., *Toomey v. Whelan*,
506 U.S. 906 (1992)………………… ……..………..………..………..………..  14, 16

*Williamson v. Tucker,* 645 F.2d 404 (5th Cir.1981)…. ……..………..………..………..…… 8

*Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528 (6th Cir. 2002)….. ………..…………… 14, 15

## Federal Statutes

11 U.S.C. § 541(a)(1)…. ……..………..………..………..………..………..………..……………16

18 U.S.C. § 1341………………..…….……..………..……….………..……………… 24, 29, 33

18 U.S.C. § 1343………………………………..……..………..……….……………….24, 33

18 U.S.C. § 1951…………..…..……….……..…..……..……..………..……..……….24, 31

18 U.S.C. § 1961(1)(A)…. ………..…….……..………..……..………..……..……………20

18 U.S.C. § 1961(1)(B)……………………………..……….. ………..……..……… 20

18 U.S.C. § 1961(4)………..… ……..……..………..……..………..……..……………20

18 U.S.C § 1961(5)……… ……..………..……..………..……..………..……..…………20

18 U.S.C. § 1962(c)…………………………………..…...1, 19, 20, 21, 33

18 U.S.C. § 1962(d)……………………………………………..1, 32, 33

42 U.S.C. § 1983……………………………………………………... 1

**Federal Rules**

Fed. R Civ. P. 12(b)(1) …………………………………………..………..……1, 2

Fed. R Civ. P. 12(b)(6)… ………..………..……….………..………..………..……...1, 2

Fed. R Civ. P. 15(a)(2)…..………..……….………..………..………..…………18, 19

Fed. R Civ. P. 17(a)(1)..………..………..…. …………..………..………..………..……16

Fed. R Civ. P. 17(a)(3)….. ………..………..………..………..…………..………16, 17, 18, 19

Fed. R. Evid. 801(d)(2)(E)…. ………..………..……….………..………..………..………...32, 37

**Michigan Compiled Laws**

MCL 600.4545….………..………..……….………..………..………..…………..……………17

MCL 600.4545(2)… ………..………..……….………..………..………..………..………… 18

MCL 750.117…..………..………..……….………..………..………..………..………… 24, 33

MCL 750.213…..………..………..……….………..………..………..………..……… 24, 31, 33

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014)… ………..………..……….………..………..……….. 10

## INTRODUCTION

Defendant Joel Ferguson has been running and continues to run a racketeering enterprise ("Ferguson Enterprise" or "Enterprise") with his son-in-law, Christopher Stralkowski ("Stralkowski") through their company, Ferguson Development LLC ("Ferguson Development").   With the assistance and encouragement of the co-Defendants, Joel Ferguson, and Stralkowski misuse Ferguson's political influence to create a "pay-to-play" system for municipal and state contract approvals, political favors, and access to public tax dollars related to public contracts for highly profitable land development projects focused primarily in and around the City of Lansing.

In this case, Ferguson, through his Enterprise and with his co-Defendants, rigged, and continue to rig the public contracting process, in a successful effort to steal both (a) intellectual property and (b) an exclusive development award for the Red Cedar Renaissance Project (the "Project Award"), from the Plaintiffs.  The defendants' various acts violated 18 U.S.C. § 1962 (c) and (d), 42 U.S.C. § 1983, and also constitute two different state law claims of tortious interference with business expectancy.

Defendants' Unified Motion to Dismiss ("Unified Motion") seeks dismissal pursuant to Fed. R Civ. P. 12(b)(1) and (6) claiming: (1) Plaintiffs lack standing; (2) Plaintiffs have not adequately pled a violation of 18 U.S.C § 1962(c); (3) Plaintiffs have not adequately pled a property deprivation for a violation of 42 U.S.C. § 1983; (4) Plaintiffs have not adequately pled tortious interference under Michigan law; and finally, (5) Defendants Bernero, LEAP, and Trezise are entitled to immunity here.  However, most, if not all, of the Defendants' arguments are predicated on a false premise:  that the Plaintiffs never possessed a legally protectable interest here.  "Plaintiffs' claims *are entirely premised* on a deprivation of 'rights' they allegedly obtained through the RFQP Response…" (emphasis added) Defs' Unified Br, p. 14.  On the

1

contrary, Defendants' acts deprived the Plaintiffs of two different and distinct protectable property interests: one, intellectual property including specialized skills, knowledge and expertise related to the site-specific location, architectural renderings and other property worth hundreds of thousands of dollars ("Intellectual Property"), and two, the award of the exclusive right to develop the Red Cedar Renaissance Project ("Project Award").

Defendants other non-standing arguments are garden-variety objections that are not sufficient to warrant dismissal under either Fed. R Civ. P. 12(b)(1) or Fed. R Civ. P. 12(b)(6). Accordingly, Plaintiffs respectfully request this Court deny Defendants' Unified Motion.

### STATEMENT OF PERTINENT FACTS REGARDING STANDING[1]

As Defendants' arguments are predominantly based on their primary argument that Plaintiffs lack standing, this section shall focus on the facts demonstrating standing. Plaintiffs shall rely on both the averments in the First Amended Complaint ("FAC") (PageID.251-297) and Exhibit 7 of the FAC (PageID.320-345), for factual support of its substantive arguments below.

<u>Intellectual Property</u>

Plaintiffs Christopher Jerome, Leo Jerome, and Story Companies, LLC, own two large properties (the "Jerome Auto Properties") totaling 8 acres on the key commercial strip of Michigan Avenue in Lansing, Michigan and located adjacent to the former Red Cedar Golf Course at issue here. FAC at PageID.257-258, ¶¶ 37-38 and Ex. 2 at pp. 4, 11. To redevelop these two properties, a closed Oldsmobile automobile dealership lot and a closed Pontiac dealership which sits across the street ("Jerome Auto Properties"), Chris Jerome spent over two

---

[1] At the Court's May 5, 2017 Pre-motion Conference Proceeding, the Court's law clerk requested the parties if possible coordinate a joint statement of facts and use numbered paragraphs. (5/5/17, Hr'g Tr, p 10.) Because the Defendants' brief does not use a joint statement of facts and numbered paragraphs, Plaintiffs will not use numbered paragraphs here to avoid confusion.

years to develop architectural renderings, development and finance leads, contacts, and other intellectual proprietary property ("Intellectual Property") at a cost of hundreds of thousands of dollars to develop a plan for the Jerome Auto Properties. FAC at PageID.258-259, ¶¶ 39 and 42; Ex. 4, (Affidavit of Christopher Jerome) ¶¶7-12.   This work also included additional plans to develop the Jerome Auto Properties *and* the adjacent Red Cedar Golf Course.   FAC at PageID.258-259, ¶ 42; Ex. 4, ¶ 8.

Chris Jerome developed the Intellectual Property before January of 2012 and it was so valuable that Chris Jerome insisted on a Confidentiality and Non-Compete Agreement before he shared it with Defendant Kass and his entities.  FAC at PageID.258-259, 282, ¶¶ 42, 140-141. Accordingly, this Intellectual Property existed before the City of Lansing and the Lansing Economic Development Corporation ("LEDC") issued the Request for Qualifications and Proposals ("RFQP") at issue here on June 6, 2012.  In Count One of the FAC, Plaintiffs pled the theft and misappropriation of Plaintiffs' Intellectual Property:

> "Pursuant to and in furtherance of their racketeering scheme, the Count I Defendants committed multiple related acts of fraud and fraudulent misrepresentations involving multiple violations of 18 U.S.C. § 1341 mail fraud and 18 U.S.C. §1343 wire fraud… to appropriate and steal Plaintiffs property including *inter alia*, the Project RFQP award to the Plaintiffs, ***architectural renderings and other proprietary intellectual property costing hundreds of thousands of dollars***, and tens of millions of dollars in value and expected profits related to developing the Project…" (emphasis added) FAC at PageID.285, ¶ 158. See also FAC at PageID. 285-286, ¶¶ 159 and 163.

This property interest – separate and distinct from the Project Award – was also separately pled for Count Two in FAC at Page ID.288-289, ¶¶ 169[2] and 173[3];  and while not necessary, for

---

[2] "…designed to induce the Plaintiffs to surrender valuable confidential information…".

[3] "…Plaintiffs have been injured in their business and property in that they lost their award of the Project and all expected attendant profits as well *as hundreds of thousands of dollars in costs and the loss of intellectual property*…"  (emphasis added).

Count Three in FAC at PageID.290, ¶ 176; Count Four in FAC at PageID.294-295, ¶¶ 199 and 206[4] and Count Five in FAC at PageID.296, ¶ 208.

Indeed, while he called it "development services," Defendant Ferguson himself acknowledged the Plaintiffs' Intellectual Property in his October 25, 2012 letter to Chris and Leo Jerome, and offered to pay for the Intellectual Property developed by Chris Jerome: "2. Chris Jerome would be paid for development services he provided for the past three (3) years." FAC Ex. 3 at PageID.308-309. In the actual attachment Ferguson writes:

> Joel Ferguson recognizes that Chris Jerome has been working on a development project for approximately three years. Chris Jerome has obtained a deep working knowledge of mixed use developments and 'best practices' of student housing developments around the country…Chris Jerome should be paid $300,000.00 out of the project funding for these *prior* development services…" (emphasis added) [FAC Ex. 3 at PageID.309].

See also Christopher Jerome Affidavit, Ex. 4 at ¶ 13. Thus, it is uncontroverted that the Plaintiffs developed and possessed the Intellectual Property, that the Defendants appropriated and are now using, FAC at PageID. 284, ¶ 151, well before meeting any of the Defendants.

**Project Award**

The RFQP Chronology

Separate from the Plaintiffs' Intellectual Property interest is their property interest in the Project Award. The FAC outlines this property interest in detail. First, Plaintiffs *already owned* and controlled the 8 acres of the Project Award that are actually on Michigan Avenue, the so-called "gateway." FAC at PageID.257-258, ¶ 37-38 and Ex. 2 at pp. 4, 11. After developing the Intellectual Property for these two properties, FAC at PageID.258, ¶ 39, Chris Jerome developed the "game changing" plan that led to Lansing issuing its Request for Qualifications and Proposal

---

[4] "…(2) misappropriating and stealing the plans and depictions of the Capital Gateway Project for their own use…"

("RFQP") on June 6, 2012.  FAC at PageID.258-260 ¶¶ 42, 46, and 50.  The RFQP provided for

an initial sale of 12.5 acres of the Red Cedar Golf Course adjacent to the Story Properties, but

stated the bid authorities "will be receptive to proposals which include a vision for the area

beyond the prescribed boundaries of the Property approved by Lansing voters."  Ex. 1 at p. 4.

This "beyond the prescribed boundaries" is approximately 60 acres adjoining both the initial 12.5

acres and the Jerome Auto Properties.  See Ex. 1 at p. 4.

The RFQP proposal provided that it sought to "identify *one developer*" and after the

award of the RFQP, the award selection "should *ultimately result* in a Comprehensive

Development Agreement."  FAC at PageID.260, ¶ 51 and Ex. 1 at p. 1.  The RFQP specifically

required each proposal to "identify *its authorized agent who has unqualified authority* to bind the

developer with regard to all matters arising from or related to this process."  FAC at PageID.260,

¶ 52.  Importantly, the RFQP set forth certain enumerated reservations that limited the property

interest granted to Plaintiffs in the Project Award:

> Notwithstanding any other provision in this RFQP, the Public Entities, reserve the right to:
>> Reject any and all proposals.
>> Waive any errors or irregularities in the solicitation process or in any proposal.
>> Re-solicit proposal for the project.
>> Negotiate with any developer for a reduced price, or for an increase price to include any alternates any Developer may propose.
>> Reduce or revise the scope of the project, and re-solicit or negotiate with any Developer regarding the revised project.
>> Defer or abandon the project.  Ex. 1 at p. 12.

Here the Public Entities accepted the Chris Jerome proposal; never waived any errors;

never solicited new bids for the project; did not ask for a reduced or higher sale price; did not re-

solicit bids based on a revision of the project; nor abandon the project:  So the Public Entities

never exercised any of the reservations.

5

On July 9, 2012, Chris Jerome submitted the Project proposal to the City of Lansing and LEAP with his name listed as the authorized agent.  "The Project proposal was *paid for and created by Chris Jerome and his family*." FAC at PageID.263, ¶ 64 (emphasis added). This proposal combined the 8-acre Jerome Auto Properties already *owned* by the Plaintiffs with the RFQP acreage of 12.5 acres or the additional 60 acres if authorized by the voters of Lansing. See Ex. 2 at p. 4.  On August 13, 2012, the City of Lansing announced Chris Jerome's Capital Gateway Project proposal was selected as the RFQP winner.  FAC at PageID.263, ¶ 66.  Two weeks later, the Lansing City Council approved the Project Award.  FAC Ex.3 at PageID.308. Chris Jerome then campaigned as the pubic face of the Project Award to convince the voters of Lansing to include the additional 60 acres in development.  FAC at PageID.263, ¶ 67.  Three months later, on November 6, 2012, the citizens of Lansing agreed to grow the Project Award by voting to sell the additional 60 acres of the Red Cedar Golf Course.  FAC at PageID.263, ¶ 68.

Defendants' Treat Plaintiffs' Project Award as a Valuable Property Asset

From May of 2012 through December 2, 2013, when Karl Dorshimmer, the Chief Operating Officer of the Lansing Economic Area Partnership, Inc. ("LEAP"), informed Chris Jerome that LEAP and the City of Lansing were taking the Project Award away from the Plaintiffs, *all* of the defendants, including Messrs. Ferguson, Stralkowski, Bernero, Trezise, Clark, Kass and LEAP routinely recognized the Project Award as the property interest of the Plaintiffs.   For instance, Mr. Ferguson repeatedly asked for portions of the Project Award from the Plaintiffs; either through false representations of cooperation or extortionate threats.  See, for example, FAC at PageID.264-265, ¶¶ 72-76.  In the attachment to his October 25, 2012 letter to Chris and Leo Jerome, Mr. Ferguson acknowledges in sections entitled "Joint Development" and

"Prior Development" that the Project Award property was developed by the Plaintiffs.  FAC Ex. 3 at PageID.308-309.

In the same manner, Defendant Bernero repeatedly hectored the Plaintiffs to give Mr. Ferguson a portion of their property, the Project Award.  For instance, in December, 2012, Mayor Bernero pushed the Jeromes to give into Ferguson's demands for a portion of the Project Award.  FAC at PageID.268, ¶ 90.b.  Mayor Bernero continued to push the Plaintiffs to agree to Ferguson's demands for a portion of their Project Award on December 20, 2012, FAC at PageID.268-269, ¶ 90; March 6, 2013, FAC at PageID.275, ¶ 107; March 7, 2013, FAC at PageID.275, ¶ 108; and March 26, 2013, FAC at PageID.276, ¶ 110.  Similarly, Defendants Trezise and LEAP also participated in repeated acts that demonstrated their recognition of Plaintiffs' property interest in the Project Award.  For instance, on December 20, 2012, Trezise was present when Defendant Bernero pushed the Plaintiffs to give a portion of their award to Ferguson, FAC at PageID.270, ¶ 98, and then subsequently, Trezise on his own pushed the Plaintiffs to acquiesce and give a portion of their award to Ferguson.  See, for example, FAC at PageID.270, 275-277, ¶¶ 99b, 109, 114.

**Substantive Counts**

On February 10, 2017, the Court ordered:

> that Plaintiffs shall file an Amended Complaint not later than March 9, 2017, revising and refining the complaint allegations in accordance with the Court's directives on the record and specifically addressing the requisites of each asserted legal claim; Plaintiffs shall attach a chart concisely delineating for each claim the conduct of each Defendant in violation of the respective statute and/or establishing the Defendant's liability.        Dkt. 60.

Accordingly, Defendants filed their FAC with Exhibit 7 specifically "delineating for each claim the conduct of each Defendants in violation of the respective statutes and/or establishing the

Defendant's liability." Thus, Plaintiffs rely on the FAC (PageID.251-297) and Exhibit 7 (PageID.320-345) for the balance of their Statement of Facts.

## STANDARD OF REVIEW

When reviewing a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction based on standing, the district court must "construe the complaint in the light most favorable to the Plaintiffs and accept all well-pleaded factual allegations as true." In reviewing factual attacks on standing, a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts. *See Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.1981); *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3rd Cir.1977); *Ohio Nat. Life Ins. Co. v. United States*, 922 F2d 320, 325 (6th Cir. 1990); *Phillips v. DeWine*, 841 F.3d 405, 413 (6th Cir. 2016); see also *Warth v Seldin,* 422 U.S. 490, 401 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, ... the ... [C]ourt must accept as true all material allegations of the complaint, and [it] must construe the complaint in favor of the complaining party.")[5]

Likewise, when reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, "[t]he district court must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support his claims that would entitle him to relief." *Columbia Natural*

---

[5] It is unclear whether Defendants are presenting a facial or factual challenge. In their Standard of Review, Defs' Br at p. 6., Defendants first state the standard for a facial jurisdictional challenges - "A motion under this rule attacks the claim of jurisdiction on its face, taking Plaintiff's jurisdictional assertions as true. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004)." - but then go on to cite cases that involve factual jurisdictional challenges and argue in their brief as if they are mounting a factual challenge. Therefore, the Plaintiffs will address both, but treat this as a factual challenge to jurisdiction. In either event – facial or factual – Plaintiffs meet the challenge. *Ohio Nat. Life Ins. Co. v. United States*, 922 F2d 320, 325 (6th Cir. 1990)

*Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) (citation omitted). The district court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678; 129 S.Ct. 1937; 173 L.Ed.2d 868 (2009) (internal citations and quotations omitted). "When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. Hence, a judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Natural Resources*, 58 F.3d at 1109 (internal citations and quotations omitted).

## ARGUMENT

**I.      Plaintiffs Have Standing to Pursue this Action**

As the Defendants noted, the United States Supreme Court instructs in *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561; 112 S. Ct. 2130; 119 L.Ed.2d 351 (1992) that to obtain standing for relief a plaintiff must show:

1) The plaintiff has suffered an "injury in fact" — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, and not "conjectural" or "hypothetical";

2) There is a causal connection between the injury and the conduct complained of; in other words, the injury must be fairly traceable to the challenged acts of the defendant(s) and not the result of an independent act by a third party not before the court; and,

3) That the injury is likely, as opposed to merely "speculative," so the injury will be "redressed by a favorable decision."

*Lujan, supra* at 560-561.  Defendants' standing argument focuses only on the Project Award and what rights, if any, the award of the Project Award created.  However, Plaintiffs pled standing based on their Intellectual Property rights *and* the rights created by the Project Award, both of which provide Plaintiffs with standing for this action.

A.     **Plaintiffs Have Standing to Pursue this Action Based on the Injury to their Intellectual Property and Based on the Injury to their Property Interests in the Project Award**

1.     **Intellectual Property**

i.     **Plaintiffs Suffered an Injury in fact to their Concrete and Particular Intellectual Property**

In this case, Plaintiffs have pled two distinct concrete and particularized injuries that are both actual and imminent.  Yet, Defendants do not attempt to address Plaintiffs' uncontroverted property interest in the Intellectual Property that Chris Jerome created before 2012.[6]  Plaintiffs clearly pled that Christopher Jerome spent several hundred thousand actual dollars to develop Intellectual Property regarding the development of the vacant 8 acre Story Properties *and* the adjacent, potential development of the Red Cedar Golf Course.  This property interest is actual, not conjectural.   Its value led Mr. Jerome to obtain a Confidentiality and Non-Compete Agreement with Defendant Kass and his entities before sharing his architectural renderings and other Intellectual Property related to the development of the Story Properties and the Project Award.  FAC at PageID.282-283, ¶¶ 140-146.    Indeed, most tellingly, in one of his offers, Defendant Ferguson offered to pay $300,000 for this Intellectual Property.  FAC Ex. 3 at PageID. 309.  Simply put, Ferguson would not make such an offer, nor would Kass agree to sign a Confidentiality and Non-Compete, if the Intellectual Property were not a protectable property interest.

---

[6] *See* definition of "Intellectual Property": "1. A category of intangible rights protecting commercially valuable products of the human intellect. … 2. A commercially valuable product of the human intellect, in a concrete or abstract form…" *Black's Law Dictionary* (10th ed. 2014). As noted above, Defendant Ferguson offered to pay $300,000 for the Plaintiffs' Intellectual Property.

            **ii.**      **Defendants' Conduct Caused Injury to Plaintiffs' Intellectual Property**

The FAC (PageID.251-297) and Exhibit 7 of the FAC (PageID.320-345) are replete with factual allegations that connect the actions of the Defendants with the loss of the Plaintiffs' Intellectual Property. For instance, at PageID.282-283, ¶¶ 140-146, the FAC connects the loss of the Intellectual Property with Defendants Kass, Continental Development, and Hallmark Campus Communities. Similarly, at PageID.264, ¶ 72 of the FAC, Plaintiffs plead with particularity that, among other things, Mr. Ferguson lied about assisting the Plaintiffs and used "his misrepresentation(s) to gain access to the Jerome's pre-Project development designs, efforts, intellectual property, business contacts, and other valuable work product to reap the benefits of the Jeromes' work and cooperation." This theft, in part, allowed Ferguson and Kass and their related entities to take the Project Award from the Plaintiffs without a new bid process. FAC at PageID. 278 ¶ 118. Plaintiffs clearly pled in the FAC at PageID.284, ¶ 151 that Defendant Ferguson's and Defendant Kass's new company, Ferguson/Continental, is now "largely appropriating in form and substance the proprietary plans and specifications originally developed by the Jeromes…"

Plaintiffs pled and connected the loss of their Intellectual Property with each of the Defendants in FAC at PageID.285-286, 288-291, ¶¶ 158, 159, 163, 169, 173, and 187. Accordingly, Plaintiffs have pled facts which demonstrate the Defendants are the proximate cause of the loss of the Plaintiffs' Intellectual Property here.

            **iii.**     **Plaintiffs' Injury will be Redressed by a Favorable Court Decision**

Importantly, a favorable decision by the Court would redress the Plaintiffs' loss of their Intellectual Property with not only compensatory damages (applicable for all counts), but treble

damages (for the claims related to Counts One and Two), as well as "such other relief as the Court deems just and proper." Thus, a favorable decision can remedy and address the monetary damages caused to the Plaintiffs by the Defendants theft of Plaintiffs' Intellectual Property. Further, the Court then also has the ability to provide "such other relief as the Court deems just and proper" to include equitable relief to prevent any of the Defendants from using Plaintiffs' Intellectual Property in the future.

### 2. Project Award

Unable to challenge the Plaintiffs' standing arising from their legally protected interest in their Intellectual Property, Defendants only address the Project Award. They argue the Project Award does confer standing because "(1) the RFQP and RFQP Response do not grant any rights whatsoever, (2) even if they did, Plaintiffs were not a party to these documents, and (3) any redress sought by Plaintiffs based on the RFQP and RFQP would be entirely speculative." Defendants are wrong: the Project Award did grant the Plaintiffs the exclusive property right to negotiate where that negotiation "should *ultimately result* in a Comprehensive Development Agreement." FAC at PageID.260, ¶ 51 and Ex. 1 at p. 1; Plaintiffs were a party to the Project Award; and Plaintiffs' damages are ascertainable and thus subject to redress.

### i. Plaintiffs Suffered an Injury in fact to their Concrete, Particular, and Exclusive Project Award

Defendants rely largely on *Angelo DiPonio Equip. Co. v. State Dep't of State Highways & Transp.*, 107 Mich.App. 756; 309 N.W.2d 566 (Mich. App. 1981) to argue Plaintiffs have no property or contract interest here. However, *DiPonio* is factually inapposite because the DiPonio bid was never recognized as the winning bid; indeed, Department of State Highways (now the Michigan Department of Transportation) re-bid the proposed road project without ever declaring DiPonio *or anyone else* the winning bidder. That is not the case here. The Plaintiffs *won* the

Project Award on August 13, 2012. FAC at PageID.263, ¶ 67. It gave the Plaintiffs the *exclusive* right to negotiate with the public entities, LEAP and the City of Lansing, which should ultimately result in a Comprehensive Development Agreement. Put differently, this case involves an actual Project Award to Plaintiffs (not a rejection of a bid). The Sixth Circuit has recognized this crucial distinction, noting that a plaintiff may establish a legitimate claim of entitlement by showing that it was actually awarded the contract at any procedural stage. *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992), citing *Peterson Enters., Inc. v. Ohio Dept. of Mental Retardation*, 890 F.2d 416 (6th Cir. 1989) ("if Plaintiff actually had been awarded the contract any procedural stage, he might have claimed a property interest."), unpublished decision (attached as Exhibit 5). Among other things, the requirement to formally rebid the Project Award and the separate requirement regarding the Public Entities reservations limited the discretion of LEAP and Lansing here, and prevented them from taking Plaintiffs' Project Award.

As a factual matter, the existence and value of the Plaintiffs' exclusive property right here is best established by the various defendants' themselves. The defendants' egregious acts to take that right away from the Plaintiffs demonstrates that the interest was concrete and not hypothetical. The sustained and escalating conduct of threats by Ferguson and Stralkowski, aided by defendants Bernero, Trezise, LEAP, Clark and the others, demonstrates that the Project Award was an actual property interest that was worth great effort to acquire. Importantly, this winning award was affirmed by the Lansing City Council on August 27, 2012. FAC Ex. 3 at PageID.308. After the City Council affirmed the award, Chris Jerome then campaigned as the public face of the Project Award to convince the voters of Lansing to include the additional 60 acres for development. FAC at PageID.263, ¶ 67. The citizens of Lansing then ratified the

13

initial Project Award, and the City Council vote on November 6, 2012 when they authorized the sale of the additional 60 acres of the Red Cedar Golf Course.  FAC at PageID.263, ¶ 68.

Finally, Plaintiffs do not claim an unencumbered property interest; rather the Project Award was subject to the six reservations that the Public Entities could exercise to take the award away from the Plaintiffs.  Ex. 1 at p. 12.  However, none of the Public Entities exercised any of the six reservations and thus Plaintiffs maintained their property interest until December 13, 2013, when LEAP revoked the award as a result of the Defendants' acts. FAC at PageID.278, ¶118.  Accordingly, with the award of the Project Award, the Plaintiffs obtained a concrete and particularized and protectable property interest which provides them standing here.

### B.    Plaintiffs Have Legally Protected Rights under the Project Award even if Plaintiffs are not Parties to the Documents

Defendants assert that the Court should dismiss this case for lack of standing arguing that Capital Gateway Project, LLC, rather than the named Plaintiffs, was the selected developer under RFQP Response.  Defendants argue that the rights and interests of Plaintiffs, Christopher Jerome and Leo Jerome, as owners of Capital Gateway Project, LLC, are merely derivative and can only be asserted here by Capital Gateway Project, LLC.

On the contrary, in the context of shareholder/corporation derivative claims, the question of whether the shareholder has constitutional standing to sue, and the question of which party— the shareholder or the corporation—is the real party in interest to assert the claim, are separate questions.  *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 532-533 (6th Cir. 2002);  *Ensley v. Cody Resources, Inc.*, 171 F.3d 315, 320 (5th Cir. 1999), reh., *en banc,* den., 181 F.3d 98 (5th Cir. 1999);  *Whelan v. Abell*, 953 F.2d 663, 672 (D.C. Cir. 1992), cert. den., *Toomey v. Whelan*, 506 U.S. 906 (1992).  The constitutional standing issue turns on whether the plaintiff has suffered an injury in fact caused by the defendant's conduct.  *Whelan, supra*, 953 F.2d at 672.  In

14

the case of a closely-held corporation (such as Capital Gateway Project, LLC in the instant case[7]), the shareholders satisfy the injury requirement when the defendant's conduct is alleged to have caused an injury to the corporation thereby diminishing the value of the shareholders' interest in the corporation.  *Id.*; *Ensley, supra*, 171 F.3d at 319-320; see also *Logitrans, supra*, 297 F.3d at 533-534 (Judge Gilbert, concurring) (distinguishing between the parent corporation shareholder of the real party in interest, which did have constitutional standing, and the sister corporation of the real party in interest, which did not have a stake in the outcome of the case and therefore did not have standing).  The Plaintiffs' FAC in the present case satisfies the constitutional standing standard, as the value of the ownership interest of Plaintiffs, Leo and Christopher Jerome, in Capital Gateway Project, LLC were adversely affected by Defendants' conduct.

The second question, whether the shareholders or the corporation is the real party in interest under applicable state corporation law to assert the claim for harm caused directly to the corporation and indirectly to the corporation's shareholders, is not a constitutional standing question, but a *prudential* "real party in interest" standing question that is governed by Fed.R.Civ.P. 17(a).  *Ensley, supra*, 171 F.3d at 320; *Logitrans, supra*, 297 F.3d at 532-533; *Whelan, supra*, 953 F.2d at 672.

Rule 17 provides, in pertinent part:

**Rule 17.        Plaintiff and Defendant; Capacity; Public Officers**

(a)      Real Party in Interest.

(1)      *Designation in General.*  An action must be prosecuted in the name of the real party in interest. . . .

---

[7]        Christopher and Leo Jerome are and have always been the sole owners of Capital Gateway Project, LLC.  Ex. 4, *Affidavit of Christopher Jerome*, ¶¶ 16-17, 19, pp. 5-6.

* * *

> (3)    *Joinder of the Real Party in Interest*.  The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.  After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

FED.R.CIV.P. 17(a)(1), (3).  Defendants' argument that Plaintiffs lack standing to assert a claim for damages suffered by Capital Gateway Project, LLC, is, at bottom, a real party in interest objection under Rule 17(a).  *Ensley, supra*, 171 F.3d at 320; *Whelan, supra*, 953 F.2d at 672.

In the circumstances of this case, the real party in interest/standing objection lacks merit. In support of their objection, the Defendants cite *Warren v. Manufacturers Nat. Bank of Detroit*, 759 F.2d 542 (6th Cir. 1985); *Frank v. D'Ambrosi*, 4 F.3d 1378 (6th Cir. 1993); *Salem Springs, LLC v. Salem Township*, 312 Mich.App. 210; 880 N.W.2d 793 (2015); and *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491 (5th Cir. 2012).  These cases are each distinguishable from the present situation in that the plaintiffs in those cases lack the identity of interest that exists between Capital Gateway Project, LLC and its sole members, Leo Jerome and Christopher Jerome.

In the *Warren* case, the corporation that was allegedly harmed by defendant's conduct was the debtor in an involuntary bankruptcy case brought by its creditors.  *Warren, supra*, 759 F.2d 545.  The plaintiff was the corporation's sole shareholder and was employed by the corporation until the bankruptcy intervened.  *Id.* at 544.  The corporation's bankruptcy severed the identity of interest between the corporation and Warren, its sole shareholder, because the corporation's creditors' interests take priority in the bankruptcy.  The bankruptcy also had the effect of making the corporation's claim to recover for damages caused directly to it property of the bankruptcy estate under the federal Bankruptcy Code, 11 U.S.C. § 541(a)(1), which can only be asserted by the appointed trustee for the bankruptcy estate, to the exclusion of the debtor's

16

creditors and shareholders.  *In re Van Dresser Corp.*, 128 F.3d 945, 947 (6th Cir. 1997).  In the present case, Capital Gateway Project, LLC is not and has not ever been the debtor in a bankruptcy case, voluntary or involuntary.  *Christopher Jerome Affidavit*, ¶ 20, page 6.

In *Frank v. D'Ambrosi*, the plaintiff and one of the defendants were each 50% shareholders in Lornic Corporation which had been dissolved with the consent of both shareholders.  The court affirmed the dismissal of the plaintiff's RICO case on the grounds that the plaintiff lacked standing to redress injuries to Lornic Corporation and because plaintiff's complaint otherwise failed to state the necessary facts to support a RICO claim.  *Frank v. D'Ambrosi, supra*, 4 F.3d at 1385-1386.  The fact that the plaintiff in the *Frank* case was only a 50% shareholder and his claim was asserted against the other 50% owner distinguishes *Frank* from the present case.  In the present case, Plaintiffs, Christopher and Leo Jerome, are the sole member/owners of Capital Gateway Project, LLC, *Christopher Jerome Affidavit*, ¶¶16-17, 19, pp. 5-6, and have the power to consent to and ratify on behalf of the limited liability company all of their own actions, including their actions in bringing this case in their own name.  In fact, Capital Gateway Project, LLC *has* ratified Plaintiffs' actions in bringing this case and assigned its claims to Leo Jerome and Christopher Jerome.  *Id.*, ¶ 21, page 6.   *See Digizip.com, Inc. v. Verizon Services Corp.*, 139 F.Supp.3d 670, 679-680 (S.D. N.Y. 2015) (ratification of lawsuit by real party in interest is sufficient to cure lack of standing under FED.R.CIV.P. 17(a)(3)).  There is no one other than Christopher and Leo Jerome who have the authority to consent or withhold consent on behalf of Capital Gateway Project, LLC.  The identity of interest between the Jeromes and Capital Gateway Project, LLC are complete.

The *Salem Springs* case turns on whether the plaintiff had standing under MCL 600.4545 to challenge a local township election that affected certain land re-zoning within the township.

Section 600.4545(2) grants standing to sue only to the county prosecutor or to any citizen of the county.  Since the plaintiff limited liability company was not a citizen of the county, it lacked standing under the statute to challenge the election.  *Salem Springs, supra*, 312 Mich.App. at 219-220.

Finally, in the *Baisden* case, the court affirmed the district court's dismissal of plaintiff Michael Baisden's claim for tortious interference with contract on the grounds that he was not a party to the contract that was the subject of that claim.  *Baisden, supra*, 693 F.3d at 509-510. The *Baisden* court does not even identify what Mr. Baisden's relationship was to any of the parties who *were* parties to the contract, except to note that Mr. Baisden was "presumably a part" of the entity known as "Farcor Baisden Partnership, L.L.C.," one of the parties to the contract. *Id*. at 498.

Even if the Defendants' objection were meritorious, the Court should allow the objection to be cured either by allowing Plaintiffs to amend their complaint to join Capital Gateway Project, LLC as plaintiff in this case or by recognizing Capital Gateway Project, LLC's ratification of the existing Plaintiffs' lawsuit and its assignment of its claims to the existing plaintiffs.  *Digizip.com, Inc.*, 139 F.Supp.3d at 679-680 (assignee and owner of plaintiff's claims at the time lawsuit was filed was real party interest, not plaintiff, but ratification of lawsuit by real party in interest and reassignment of claims to plaintiff was sufficient to cure lack of standing under FED.R.CIV.P. 17(a)(3));  *Ralph Gonnocci Revoc. Living Trust v.  Three M Tool & Mach., Inc.*, Case No. 02-74796, 2006 WL 89867, *3 (E.D. Mich. Jan. 13, 2006) (amendment of complaint to join omitted real party in interest appropriate under FED.R.CIV.P. 17(a)(3) and FED.R.CIV.P. 15(a)(2) when original complaint failed to include the real party in interest, the trustees of the plaintiff trust, as plaintiff)(attached as Exhibit 6);  *Hillgraeve Corp. v. Symantec*

*Corp.*, 212 F.R.D. 345, 348 (E.D. Mich. 2003) (amendment of complaint to substitute omitted real party in interest appropriate under FED.R.CIV.P. 17(a)(3) and FED.R.CIV.P. 15(a)(2) when the original complaint inadvertently identified the plaintiff as "Hillgraeve Corporation," a non-existent entity, and Hillgraeve, Inc. was the correct plaintiff real party in interest).

Further, the Court should note that Defendants' standing argument does not apply to every claim in Plaintiffs' FAC.  For example, Count I, pages 34-37 at PageID.284-287, Plaintiffs' FAC alleges that Defendants appropriated the Plaintiffs' Intellectual Property.  The Defendants do not and cannot contend that the Intellectual Property ever property belonged to Capital Gateway Project, LLC.

As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that they lost the award of the Project Award and all expected attendant profits, as well as hundreds of thousands of dollars in costs expended to develop the Project, and the loss of their Intellectual Property.  FAC at PageID.286, ¶163.

### C.  Plaintiffs' Injury will be Redressed by a Favorable Court Decision

Defendants claim that a favorable court decision cannot redress or remedy Plaintiffs' injury.  However, Defendants do not provide any supporting legal authority and offer only the factual argument that the damages are speculative.  Yet, as is the case in any commercial case, either through Plaintiffs' fact witness testimony regarding the amounts spent to develop and create the Intellectual Property or through expert witness real estate valuation testimony for the Project Award damages, a jury here can find facts and a favorable judgment here can remedy the Plaintiffs' losses.  All five of the counts seek compensatory damages equal to the damages the Plaintiffs have suffered.  Further, Counts One and Two seek statutory treble damages.  These

damages are ascertainable and can remedy Plaintiffs' damages. Finally, Plaintiffs seek "such other relief as the Court deems just and proper" which encompasses both monetary damages and equitable relief.  Thus, potentially based on the factual development during discovery and trial, the Court may in the future provide equitable relief to prevent any of the Defendants from using Plaintiffs' Intellectual Property in the future.

## II.    Plaintiffs Adequately Pled the RICO Counts in the FAC

### A.    Plaintiffs Adequately Pled that the RICO Defendants Violated 18 U.S.C. §1962(c)

18 U.S.C. § 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  The statute defines racketeering as "any act or threat involving … extortion …, which is chargeable under State law and punishable by imprisonment for more than one year," 18 U.S.C. § 1961(1)(A), and also includes as prohibited activities "any act which is indictable under any of the following of title 18, United States Code:..section 1341 (relating to mail fraud) and section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). A "'pattern of racketeering activity' requires at least two acts of racketeering ... the last of which occurred within ten years … after the commission of a prior act of racketeering activity[.]" 18 U.S.C § 1961(5).

Thus, "[a] complaint asserting a RICO claim must allege the (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering." *Paycom Billing Servs., Inc. v. Payment Res.*

*Int'l*, 212 F. Supp. 2d 732, 735 (W.D. Mich. 2002). The United States Supreme Court in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229; 109 S.Ct. 2893; 106 L.Ed.2d 195 (1989) defined term "pattern" to mean "the showing of a relationship between the predicates and the of the threat of continuing activity. It is this factor of *continuity plus relationship* which combines to produce a pattern." 492 U.S. at 239. Continuity may be open ended or closed. *Id.* at 241.

Despite Defendants' arguments to the contrary, Plaintiffs have sufficiently pled a violation of 18 U.S.C. § 1962(c) by Defendants Ferguson, Stralkowski, and Ferguson Development, LLC ("RICO Defendants"). Plaintiffs have specifically alleged at least 15-plus predicate acts committed by the RICO Defendants. The enterprise in this matter consists of Defendants Ferguson, Stralkowski, and Ferguson Development, LLC – all associated in fact. See FAC at PageID.254-255, ¶¶ 24-27. Defendant Ferguson is the leader of the Ferguson Enterprise, which also includes his son-in-law, Defendant Stralkowski as his executive project manager, for Ferguson Development LLC.  *Id.*

### 1.   Ferguson Development LLC is Distinct Person Subject to RICO Liability

Plaintiffs have not alleged that Defendant Ferguson Development LLC is both a "person" and an "enterprise."   Instead, Plaintiffs' have defined the enterprise run by Defendant Joel Ferguson as the "Ferguson Enterprise" or "Enterprise."  FAC at PageID.254, ¶24.  Plaintiffs further allege that the Ferguson Enterprise includes Ferguson's son-in-law, Defendant Stralkowski and Ferguson Development LLC.  FAC at PageID.254, ¶24.  Though Ferguson Development LLC cites to *In re ClassicStar Mare Lease Litig*., 727 F.3d 473 (6th Cir. 2013), it ignores important points – the most important being: "corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles

within the enterprise or use their separate legal incorporation to facilitate racketeering activity." *Id*. at 492.

In this case, as alleged by Plaintiffs, Ferguson Development LLC performs a different role within the enterprise with Defendants Ferguson and Stralkowski and uses it's legal incorporation to facilitate racketeering activity.  It is a separate "person" under RICO subject to liability.  The "enterprise" is the "Ferguson Enterprise" (FAC at PageID.254, ¶24) and Ferguson Development LLC is one of the "persons" involved in the Ferguson Enterprise (FAC at PageID.254, ¶24).  In the case cited by Ferguson Development in support of his position, *In re ClassicStar*, 727 F.3d 473, the defendants made a similar challenge on appeal to the one being set forth in the Unified Motion, i.e., that because the enterprise consisted only of the companies' agents, subsidiaries, and affiliates, the company could not be liable under RICO because it cannot be both a RICO "person" and the "enterprise."  *Id*. at 492.  The Sixth Circuit disagreed, finding that the company played its own distinct role and, therefore, was sufficiently distinct from the enterprise to be separately liable.

Given that the FAC must be construed in the light most favorable to the plaintiff and that all inferences must be construed in Plaintiffs' favor, *Columbia Natural Resources*, 58 F.3d at 1109, and given the clear allegations against Ferguson Development LLC as a distinct member of the Ferguson Enterprise, Ferguson Development LLC's motion should be denied.

### 2.    Plaintiffs Sufficiently Allege a "Pattern" of "Racketeering Activity"

The Defendants correctly state a pattern of racketeering activity requires continuity and relatedness among the predicate acts.  *Moon v Harrison Piping Supply*, 465 F.3d 719, 724 (6th Cir. 2006).  Here, Defendants do not question the relatedness between the predicate acts (or what the Sixth Circuit calls "facts external to the predicate acts," *Brown v. Cassens Transport Co*., 546

F.3d 347, 355 (6th Cir. 2008)), because all of the predicate acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Moon,* 465 F.3d at 724 (internal citations omitted).

Just two years ago the Sixth Circuit observed that when "assessing continuity and relatedness, courts consider several factors: the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Grubbs v Sheakley Group, Inc.*, 807 F.3d 785, 804 (6th Cir. 2015) (citation omitted).  Here, as is pled in the FAC and Exhibit 7 to the FAC, as well as addressed below,  the fifteen predicate acts plus "facts external to the predicate acts" committed in 2014, 2015, 2016, and 2017;  the victimization of not only the Plaintiffs, but Developer A, FAC at PageID.279, ¶¶121-123 and FAC at PageID.279-281, ¶¶125-133; the potential financial risk to Lansing citizens who have agreed to provide the Ferguson Enterprise with $38 million in subsidies, FAC at PageID.281, ¶ 135; the costs to Ingham County residents because the Drain Commissioner is providing $38 million in public dollars to subsidize the private Ferguson Enterprise's cost of development, FAC at PageID.281, ¶ 136; and the risk of further financial liability as the Defendants seek an additional $35 million in assistance from Ingham County, FAC at PageID.282, ¶ 138, all show a racketeering pattern that is open-ended. Further, the injuries to the Plaintiffs when the Ferguson Enterprise stole Plaintiffs' Intellectual Property and Project Award, the injuries to Developer A in 2014 and 2015, and the injuries to Lansing and Ingham County residents in 2016 and 2017 are all distinct.

### i.      Plaintiffs Have Adequately Pled Open-Ended Continuity

Plaintiffs have demonstrated an open-ended continuity based pattern of racketeering activity by the RICO Defendants through their long-term racketeering activities and through evidence that these activities form the Ferguson Enterprises' ongoing regular way of doing business.

Defendants do not dispute the relationship prong of the pattern of racketeering prong, but instead argue that Plaintiffs have failed to plead with particularity any form of continuity. Despite Defendants' arguments to the contrary, Plaintiffs have sufficiently pled a pattern of racketeering through open ended continuity.

"[O]pen ended continuity could be pleaded through facts showing 'a distinct threat of long-term racketeering activity,' or by showing 'that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.'" *Moon*, 465 F.3d at 726-727 (quoting *H.J. Inc.*, 492 U.S. at 242).

Here, the Ferguson Enterprise engaged broadly in the predicate acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), as well as extortion and bribery, in violation of the Hobbs Act, 18 U.S.C. § 1951[8] and Michigan Compiled Laws 750.213[9] and 750.117[10] from

---

[8] Under the Hobbs Act, it is a felony to obstruct, delay, or affect commerce by extortion or attempts or conspiracy to do so. 18 U.S.C. § 1951(a). "Extortion" is "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

[9] Under Michigan law, "[a]ny person who shall, either orally or by a written or printed communication…maliciously threaten any injury to the person or property…with intent thereby to extort money or any pecuniary advantage whatever…" is guilty of the felony of extortion. Mich. Comp. Laws Ann. § 750.213.  Under Michigan law, it is not necessary that the threat actually intimidates the complainant or is even successful in obtaining money or pecuniary advantage. *Nali v Phillips,* 681 F3d 837, 842-843 (6th Cir. 2012).

June 2012 continuing to the present date. Plaintiffs, Developer A, and the citizens of City of Lansing all suffered and suffer at the hands of the Ferguson Enterprise. Through the Ferguson Enterprise's commission of mail fraud, wire fraud, extortion and bribery, the Plaintiffs were harmed economically by the loss of their Intellectual Property and the Project Award, Developer A through lost development opportunities, and the citizens of Lansing and Ingham County through increased financial exposure for a private enterprise.  See generally, FAC at PageID.261, 264-278, 285, ¶¶ 54-56, 71-115, 158, and Exhibit 7 of the FAC at PageID.320-345.

Not content to just appropriate Plaintiffs' Intellectual Property and sabotage Plaintiffs' Project Award, during 2014 and 2015, Ferguson, LEAP, and Mayor Bernero continued the Ferguson Enterprise's established pattern of threats and attempts to extort monies – this time from Developer A with whom Plaintiffs had an established relationship in the attempted sale of Plaintiffs' property to Developer A. See FAC at PageID.280-281, 286, ¶¶ 129, 131, 132, and 162. While not listed as predicate acts, these acts by Ferguson, LEAP, and Mayor Bernero clearly forwarded the purposes and goals of the Ferguson Enterprise in a successful attempt to fend off a developer who would put a competing mixed-use, student housing project on one of the Jerome Auto Properties, see FAC at PageID.279, ¶ 121, in direct competition with Ferguson Enterprise's current ongoing Red Cedar project (the stolen Project Award).

Now, based on their no-bid project award – a project largely containing Plaintiffs' Intellectual Property – the Ferguson Enterprise has received at least $35 million in bonding of

---

[10] Michigan law also makes it a felony to bribe public officials: "Any person who shall corruptly give, offer or promise to any public officer, agent, servant or employee…any gift, gratuity, money, property or other valuable thing…the purpose and intent of which is to influence any act or omission relating to any public duty of such officer, agent, servant or employee, shall be guilty of a felony." Mich. Comp. Laws Ann. § 750.117.

public monies from the City of Lansing and is currently seeking an additional $35 million bond

from the Ingham County Board of Commissioners. FAC at PageID.286, ¶ 162.

The Sixth Circuit, in *Brown v Cassens*, 546 F.3d at 355, found open-ended continuity

even where the plaintiffs did not plead open-ended continuity.  The court relied on this guidance

from the Supreme Court in *H.J. Inc.*:

> 'Continuity' is both a closed- and open-ended concept, referring either to a
> closed period of repeated conduct, or to past conduct that by its nature
> projects into the future with a threat of repetition." *H.J. Inc.,* 492 U.S. at
> 241, 109 S.Ct. 2893... Determining whether open-ended continuity has
> been established requires a court to probe "the specific facts of each case."
> *Id.* "A RICO pattern may surely be established if the related predicates
> themselves involve a distinct threat of long-term racketeering activity,
> either implicit or explicit." *Id.* Even when *"the number of related
> predicates involved may be small and they may occur close together in
> time," if "the racketeering acts themselves include a specific threat of
> repetition extending indefinitely into the future*," this "suppl[ies] the
> requisite threat of continuity." *Id.* A "threat of continuity may [also] be
> established by showing that the predicate acts or offenses are part of an
> ongoing entity's regular way of doing business."...*Id.* at 243, 109 S.Ct.
> 2893 (footnote omitted). (emphasis added).

*Brown*, *supra* at 354.

In *Brown*, the plaintiffs pled 13 predicate offenses of mail and wire fraud. *Id. at* 354-55.

Here defendants Ferguson and Stralkowski committed, at least, 15 predicate acts.  See FAC,

Exhibit 7 at pp. 3-9 (PageID.323-329).  As stated above, in *Brown,* the Court found open-ended

continuity:

> Although the plaintiffs do not specifically allege that this conduct is
> ongoing, given that "the threat of continuity need not be established solely
> by reference to the predicate acts alone," and that "facts external to the
> predicate acts may, and indeed should, be considered," the plaintiffs'
> allegations also state a period of open continuity.

*Id.* at 355 (citations omitted).

Here Plaintiffs pled "facts external to the predicate acts" that demonstrate the open-ended

and continuous nature of the Ferguson Enterprise, including:

- in 2013, co-conspirators Bernero's, Trezise's, and LEAP's acts and statements to both Jeromes to give into Ferguson and the Ferguson Enterprise, FAC at PageID.275-278, ¶¶ 107-116; these external acts and statements included Defendant Trezise's calls to out-of-state developers to undercut the Jeromes, FAC at PageID.278, ¶116;

- in 2014, external acts and statements by co-conspirators Trezise and LEAP to intimidate Developer A from dealing with the Jeromes to set up a competing real estate development abutting to the Enterprise's planned development (created with Plaintiffs' Intellectual Property), FAC at PageID.279, ¶¶ 121-123;

- in 2015, external acts and threats by Defendants Ferguson and Bernero to Developer A's representatives to intimidate Developer A from doing business with the Jeromes or, conversely, to do business with Ferguson and the Ferguson Enterprise, FAC at PageID.279-281, ¶¶ 125-132; these 2015 external acts included the very specific threat by Ferguson to the Developer A representative that Developer A's potential project was dead unless Developer A paid Ferguson $147,000 and exerted influence on the Jeromes to refrain from any litigation, FAC at PageID.281, ¶ 132;

- in 2016, as predicted by Defendant Stralkowski in January of 2013, the local drain commissioner began a $35 million public project that saves the Ferguson Enterprise millions of dollars in its attempt to develop the Red Cedar Golf Course, FAC at PageID.281, ¶¶ 136-137; and

- now, in 2017, the Ferguson Enterprise is again using Ferguson's political power to obtain $38 million in public funds to lessen its costs to develop the Red Cedar Golf Course, FAC at PageID.282, ¶ 138.

The 15 racketeering predicates, the "facts external to the predicate acts," and the well-pled historical allegations [11] over a five-year period of time demonstrate not only relationship, but open-ended continuity for pleading purposes at this stage in the proceedings. See, *Brown, supra,* at 354; *H.J. Inc., supra* at 243. ("Even when "the number of related predicates involved may be small and they may occur close together in time," if "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," this "suppl[ies] the

---

[11] See, for representative examples, FAC at PageID.255,259-263,266-277, ¶¶ 27, 28, 47-49, 54 b-d, 58-59, 62-63, 83 and FAC Exhibit 3 (PageID.307-309).

requisite threat of continuity.").

These well-pled allegations show the Ferguson Enterprise's racketeering activity thus presents both a distinct threat of long-term racketeering activity and demonstrably are part of the Ferguson Enterprises' regular way of doing business.

### 3. Plaintiffs Have Sufficiently Pled Mail and Wire Fraud Predicate Acts

Given the FAC, and more specifically, Exhibit 7 to the FAC, the Defendants speciously argue Plaintiffs have not sufficiently pled mail and wire fraud. Exhibit 7 explicitly lays out an inordinately large number of predicate acts of mail and wire fraud, many with exhibits as evidentiary support. For instance, Predicate Act No. 6 listed on Exhibit 7 at PageID.325, FAC at PageID.265, ¶77, pleads that on June 29, 2012, Ferguson caused his attorney to use the wires by email communication to memorialize Ferguson's then most-recent extortionate demand for Plaintiffs' property. This act mispresenting Ferguson's willingness to help the Plaintiffs – while secretly talking to co-Defendant Kass about an alternate deal – is a clear allegation of wire fraud.

The FAC and Exhibit 7 to the FAC explicitly pleads 3 other predicates of wire fraud by Ferguson or an agent at his direction:  Exhibit 7 Predicate Act No. 7 at PageID.325, FAC at PageID.265, ¶ 78; Exhibit 7 Predicate Act No. 10 at PageID.326, FAC at PageID.268, ¶¶ 88-89; and Exhibit 7 Predicate Act 12 at PageID.326-327, FAC at PageID.269-270, ¶¶ 91-96. The FAC and Exhibit 7 also plead one act of mail fraud by Mr. Ferguson, Exhibit 7 Predicate Act No. 9 at PageID.326, FAC at PageID.266-267, ¶ 83. The FAC and Exhibit 7 also plead 3 distinct predicates of wire fraud by Defendant Stralkowski:  Exhibit 7 Predicate Act No. 14 at PageID.328, FAC at PageID.267-268, ¶¶ 84-86; Exhibit 7 Predicate Act No. 15 at PageID.329, FAC at PageID.271, ¶ 100; and Exhibit 7 Predicate Act 16 at PageID.329, FAC at PageID.271-272, ¶ 101. For some of these predicates, the Plaintiffs plead the contents, date, and place (by

wire or mail) of the predicate; for the remaining, Plaintiffs attach the actual wire or mail communication with the contents, date, and place explicit in the Defendants' words.  See, for example, Exhibits 3 through 6 of the FAC (PageID.306-319).   However, for all of these predicates, the Plaintiffs pled the respective misrepresentations (or extortionate threats) in detail with sufficient particularity and circumstances to meet requirements of Rule 9b.

Despite Plaintiffs explicit citation to *Schmuck v United States*, 489 U.S. 705, 711-712; 109 S.Ct. 1443; 103 L.Ed.2d 734 (1989) in Exhibit 7 of the FAC, where the Supreme Court held that a mailing that is incident to an essential element of a fraudulent (or extortionate) scheme – or a step in the plot - satisfies the mailing element required of the 18 U.S.C. § 1341, the federal mail fraud statute, the Defendants conveniently choose to ignore this precedent.  Thus, the Plaintiffs' pleading of the 8 other predicates occasioned by a telephone call or email[12] to set up meeting between Messrs. Ferguson and Chris or Leo Jerome at Mr. Ferguson's office at Ferguson Development where Ferguson communicated a threat or misrepresentation sufficiently constitutes predicate offenses for purpose of RICO.  *Schmuck, supra; In re Sumitomo Copper Litig.*, 995 F.Supp. 451, 456 (SDNY 1998) ("In cases in which the plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves, S*ee Schmuck,* 489 U.S. at 715. In such cases, a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)).

Here, for instance, in Exhibit 7 Predicate Act No. 1 at PageID.323, FAC at PageID.261, ¶¶ 54-56, alleges on June 18, 2012, the Ferguson Enterprise made use of the wires (by telephone

---

[12] The *Schmuck* holding has been applied to e-mail communications forming the basis for wire fraud by the 6th Circuit.  *United States v. Shanshan Du*, 570 F. App'x 490, 505 (6th Cir. 2014), unpublished decision, attached as Exhibit 7.

either by Stralkowski or Ferguson's assistant) to arrange a meeting with the Plaintiffs. At the meeting at Ferguson Development, LLC's Lansing Office, Ferguson misrepresented that he would help Plaintiffs gain the necessary regulatory and governmental approvals "free of charge," and in turn solicited proprietary information from Plaintiffs. Yet, as contained in Exhibit 7 Predicate Act No. 2 at PageID.323-324, FAC at PageID.264, ¶¶ 70-72, at another meeting at the Ferguson Development, LLC office in Lansing, accomplished through telephone either by Stralkowski or Ferguson's assistant, Ferguson suddenly demanded a 5% equity stake in the Plaintiffs' project for his cooperation and help – while at the same time Ferguson was meeting with Kass to steal the project from the Plaintiffs using the same proprietary information, FAC at PageID.264, ¶ 73. This 5% equity demand also forms Predicate Act No. 3 at PageID.324, extortion, where Ferguson threatened to spike the project if his demands were not met. Again, this meeting and the preceding two acts were accomplished through use of wires in June 2012, meeting the *Schmuck* requirements that the use of mail or wires to facilitate the master plan of wresting as much equity as possible from the Plaintiffs in the Project Award or, if unsuccessful, then removing the Plaintiffs from the scene entirely.

### 4.   Plaintiffs Pled Sufficient Facts for the RICO Predicate Offense of Extortion

In Sections II, A 4 and 5b, Defs' Br. at pp. 26-28, Defendants argue Plaintiffs have not adequately pled the extortion predicates because (1) the Project Award contained no property rights, Defs' Br at p 27.; and (2) "Plaintiffs fail to make any allegations that the RICO Defendants obtained any property belonging to Plaintiffs (or anyone else, for that matter), through extortion." Defs' Br at p. 28. Both of these arguments fail. First, as noted above in Section I of this brief, Plaintiffs possessed two property interests that were stolen by the

Defendants, the Plaintiffs' Intellectual Property and the Project Award.  The Defendants simply never address the theft of the Intellectual Property in their brief.

Second, even if the Defendants did not obtain any property from the Plaintiffs, it is sufficient that the Defendants intended to obtain either of the Plaintiffs' property interests through extortionate threats.  Michigan's extortion statute is Michigan Compiled Law 750.213, which provides in relevant part:

> Any person who shall, either orally or by a written or printed communication, …or shall orally or by any written or printed communication *maliciously threaten any injury to* the person or *property … of another with intent thereby to extort money or any pecuniary advantage whatever*, or with intent to compel the person so threatened to do or refrain from doing any act against his will, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 20 years or by a fine of not more than 10,000 dollars.

Unlike the Hobbs Act, 18 U.S.C. §1951, MCL 750.213 does not require that the Defendants actually obtained property from the Plaintiffs, rather it is sufficient to establish the predicate of (Michigan) state law extortion if any of the Defendants threatened the property of the Plaintiffs "with intent thereby to extort money or any pecuniary advantage whatever."  MCL 750.213; *Nali v. Phillips*, 681 F.3d 837, 842-843 (6th Cir. 2012).  Accordingly, even if Defendants had not obtained the Intellectual Property and Project Award by their extortionate threats, it is sufficient that the Defendants made the threats with the intent to obtain the Intellectual Property or Project Award.

### 5.    Plaintiffs Have Adequately Pled a RICO Violation Regarding the Sale of Land to Developer A

In May of 2015, Ferguson and Stralkowski telephoned, emailed, and intimidated Developer A in an attempt to cause Developer A to reveal proprietary information and leverage this proprietary information because it represented competition to the Ferguson Enterprise Project. FAC at PageID.280, ¶ 129.  These were predicate state law extortion acts.  See MCL

750.213 and *Nali, supra*.  Ferguson's outright attempted extortionate demands on June 5, 2015, of $147,000 from Developer A, along with pressure to force Plaintiffs to drop a pending suit against the Ferguson Enterprise in Cook County, Illinois, and a threat that Developer A would be unable to develop the Plaintiffs' property are all extortionate threats. FAC at PageID.280-281, ¶ 130-132. These allegations all meet the requirements for a RICO violation.

While these predicate acts were not pled with the 15 predicates listed in Exhibit 7 of the FAC, they are, nonetheless, predicate acts that forward the open-continuous pattern of racketeering that the Ferguson Enterprise has engaged in over the past five years.  Even if not included as predicate acts, these acts still are minimally "facts external to the predicate acts" that show the continuity of the Ferguson Enterprise.

**B.      Plaintiffs Have Amply Demonstrated the Sprawling Conspiracy by the Count II Defendants under 18 U.S.C. 1962(d)**

To state a claim under 18 U.S.C. § 1962(d), the plaintiff must allege the existence of an agreement to participate in an endeavor which, if completed, would constitute a violation of the RICO statute. *Salinas v. United States*, 522 U.S. 52, 67 (1997). This requires plaintiff to allege the elements of a RICO violation, as well as "an existence of an illicit agreement to violate the substantive RICO provision." *Heinrich v. Waiting Angels Adoption Servs., Inc.,* 668 F.3d 393, 411 (6th Cir. 2012).  In the civil context, a plaintiff must allege that the defendant "knew about and agreed to facilitate the scheme." *Baisch v. Galina*, 346 F.3d 366, 377 (2d Cir. 2003) (quoting *Salinas*, 522 U.S. at 66).[13]

---

[13]      When considering the conspiracy here, some of the fundamental rules of co-conspirator statements apply.  Under the Federal Rules of Evidence, an out-of-court statement is admissible when made by a "coconspirator of a party during the course of and in furtherance of the conspiracy." FED.R.EVID. 801(d)(2)(E).  There is no requirement that the party against whom the statement is offered be a member of the conspiracy at the time of the statement. "[T]he declarations and acts of the various members, even though made or done prior to the adherence

As demonstrated above, Plaintiffs have sufficiently established the elements of a substantive RICO violation, 18 U.S.C. § 1962(c), by Defendants Ferguson, Stralkowski, and Ferguson Development LLC. The Court ordered the Plaintiffs to file an amended complaint with an exhibit chart "concisely delineat[ing] for each claim the conduct of each Defendant in violation of the respective statute and/or establishing the Defendant's liability…"  Exhibit 7 of the FAC accomplished that task for the Count Two defendants at pp. 11-15, in addition to the primary allegations in the body of the FAC.

The FAC averments and exhibits, including Exhibit 7, sufficiently plead the Count Two Defendants violation of 18 U.S.C. § 1962(d).  The FAC lays out more than ample evidence that the Count II Defendants intentionally agreed and conspired to violate 18 U.S.C. § 1962(d) by assisting and facilitating Ferguson, Stralkowski, and Ferguson Development in the conduct of the Ferguson Enterprise through a pattern of racketeering, including phone calls, mailed documents, and emails, to further the numerous fraudulent misrepresentations made in violation of 18 U.S.C. §§ 1341 and 1343, and to attempt to accomplish the threats/bribes that violate the Hobbs Act, 18 U.S.C. § 1952 and Mich. Comp. Laws § 750.213 and § 750.117.

For instance, Ferguson's December 5, 2012 wire communication (email) to Plaintiffs regarding Ferguson's repeated demands for 50% equity in the Project in exchange for Ferguson's

---

of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy." *United States v. Cassity*, 631 F.2d 461, 464 (6th Cir.1980), vacated on other grounds, 468 U.S. 1212, 104 S.Ct. 3581, 82 L.Ed.2d 879 (1984) (*quoting United States v. U.S. Gypsum Company*, 333 U.S. 364, 393, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). *see also United States v. Adamo*, 882 F.2d 1218, 1230-1231 (7th Cir. 1989) ("[I]t is well established that a defendant who joins a conspiracy takes the conspiracy as he found it. When he joined and actively participated in it, he adopted the previous acts and *declarations* of his fellow co-conspirators." (Emphasis in original).

"assistance," carbon-copied Mayor Bernero and LEAP CEO Trezise: demonstrating Mayor Bernero's and Trezise's knowledge of and agreement to facilitate the master plan of the Ferguson Enterprise through a pattern of racketeering. FAC at PageID.268, ¶¶ 88-89. This is further demonstrated by the fact that Mayor Bernero called a meeting at Lansing City *the very next day* on December 6, 2012, in acknowledgment of the wire communication and in furtherance of the conspiracy, to discuss Ferguson's demands and intimidate Plaintiffs into acceptance of Ferguson's extortionate terms. FAC at PageID.268-269, ¶ 90. This meeting was attended by Bernero and Trezise, as well as Defendants Ferguson and Stralkowski.  FAC at PageID.268-269, ¶ 90  This conduct – group pressure to accept Ferguson's terms – was repeated on December 20, 2012, at a meeting whose attendees included Plaintiffs, Bernero's Chief of Staff, and LEAP CEO Robert Trezise. FAC at PageID.270, ¶ 98.

On March 6, 2013, Bernero revealed the extent of Ferguson's conspiracy by admitting to Plaintiffs that Ferguson and Chuck Clark had been in his office demanding that Bernero give Ferguson and Chuck Clark the Project in its entirety, without the Plaintiffs. FAC at PageID.275, ¶¶ 107-108.  On March 26, 2013, Bernero informed Plaintiffs that Ferguson would use his "control" over City Council to spike the Project unless Plaintiffs caved in to Ferguson's demands. FAC at PageID.276, ¶ 110. This threat demonstrates not only knowledge of the Ferguson Enterprise and its goals, but also a manifestation of Bernero's agreement to aid the Ferguson Enterprise in achieving these goals.

Bernero also admitted that he and LEAP CEO Trezise had secretly been in communication with Chris Jerome's investment group, while also revealing that Ferguson and Kass had long been planning to remove the Plaintiffs from the Project. FAC at PageID.276, ¶¶ 111, 112. Bernero's knowledge of this information and his subsequent conduct demonstrate,

again, knowledge the Ferguson Enterprise's intent to take the Project Award and acts to facilitate that appropriation.  On September 13, 2013, Bernero outright threatened to take the Project Award away from the Plaintiffs unless they accepted Ferguson's terms. FAC at PageID.276-278, ¶¶ 114-115.

Ferguson carbon-copied Trezise on a number of Ferguson's extortionate equity demand wire communications and thus Trezise knew about the intentions of the Ferguson Enterprise. FAC at PageID.268-269, ¶¶ 88-89, 91. Knowing the Ferguson Enterprise's intention and goal, Mr. Trezise attended several meetings in Lansing along with Ferguson, Mayor Bernero, and Stralkowski concerning Ferguson's extortionate demands and fraudulent misrepresentations geared towards pressuring Plaintiffs into accepting Ferguson's terms or risk loss of the Project Award (FAC at PageID.268,270,276-278, ¶¶ 90, 98, 114, 115); met with Ferguson, Clark, and the Drain Commissioner through Fall 2012 (FAC at PageID.275, ¶ 106) to facilitate the goals of the Ferguson Enterprise; and contacted and met the Plaintiffs many times and, invariably, put pressure on the Plaintiffs through threats and recounting Ferguson's political power to force the Plaintiffs to acquiesce to Ferguson and the Ferguson Enterprise.   See generally FAC at PageID.268-278, ¶¶ 90-115.   On March 7, 2013, Mr. Trezise warned Chris Jerome about Ferguson's increasing political pressure. FAC at PageID.275, ¶ 109.

Mr. Trezise is the CEO of LEAP, which, after the Plaintiffs would not voluntarily give into the Ferguson's Enterprise's demands, revoked the Project Award in retaliation for the Plaintiffs' attempts to protect their Intellectual Property and Project Award.  In furtherance of the Ferguson Enterprise, on December 12, 213, Trezise gave the Project Award on a no-bid basis to Ferguson/Continental Lansing LLC, an entity controlled by Joel Ferguson and Frank Kass – again furthering the goals of the Ferguson Enterprise. FAC at PageID.278, ¶ 118.  As outlined

above, Trezise continued to participate in acts such as (1) presiding at a meeting where one of his subordinates warned Developer A to avoid the Jerome family (FAC at PageID.279, ¶ 122); and (2) two months later, inviting Developer A to a meeting where Ferguson sought to obtain proprietary information from Developer A to aid the Ferguson Enterprise in fending off potential student housing competitors (FAC at PageID.279-280) ¶¶ 124-128).

The FAC provides well-pled allegations regarding LEAP's participation in the conspiracy. For instance, in addition to the acts of its CEO, Defendant Trezise, on December 2, 2013, a different LEAP officer, its COO, Karl Dorshimer, took the Project Award away from Plaintiffs, (FAC at PageID.278, ¶ 117), only to award the Project on a no-bid basis to Ferguson/Continental Lansing LLC on December 12, 2013 (FAC at PageID.278, ¶ 118). This revocation of the Project Award from Plaintiffs, followed immediately by the no-bid award to the Ferguson Enterprise-related entity amply demonstrates LEAP's agreement to assist the Ferguson Enterprise in achieving its purposes and goals of wholly controlling the Project. LEAP also interfered with Developer A's plans, because it presented a risk of competition with the Ferguson Enterprises' Project and advised that involvement with the Jeromes would endanger Developer A's development plans. FAC at PageID.279, ¶ 122.

Count II Defendant Chuck Clark (and Count II Defendant Clark Construction of which Chuck Clark is principal), as previously stated, enjoys a special long-time referral relationship with Ferguson, FAC at PageID.262, ¶ 62, that had led to several hundreds of millions of dollars in business from Michigan State University and its then Chair of the Board of Trustees, Joel Ferguson. FAC at PageID.262 and 263, ¶ 63. Mr. Ferguson pushed the Jeromes to use Clark and Clark Construction as contractors. FAC at PageID.262, ¶¶ 60-61. Importantly, Ferguson's "referral partner," Defendant Clark was carbon-copied on the wire communication (email) sent

December 11, 2012, with an attached letter penned by Ferguson from Ferguson's attorney reiterating Ferguson's demands for a 50% equity share in the Project – demonstrating Clark's knowledge of the Ferguson Enterprise's intent to appropriate some – or all – of the Plaintiffs Project Award and Intellectual Property.  FAC at PageID.269, ¶ 91. The most egregious portion of this December 11, 2012 proposal was the sudden insertion of Clark into the Project as a proposed 4% equity stakeholder *with the tie-breaking vote* in case of deadlock between Plaintiffs and Ferguson. FAC at PageID.269-270, ¶¶ 95-96. Undoubtedly, this wire communication, with a carbon-copy to Clark, demonstrates Clark's participation in the goals and plans of the Ferguson Enterprise.

Additionally, in a wire communication (email) sent by co-conspirator Stralkowski to Plaintiffs, Stralkowski revealed that Ferguson, Clark, the Drain Commissioner Pat Lindeman, and the City had reached an agreement that "would potentially save millions in construction costs" by having the Drain Commissioner build the foundations for the Project – the same email threatening modification of the Project Award if Plaintiffs did not accede to Ferguson's demands.  This co-conspirator FED.R.EVID. 801(d)(2)(E) statement demonstrates Clark's knowledge of an agreement to participate in the operation of the Ferguson Enterprise through a pattern of racketeering. FAC at PageID.275, ¶ 107. All through the fall of 2012, Clark met with Ferguson, Drain Commissioner Lindemann, and Trezise to develop the Red Cedar Golf Course – without the Plaintiffs' knowledge – another act demonstrating Clark's knowledge of and intent to facilitate the operation of the Ferguson Enterprise to appropriate Plaintiffs' Intellectual Property and Project Award.  Further, the co-conspirator statements of Mayor Bernero at his March 6, 2013 meeting with Plaintiffs where he revealed that Clark and Ferguson demanded that the Plaintiffs be removed from the Project entirely, and that the Project be turned over to Clark and

37

Ferguson also, again, demonstrates Clark's agreement to facilitate the operation of Ferguson Enterprise through a pattern of racketeering.  FAC at PageID.271-272, ¶ 101. Finally, Clark is currently joining with Bernero's, Trezise's, and Kass's efforts to convince the Ingham County Board of Commissioners to bond an additional $35 million in public tax dollars to fund the Project – showing Clark's continuing knowledge and agreement to facilitate the operation of the Enterprise. FAC at PageID.282, ¶ 138.

Red Cedar Investor LLC is a company controlled by Joel Ferguson (as managing member), formed to represent Ferguson's interests in the stolen Project, is a member of Ferguson/Continental LLC (the entity now holding the coveted Project as a 100% joint venture owner), and is identified in a September 13, 2013, operating agreement as a 51% owner of the Project. FAC at PageID.253, 273, ¶¶ 15-16, 114(b). The companies were used to facilitate and further the goals of the Ferguson Enterprise.

Similarly, Frank Kass and the company he leads, Continental Development, actively participated in misappropriating both Plaintiffs' Intellectual Property and Project Award.  After getting access to the Plaintiffs' Intellectual Property, FAC PageID.259, ¶¶43-44, FAC PageID.282 and 283, FAC ¶¶ 129-144, Kass and Ferguson began talking secretly about a Kass-Ferguson deal to take the Project Award from the Plaintiffs.  FAC PageID.283 and 284, ¶¶ 145-150.   Now having appropriated the Project Award from the Plaintiffs, Kass, Ferguson/Continental, and the Ferguson Enterprise are now using the Plaintiffs' Intellectual Property for their own development plan of the Red Cedar Golf Course.   FAC PageID.284, ¶151.  All of these well-pled facts demonstrate Defendants Kass and Continental Development's participation in aiding and conspiring with Ferguson and the Ferguson Enterprise.

**III.    Count III Sufficiently Alleges a Property Deprivation in Violation of Due Process**

Defendants Virgil Bernero, Robert L. Trezise, Jr. and Lansing Economic Area Partnership, Inc. (LEAP) (collectively, the "Count III Defendants") argue that Count III of Plaintiffs' FAC alleging deprivation of property without due process of law should be dismissed because (1) Plaintiffs were not the "selected developer"; (2) Christopher Jerome did not acquire any substantive property rights as the agent of Capitol Gateway Project, LLC,; and (3) the RFQP could not confer any constitutionally protected property interests on Plaintiffs.

For the same reasons as set forth in Section I of this brief regarding the Intellectual Property and Project Award, the argument that Plaintiffs were not the "selected developer" and that Christopher Jerome did not acquire any substantive property rights fail with respect to Count III.

Furthermore, as addressed below, Plaintiffs did obtain constitutionally protected property interests by virtue of the Project Award because the Project Award could and did confer constitutionally protected property interests on Plaintiffs.  As the winner of the Project Award, Plaintiffs obtained a constitutionally protected property interest by virtue of being awarded the exclusive right to negotiate with the public entities, LEAP and the City of Lansing, which should ultimately result in a Comprehensive Development Agreement ("CDA").  Plaintiffs never were able to exercise these rights because Defendants Bernero, Trezise, and LEAP worked in concert with the other defendants here to interfere with and ultimately deny them such rights in violation of the constitution.

Defendants Bernero, Trezise, and LEAP rely extensively on *Taylor Acquisitions LLC v. City of Taylor*, 313 F. App'x. 826 (6th Cir. 2009) in support of their argument to dismiss Plaintiffs' claims in Count III of the FAC.  However, in doing so, the Count III Defendants

misunderstand the holding of the case.  The Sixth Circuit did not make a finding one way or the other whether the purchase agreement at issue in Taylor created a constitutionally protected property interest.  Instead, the Court assumed that the purchase agreement did create a constitutionally protected property interest, but found that even if it did, the plaintiff could not establish that it did not receive adequate procedural protections.  *Taylor*, 313 F. App'x. at 831 ("even assuming that the purchase agreement granted Plaintiff a property interest, and even if the City's termination of the agreement amounted to a deprivation of that interest, Plaintiff cannot establish the third prong of a procedural due process violation: that it did not receive adequate procedural protections").  The Count III Defendants confuse the Sixth Circuit's subsequent statement that the purchase agreement did not create an absolute right for the Taylor plaintiff to *develop* the subject property with the notion that purchase agreement conveyed *no* property interests at all.  That argument is wrong.

Here, Plaintiffs do not argue that they have a constitutionally protected property interest in the eventual *development* of the subject property.  Instead, they are asserting the right that they were awarded by virtue of winning the Project Award was the *exclusive* right to negotiate with the public entities, LEAP and the City of Lansing, which "should ultimately result" in a CDA. The eventual development of the subject property is not the issue here.  The interference and denial of Plaintiffs' rights pursuant to the Project Award is at issue.

Here, the decision maker's power was not entirely discretionary – Plaintiffs had been awarded the Project Award subject to the public entities' specific and limited reservation of rights.  The procedure itself had been completed once the RFQP was awarded to Plaintiffs in the form of the Project Award.  Plaintiffs are not asserting a property interest in the procedure itself, but in the rights that the finished procedure had granted them.

40

The Count III Defendants further rely on *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845 (6th Cir. 2012) in support of their motion to dismiss, but the *EJS Properties* case is distinguishable from the present matter.   The plaintiff in *EJS Properties* argued it had a protectable property interest in its *expectation* that certain property would be rezoned by the City of Toledo City Council after the rezoning request had passed through the Toledo-Lucas County Plan Commission ("Plan Commission") and the City Council's Zoning and Planning Committee ("Zoning and Planning Committee").   The Sixth Circuit found that the EJS plaintiff did not have a protectable property interest in the potential rezoning because the City Council had the discretion to approve or deny the rezoning request, even though the request had passed through the Plan Commission and Zoning and Planning Committee. *Id*. At 857.   In contrast, here Plaintiffs were awarded the Project Award.   There was no further action required to allow Plaintiffs to obtain the benefits of such an award.   In *EJS Properties*, there were steps still to be completed prior to the plaintiff being able to claim a protectable property interest.   In this case, Plaintiffs had already won the exclusive right to negotiate with the public entities (and, therefore, a protectable property interest) and there were no additional steps to be completed before Plaintiffs could claim that protected property interest.

The *EJS Properties* court's discussion of the protectable property rights obtained by the EJS plaintiff with the early-start building permit is instructive.   According to the court, "EJS likely has a property interest in its early-start building permit" and "the interests conveyed by the permit were limited to initial renovations, which EJS did without interference or revocation." *Id*. at 859.   Therefore,  the EJS defendants' action of not approving the rezoning request did not deprive EJS of its interest in the early-start building permit because the plaintiff was able to do what the early-start building permit authorized without interference. *Id*.   A similar analysis is

41

appropriate in this case.  Plaintiffs here were awarded the Project Award, which created certain protected property interests, just like the EJS plaintiff obtained certain property interests by virtue of the approval of the early-start building permit.  The protected property interests of the Plaintiffs here were to be the selected developer and to be the exclusive party to negotiate with the various entities to come to an agreement on the development of the property, just like the EJS plaintiff obtained the interests conveyed by the early-start building permit, i.e., to begin some initial renovations prior to the vote on the rezoning request.  The similarities between the cases end, however, with what happened after the approval/award occurred.  The EJS plaintiffs were able to do the work allowed by the early-start building permit without interference, but here, Plaintiffs were never able to obtain the interest conveyed by the Project Award, but instead had those interests taken from them by the actions of Defendants Bernero, Trezise, and LEAP.

IV.     **Plaintiffs Have Sufficiently Alleged Claims of Tortious Interference**

Plaintiffs have alleged claims of tortious interference under Count IV against Defendants Kass, Continental, and Hallmark (the "Count IV Defendants") and under Count V against Defendants LEAP, Trezise, and Ferguson (the "Count V Defendants").   Plaintiffs have sufficiently alleged their claims of tortious interference against each set of defendants as demonstrated below and such claims should not be dismissed.

A.     **Plaintiffs Have Sufficiently Alleged Tortious Interference Under Count IV**

"The elements of tortious interference with a business relationship are [1] the existence of a valid business relationship or expectancy, [2] knowledge of the relationship or expectancy on the part of the defendant, [3] an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and [4] resultant damage to the plaintiff." *Mino v Clio Sch. Dist.*, 255 Mich. App. 60, 78; 661 N.W.2d 586 (2003). The

interference must be both intentional and improper. *Trepel v. Pontiac Osteopathic Hospital*, 135 Mich. App. 361, 374; 354 N.W.2d 341, 346 (1984). "Improper means 'illegal, unethical, or fraudulent.'" *Id.*

The Count IV Defendants appear to be confused as to the substance of Count IV and the allegations it contains.  Plaintiffs are not singularly contending that the Count IV Defendants interfered with a business expectancy to receive the Project Award. Rather, Plaintiffs are alleging the Count IV Defendants caused the loss of the Plaintiffs' business relationship with Ferguson and ultimately Plaintiffs' loss of the Project Award because of Kass' interference with the Plaintiffs' business relationship with Ferguson. Thus, this matter is not analogous to a disappointed low bidder as in *Cedroni Association, Inc. v. Tomblinson, Harburn Associates*, 492 Mich 40; 821 N.W.2d 1 (Mich. 2012).  *Cedroni* is simply inapposite.

A business expectancy "must be a reasonable likelihood or probability, not mere wishful thinking." *Trepel,* 135 Mich. App. at 377.  Plaintiffs had an established business *relationship* with Ferguson, (despite his ever-increasing extortionate equity demands) as evidenced by the several months of negotiations and circulation of various offers and counteroffers between Plaintiffs and Ferguson. FAC at PageID.294, ¶¶ 201, 202. All of these meetings and negotiations plainly go beyond a mere "wishful thinking" of a business relationship, but instead demonstrate at the very least the reasonable likelihood of a business relationship.[14]

Kass (and by extension, Continental and Hallmark) was fully aware of this relationship, (FAC at PageID.294-295, ¶ 204) and wrested Ferguson's cooperation from the Plaintiffs for his own benefit to create a business entity and plan with Ferguson using Plaintiffs' *own plans* for the

---

[14] Of course, as alleged throughout the FAC, early on Plaintiffs did not fully appreciate Ferguson's misrepresentations and know his ultimate goal to take away the Project Award and Intellectual Property or know of the secret Ferguson-Kass alliance until it was too late.

development – plans based on information wrongfully, unethically, and illegally appropriated from Plaintiffs through Kass's previous involvement with Plaintiffs and in violation of a Confidentiality and Non-Compete Agreement between Kass and Plaintiffs. FAC at PageID.295, ¶ 206.  Plaintiffs lost their business relationship/expectancy with Ferguson through Kass's willful and malicious interference with Plaintiffs' relationship with Ferguson.

The Count IV Defendants also attempt to avoid answering for their tortious interference with Plaintiffs' business expectancies by arguing that the conduct alleged should be pursued through a breach of contract against for violation of the Confidentiality and Non-Compete Agreement between Kass and Plaintiffs.  Defendants woefully misstate the substance of Plaintiffs' claims.  While the use of information obtained pursuant to the Confidentiality and Non-Compete Agreement was one aspect of how the tortious interference was accomplished, it is not the breach of that agreement that Plaintiffs allege as their claim for tortious interference. Instead, it was Count IV Defendants' use of the information obtained from Plaintiffs, and other actions as alleged throughout the FAC, see e.g., FAC at PageID.283, 295, ¶¶ 145, 146 206, whereby these Defendants interfered with Plaintiffs' business relationship and expectancies with Ferguson and with Plaintiffs' business expectancy as a result of obtaining the Project Award. FAC at PageID.295, ¶ 207.  The information obtained certainly was one vehicle used by these Defendants to interfere with Plaintiffs' relationships and business expectancies and the contract does not preclude Plaintiffs' from pursuing a tortious interference claim against Defendants for their unauthorized use of the information obtained, along with the other wrongful actions as alleged in the FAC whereby Plaintiffs' business relationships and expectancies were damaged.

It is clear that Plaintiffs have sufficiently alleged claims of tortious interference against the Count IV Defendants and such claims should not be dismissed.

### B.       Plaintiffs Have Sufficiently Alleged Tortious Interference Under Count V

After theft of their Project Award and the Intellectual Property, Plaintiffs developed a separate business relationship with Developer A for the sale and development of one of the Jerome Auto Properties. To forward its deal with the Plaintiffs, Developer A attended a meeting with 2 of Defendant LEAP's officers, co-Defendant Trezise and then LEAP COO, Steven Willobee. At that meeting – fully showing LEAP's and Trezise's knowledge of the Developer A and Plaintiffs' business relationship and expectancy - Mr. Willobee, a LEAP officer and Trezise subordinate, told Developer A in March of 2014, while Trezise was present, that "it was probably best if the Jeromes were not involved as it would risk the company receiving approvals for the (Developer A) Project." FAC PageID.279, ¶¶122.

The following year, Mr. Trezise, and by extension, LEAP, interjected themselves a second time as interlopers to sever the business expectancy between the Plaintiffs and Developer A.  In May of 2015, Trezise told Developer A that Mayor Bernero wanted Developer A to meet Defendant Ferguson at an office on the campus of Michigan State University.  At this meeting set up by Trezise and Leap and attended by Trezise, Ferguson (a) tried to solicit Developer A's proprietary information about its potential deal with the Plaintiffs and then (b) attempted to dissuade Developer A from its deal with the Plaintiffs with a claim that he (Ferguson) was partnering with the Michigan State University.  FAC at PageID.279-280, ¶¶124-127.  During both of these two separate but connected events, Trezise and LEAP acted to sever the Developer A-Plaintiffs business expectancy.  In the first instance, LEAP and Trezise, through their agent, Willobee, delivered the direct threat the working with Chis and Leo Jerome would threaten Developer A's prospective municipal approvals – a clearly malicious act.  In the second instance, LEAP and Trezise facilitated the conveyance of a threat from a competitor, Defendants

Ferguson, under its auspices and Mayor Bernero's auspices, to further dissuade Developer A from working with the Jeromes in Lansing.

Building on these two prior occasions, and after calls to Developer A get to get details of its prospective deal with the Plaintiffs, Ferguson then used a LEAP board member to force Developer A to meet with him again.  FAC at PageID.280, ¶¶123.  At this meeting – arranged under the auspices of LEAP – Ferguson demanded (1) $147,000 from Developer A and (2) that Developer A persuade Chris Jerome to drop litigation against Ferguson.  Clearly these demands by Ferguson were intentional and intended to let Developer A know it would lose money from LEAP and Ferguson interference if Developer A continued dealing with the Plaintiffs.  FAC at PageID.281, ¶¶132-133.  At a minimum, these connected series of acts and statements by Trezise, LEAP's officers and board member, and Ferguson were intentional and unethical and improper attempts to interfere with the business relationship and expectancy between Developer A and the Plaintiffs.

## V.     No Defendant is Entitled to Immunity

Defendants Virgil Bernero, Robert L. Trezise, Jr., and the Lansing Economic Area Partnership, Inc. (LEAP) (collectively, the "Immunity Defendants"), further argue that Count III of Plaintiffs' FAC should be dismissed because they assert that they possess either qualified or absolute immunity.

Other than initially mentioning LEAP, the Immunity Defendants' argument does not provide any reasoning or legal authority that LEAP is subject to immunity of any sort.  The argument states that "Bernero and Trezise are entitled to qualified immunity" and that "Bernero is entitled to absolute immunity."  Generally, when a party fails to support his argument with any legal authority, they are deemed to have abandoned the issue.  *United States v. Williams,* 544

F.3d 683, 690 (6th Cir.2008); see also *Schellenberg v. Rochester Michigan Lodge No. 2225, of Benev. & Protective Order of Elks of U.S.A.*, 228 Mich. App. 20, 49; 577 N.W.2d 163 (1998). Therefore, at least as to LEAP, the motion must be denied.

The motion should also be denied as it relates to Defendants Bernero and Trezise as well. In support of their immunity argument, Bernero and Trezise essentially reassert the same arguments made previously throughout Defendants' Brief – i.e., that Plaintiffs did not have a protected property interest at stake. According to Bernero and Trezise, they "could not have understood that their alleged actions … violated any property rights held by Plaintiffs, and are therefore entitled to qualified immunity." Defendants Bernero and Trezise are incorrect.

In this argument, like other arguments throughout, Bernero and Trezise focus only on the property rights vested in Plaintiffs are a result of the Project Award and completely ignore the clear and undisputed rights in Plaintiffs' Intellectual Property. None of the Defendants, including Bernero or Trezise, have made any attempt to argue that Plaintiffs do not possess property rights in their Intellectual Property. The contours of Plaintiffs' rights to their Intellectual Property are crystal clear – so much so that Defendants make no attempt to argue otherwise. As stated by Defendants, for a right to be clearly established for purposes of qualified immunity, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Waeschle v. Dragovic*, 576 F.3d 539, 550 (6th Cir. 2009). In this case, given the clear nature of Plaintiffs' rights to their Intellectual Property, the same property that is now being used by the Ferguson Enterprise, it was sufficiently clear that a reasonable person in Bernero or Trezise's position would understand that helping Ferguson misappropriate Plaintiffs' Intellectual Property would violate Plaintiffs' rights.

Moreover, as addressed in depth elsewhere in this Response, Plaintiffs did obtain protected property interests by virtue of being awarded the Project Award.  Both Bernero and Trezise, or a reasonable person in their position, would have understood that helping Ferguson and his associates steal the Project Award from Plaintiffs – and reaward it without a bidding process to Ferguson, Kass, and the Ferguson Enterprise - would violate Plaintiffs' protected rights.

In addition to arguing for qualified immunity, Defendant Bernero also argues that he is entitled to absolute immunity.  In order to determine if an individual is entitled to absolute immunity, a court must first consider whether a defendant's actions were legislative in form or "integral steps in the legislative process," and second, a court must inquire whether a defendant's actions were legislative in substance.  *Bogan v. Scott–Harris*, 523 U.S. 44, 55; 118 S.Ct. 966; 140 L.Ed.2d 79 (1988).  Here, the actions alleged against Defendant Bernero were not legislative in form or integral steps in the legislative process.  Instead, the actions of Bernero in assisting Ferguson in coopting Plaintiff's Intellectual Property and Project Award were not integral steps in a legislative process; instead they were outside any legislative process – indeed not done in conformity with any bidding process at all - and involved Bernero assisting a political ally to obtain something the political ally wanted at the expense of Plaintiffs.

Further, Bernero's actions, as alleged in the FAC, were not legislative in substance.  His actions were to assist Ferguson in unlawfully obtaining both Plaintiffs' Intellectual Property and the Project Award in a manner outside the legislative process.  There is nothing substantively legislative about helping a political ally at the expense of the winning bidder for the Project Award, the one who was to be the exclusive agent to negotiate and come to a development

agreement, and the one who spent years and hundreds of thousands of dollars in preparing the necessary Intellectual Property for the Project Award.

## VI.     Conclusion

Plaintiffs' FAC sets forth clear claims against all of the named Defendants.  Plaintiffs clearly have standing to pursue this case and have stated a claim upon which relief may be granted.  For the reasons set forth herein, Plaintiffs' respectfully request that this Court deny the Defendants' Unified Motion to Dismiss in its entirety and with prejudice.


Dated: September 12, 2017                          Respectfully submitted,

                                                   /s/ Michael A. Cox (P40439)
                                                   Michael A. Cox (P40439)
                                                   THE MIKE COX LAW FIRM, PLLC
                                                   17430 Laurel Park Drive North,
                                                   Suite 120E
                                                   Livonia, Michigan 48154
                                                   mc@mikecoxlaw.com

**CERTIFICATE OF SERVICE (e-file)**

I hereby certify that on October 19, 2017, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

/s/ Michael A. Cox
Michael A. Cox   (P43039)
Attorney for  Plaintiffs
17430 Laurel Park Drive North, Suite 120E
Livonia, MI 48152
(734) 591-4002
mc@mikecoxlaw.com