UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER JEROME, an individual,
LEO JEROME, an individual, and STORY
COMPANIES, LLC, a Michigan limited
liability company,

        Plaintiffs,

v.

JOEL FERGUSON, an individual, VIRGIL
BERNERO, the Mayor of the City of Lansing,
in his individual capacity, LANSING
ECONOMIC AREA PARTNERSHIP, INC., a
Michigan non-profit corporation, ROBERT L.
TREZISE, JR., an individual, CLARK
CONSTRUCTION SERVICES, LLC, a
Michigan limited liability company,
CHARLES CLARK, an individual, FRANK
KASS, an individual, CONTINENTAL
DEVELOPMENT, INC., an Ohio corporation,
HALLMARK CAMPUS COMMUNITIES, an
Ohio partnership, FERGUSON
DEVELOPMENT, LLC, a Michigan limited
liability company, CHRISTOPHER
STRALKOWSKI, an individual,
FERGUSON/CONTINENTAL LANSING,
LLC, a Delaware limited liability company,
and RED CEDAR INVESTOR, LLC, a
Michigan limited liability company,

        Defendants.

Case No. 1:16-cv-01116

Hon. Janet T. Neff

---

**REPLY BRIEF IN SUPPORT OF DEFENDANTS'
UNIFIED MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ........................................................................................................ 1

REPLY ARGUMENT .................................................................................................. 3

**I.**    Plaintiffs Urge this Court to Apply an Erroneous 12(b)(6) Standard of Review. ............ 3

**II.**    Plaintiffs' Admission That They Had No Interest in the Project to "Steal" is Fatal to their Amended Complaint. ........................................................................................ 4

    **A.**    Plaintiffs' Desperate Attempt to Recast Their Amended Complaint as Seeking Redress for Injury to Their Rights in the "Project Award," or "Intellectual Property" is Disingenuous and Legally Unsupported. ........................................... 4

        1.    Plaintiffs' argument that they obtained a contractual or property right under the "Project Award" fails as a matter of law. .................................. 5

        2.    Plaintiffs' desperate attempt to re-characterize their interest in the Project as intellectual property that is "separate and distinct" from the project fails as a matter of law. ............................................................ 8

        3.    To the extent Plaintiffs attempt to assert any "intellectual property" rights, they have failed to cite any authority to support that the rights they assert are legally recognized and protected property interests. ......... 10

    **B.**    Plaintiffs Fail to Meaningfully Distinguish the Controlling Sixth Circuit Case Law Demonstrating Plaintiffs' Failure to Allege any Constitutionally Recognized Property Interest ................................................................................. 12

    **C.**    Plaintiffs' Last-Ditch Effort to Assign the Claims of Capital Gateway Project, LLC Does Nothing to Support Their Amended Complaint. ................................. 14

**III.**    Plaintiffs' Response fails to Save their RICO Claims. ................................................. 14

    **A.**    Plaintiffs' Response Fails to Demonstrate that the Amended Complaint Sufficiently States a Claim for Violation of 18 U.S.C. § 1962(c). ....................... 15

        1.    The RICO Claim against Ferguson Development Must be Dismissed..... 15

        2.    Plaintiffs' Conclusory Allegations Fail to Establish a "Pattern" of Racketeering Activity. .......................................................................... 17

            a.    Plaintiffs Have Abandoned Any Closed-Ended Continuity Argument. ................................................................................... 17

i

Page

        b.      The Amended Complaint Lacks Sufficient Factual Allegations of Open-Ended Continuity. ....................................... 17

   3.     Plaintiffs Have not Adequately Pleaded Any Predicate Acts. ................. 20

        a.      Plaintiffs Have Failed to Plead Mail or Wire Fraud. .................... 20

        b.      Plaintiffs Have Not Sufficiently Alleged Extortion..................... 23

   4.     Plaintiffs Have Failed to State a RICO Violation Regarding Developer A. ................................................................................. 24

**B.**    Plaintiffs Fail to State a Claim for RICO Conspiracy........................................... 25

**IV.**   Plaintiffs' Tortious Interference Claims Must be Dismissed. ........................................ 27

   **A.**    Plaintiffs' discussion of Count IV deviates from the Amended Complaint and does nothing to advance their tortious interference claim. .................................. 27

   **B.**    Plaintiffs have abandoned Count V. ...................................................... 32

**V.**    Plaintiffs' Immunity Arguments Miss the Mark. ........................................................ 32

**VI.**   Dismissal is Proper and Further Amendment Would be Futile ..................................... 33

CONCLUSION ........................................................................................................................ 34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Biocare, Inc. v. Howard & Howard Attorneys, PLLC*,
2016 WL 5661583 (E.D. Mich. Sept. 30, 2016) ....................................................... 25

*Arrowood Indemnity Co. v. City of Warren, Michigan*,
2015 WL 457739 (E.D. Mich. Feb. 3, 2015) ........................................................... 21

*Baisch v. Galina*,
346 F.3d 366 (2nd Cir. 2003) ................................................................................. 26

*Bates v. Northwestern Human Services, Inc.*,
466 F. Supp. 3d 69 (D. D.C. 2006) ......................................................................... 16

*Begala v. PNC Bank, Ohio National Association*,
214 F.3d 776 (6th Cir. 2000) ........................................................................... 15, 16

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................. 3

*Berry v. Main Street Bank*,
2014 WL 806838 (E.D. Mich. Feb. 28, 2014) ......................................................... 34

*Board of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972) ............................................................................................... 11

*Bogan v. Scott-Harris*,
523 U.S. 44 (1988) ................................................................................................. 33

*Boike v. McLaren Health Care Corp.*,
2007 WL 1932029 (Mich. Ct. App. July 3, 2007) ................................................... 30

*Brock v. Consolidate Biomedical Laboratories*,
817 F.2d 24 (6th Cir. 1987) ................................................................................... 31

*Brown v. Cassens Transportation Co.*,
546 F.3d 347 (6th Cir. 2008) ................................................................................. 18

*Bye v. Nationwide Mutual Insurance Co.*,
733 F. Supp. 2d 805 (E.D. Mich. 2010) ........................................................... 22, 23

*Cedroni Association, Inc. v. Tomblinson*,
821 N.W.2d 1 (Mich. 2012) ................................................................................... 28

Page(s)

*Cooper v. Auto Club Insurance Association*,
   751 N.W.2d 443 (Mich 2008) ............................................................... 21

*Cullinan v. Abramson*,
   128 F.3d 301 (6th Cir. 1997)................................................................. 32

*Dalley v. Dykema Gossett*,
   788 N.W.2d 679 (Mich. Ct. App. 2010) .............................................. 29

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
   523 F.2d 389 (6th Cir. 1975)................................................................. 14

*EJS Properties, LLC v. City of Toledo*,
   698 F.3d 845 (6th Cir. 2012).......................................................... 12, 13

*Experimental Holdings, Inc. v. Farris*,
   503 F.3d 514 (6th Cir. 2007)................................................................. 12

*H.J., Inc. v. Northwestern Bell Telephone Co.*,
   492 U.S. 229 (1989) ....................................................................... 17, 18

*Hansen v. Catsman*,
   123 N.W.2d 265 (Mich. 1963) ............................................................... 6

*Heinrich v. Waiting Angels Adoption Services, Inc.*,
   668 F.3d 393 (6th Cir. 2012).......................................................... 15, 21

*Hi-Way Motor Co. v. International Harvester Co.*,
   247 N.W.2d 813 (Mich. 1976) ............................................................. 22

*In re ClassicStar Mare Lease Litigation*,
   727 F.3d 473 (6th Cir. 2013)................................................................. 15

*Kingsley v. Brundige*,
   513 F. App'x 492 (6th Cir. 2013).......................................................... 12

*Mago Construction Co. v. Anderson*,
   1996 WL 33348794 (Mich. Ct. App. 1996) ......................................... 29

*Maiberger v. City of Livonia*,
   724 F. Supp.2d 759 (E.D. Mich. 2010) ................................................ 29

*Marx v. Centran Corp.*,
   747 F.2d 1536 (6th Cir.1984)............................................................... 33

Page(s)

*Moes v. Woodward*,
2012 WL 5830596 (W.D. Mich. Nov. 16, 2012) ................................................. 16

*Moon v. Harrison Piping Supply*,
465 F.3d 719 (6th Cir. 2006) ............................................................................... 17

*People v. Harris*,
845 N.W.2d 477 (Mich. 2014) ............................................................................ 24

*QQC, Inc. v. Hewlett-Packard Co.*,
258 F. Supp. 2d 718 (E.D. Mich. 2003) .............................................................. 31

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
30 F.3d 339 (2d Cir. 1994) .................................................................................. 16

*Runyon v. Glynn*,
64 F. App'x 924 (6th Cir. 2003) .......................................................................... 33

*Saab Automobile AB v. General Motors Co.*,
953 F. Supp. 2d 782 (E.D. Mich. 2013) .............................................................. 29

*Salinas v. U.S.*,
522 U.S. 52 (1997) .............................................................................................. 26

*Taylor Acquisitions LLC v. City of Taylor*,
313 F. App'x 826 (6th Cir. 2009) .................................................................. 11, 12

*Trepel v. Eaton*,
354 N.W.2d 341 (Mich. Ct. App. 1984) ............................................................. 29

*U.S. v. Williams*,
544 F.3d 683 (6th Cir. 2008) ...................................................................... 3, 6, 19

*United States v. Sinito*,
723 F.2d 1250 (6th Cir. 1983) .................................................................... 25, 26

*United States v. Weimert*,
819 F.3d 351 (7th Cir. 2016) ...................................................................... 21, 22

*Vild v. Visconsi*,
956 F.2d 560 (6th Cir. 1992) .............................................................................. 18

*Waltentas v. Lipper*,
636 F. Supp. 331 (S.D.N.Y. 1986) ...................................................................... 13

Page(s)

*Warren v. City of Athens*,
  411 F.3d 697 (6th Cir. 2005) ................................................................................. 12

*Wausau Underwriters Ins. Co. v. Vulcan Development, Inc.*,
  323 F.3d 396 (6th Cir. 2003) ................................................................................. 30

**Statutes**

18 U.S.C. § 1962 ......................................................................................... 25, 27

**Rules**

Federal Rule of Civil Procedure 12 .............................................................. 3, 14

Federal Rule of Civil Procedure 9 .................................................................. 20

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) .......................................................... 10

## INTRODUCTION

Plaintiffs filed this action accusing Defendants of conspiring to "steal a development" from Plaintiffs "called the Red Cedar Renaissance Project ... (the "Project")." (Compl. ¶ 2, PageID.2.)  Defendants sought pre-motion conferences seeking to dismiss this case because, among other reasons, the unambiguous language of the project documents on which Plaintiffs' base their claim, and controlling case law, thoroughly demonstrate that Plaintiffs never had any interest in the Project for Defendants to "steal."  (*See*, *e.g.,* Dkt. No. 32, PageID.164-167.) Plaintiffs were then given the opportunity to amend their Complaint, and again asserted their theory that Ferguson conspired with the other Defendants "to steal the [Red Cedar Golf Course Development] Project from Plaintiffs."  (Am. Compl. ¶ 34, PageID.257; *see also id.* ¶¶ 29-31, PageID.255-256 (accusing Ferguson of "stealing" the "Project" from Plaintiffs), ¶ 104, PageID.274 ("[t]his pattern of racketeering continued, with a series of misrepresentations and threats that ultimately deprived the Jeromes of their property interest in the Project").) Defendants responded by filing their Unified Motion to Dismiss and Brief in Support, furnishing the full text of the Request for Qualifications and Proposals (Defs' Ex. 1, the "RFQP") and the proposal submitted in response thereto (Defs' Ex. 2, the "RFQP Response"), and discussing controlling case law that establishes beyond any shadow of a doubt that Plaintiffs had no interest in the "Project" to be "stolen" as a matter of law.

Plaintiffs have responded by filing a Brief that amounts to a 50-page concession of the obvious: that they have no legally protected interest in Red Cedar Renaissance Project as a matter of law.  (*See* Pls' Resp. at 9-14; *id.* at 40 ("Plaintiffs do not argue that they have a constitutionally protected property interest in the eventual *development* of the subject property").)  After conceding this central premise of the Amended Complaint, Plaintiffs seek to re-arrange the deck chairs on the Titanic by describing their interest in the Project as something

else.  Specifically, they assert that the interest sufficient to give them standing consists of (1) Plaintiffs' interest in the "Project Award," (which Plaintiffs describe as their contractual right to "exclusively negotiate" with the City for the Project), or (2) Christopher Jerome's "property interest" in the work and money that he spent pursuing the Project (which Plaintiffs erroneously label as his "Intellectual Property").

Plaintiffs do not provide the Court with any authority to establish that these items are legally protected interests that Plaintiffs had in or related to the Project.  Plaintiffs also cannot explain how the so-called "project award" or "intellectual property" are interests that are in any way separate and distinct from their admittedly nonexistent interest in the Project itself.  Perhaps most importantly, Plaintiffs make little effort to refute the central premise of Defendants' Motion: that Plaintiffs' claims cannot survive the plain and unambiguous language of the RFQP and RFQP Response on which Plaintiffs' claims are based.  Instead, Plaintiffs stay true to form by simply ignoring bad facts, ignoring controlling law, and mostly avoiding discussion of the actual RFQP language.

Plaintiffs cannot salvage their Amended Complaint in this manner.  Defendants have cited unambiguous language in documents central to the claims in the Amended Complaint, as well as controlling case law demonstrating Plaintiffs' lack of any legally recognized property or contract interest to vindicate in this action.  Plaintiffs have responded by trying to completely redefine that property interest in a manner contrary to that described in the Amended Complaint, without providing any legal authority to support their new bare, conclusory assertions that they had other vaguely defined property rights arising in the Project.  As Plaintiffs acknowledge, their failure to support their position with legal authority is a sufficient basis, in and of itself, for this Court to determine that Plaintiffs "are deemed to have abandoned the issue," (Pls' Resp. at 46-

47, *citing U.S. v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008)), and find that Plaintiffs lack standing as a matter of law.

Plaintiffs also make a half-hearted effort to avoid dismissal for failure to state a claim, sidestepping the core arguments and legal authority cited by Defendants, only to vaguely cite and characterize the voluminous conclusory allegations in the Amended Complaint.  Ultimately, Plaintiffs' Response accomplished nothing more than proving Defendants' underlying point: Plaintiffs attempt to substitute volume for substance, conclusory assertions for factual allegations.  For all of its exhaustive length, the Amended Complaint states no legally actionable claim upon which relief may be granted.  In view of Plaintiffs' repeated failures to state an actionable claim, Defendants respectfully request that the Court dismiss this case with prejudice in order to bring this baseless harassment to an end.

## REPLY ARGUMENT

### I.      Plaintiffs Urge this Court to Apply an Erroneous 12(b)(6) Standard of Review.

Plaintiffs argue that the Court cannot dismiss this motion under Fed. R. Civ. P. 12(b)(6) unless it can determine that Plaintiffs "undoubtedly can prove no set of facts in support of [their] claims that would entitle [them] to relief."  (Pl.'s Resp. Br. at 8.)  Plaintiffs make their arguments against dismissal laboring under this erroneous standard of review, despite the fact that the United States Supreme Court explicitly rejected it a decade ago in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560–63 (2007).  It is telling that to even attempt to support their fatally flawed pleading, Plaintiffs must resort to this outdated and inapplicable standard of review. Plaintiffs' reliance on the wrong standard of review undermines their entire Response, and Plaintiffs have not even come close to stating a claim upon which relief may be granted under the proper standard of review, set forth in Defendants' Brief. (Defs' Br. at 6-8.)

## II.     Plaintiffs' Admission That They Had No Interest in the Project to "Steal" is Fatal to their Amended Complaint.

The gravamen of the Amended Complaint is its repeated claim that Ferguson conspired with the other Defendants "to steal the Project from Plaintiffs."  (Am. Compl. ¶ 34, PageID.257; *see also id*. ¶¶ 29-31, PageID.255-256 (accusing Ferguson of "stealing" the "Project" from Plaintiffs).)  The Amended Complaint explicitly accuses Ferguson and others of conspiring to appropriate and steal Plaintiffs' property, "including ... the Project RFQP award with the value of tens of millions of dollars in value related to developing the Red Cedar Renaissance Project." (*Id*. at ¶¶ 158, 159, PageID.285-286).  Plaintiffs also complain that they were injured "in that they lost the award of the Project and all expected attendant profits."  (*Id*. ¶ 163, PageID.286.)

Defendants filed their Motion to Dismiss along with the full text of the RFQP and RFQP Response, which demonstrate beyond any shadow of a doubt that Plaintiffs had no legal interest in the Project whatsoever.  Plaintiffs have responded by conceding the point – contradicting their own Amended Complaint to admit that they do not have any interest in the development of the Project.  (*See* Pls' Resp. at 40 ("Plaintiffs do not argue that they have a constitutionally protected property interest in the eventual *development* of the subject property").)  This admission is fatal to the Amended Complaint, for the very simple reason that the Plaintiffs have admitted that they had no legally recognized property or contractual interest in the Project capable of being "stolen" by Defendants.

### A.     Plaintiffs' Desperate Attempt to Recast Their Amended Complaint as Seeking Redress for Injury to Their Rights in the "Project Award," or "Intellectual Property" is Disingenuous and Legally Unsupported.

After now disclaiming any interest in developing the Project, Plaintiffs desperately try to change the subject by arguing that their interest in this Project consisted of either contractual rights granted under the "Project Award," or Christopher Jerome's so-called "intellectual

property" relating to the Project.  (*See* Pls' Resp. at 10-14.)  These bare arguments cannot save the Amended Complaint, because Plaintiffs have not alleged an injury to any legally protected interest in this action as a matter of law.[1]

    1.     *Plaintiffs' argument that they obtained a contractual or property right under the "Project Award" fails as a matter of law.*

Plaintiffs' first theory seeks to draw a distinction without a difference, by recasting Plaintiffs' nonexistent interest in the Project as an interest in the "Project Award."  Plaintiffs describe the "Project Award" as the "exclusive right to negotiate with the public entities."  (Pl's Resp. at 12-13.)  Plaintiffs repeatedly refer to this as a "contract" right that they obtained from the City, (*id.*), but do not cite any legal authority to support their bare assertion that an "exclusive right to negotiate with public entities" is a legally recognized contractual right.  Instead, Plaintiffs attempt to distinguish the case law cited by Defendants by arguing that Plaintiffs are not "disappointed bidders," because they actually "won" the "Project Award." (Pl's Response at 12-13.)  Plaintiffs' superficial discussion only begs the underlying question: is the "Project Award" a contract in the first place?

Defendants have already answered this question.  They attached the full text of the relevant "contractual" documents – the RFQP and RFQP Response – and discussed binding Sixth Circuit and Michigan case law demonstrating that no contractual or other legally protected interest could arise under these documents.  The RFQP and RFQP Response did not, and cannot, form an enforceable contract under Michigan law (Defs' Br. at 10-12), they cannot create a

---

[1] Plaintiffs' latest theory is absurd on its face.  Real estate developers do not make their living by having "negotiations" with a City, or by putting time and effort into a "pitch" for a new development.  Their business is in acquiring property, developing that property, and then selling or leasing it for profit.  The Amended Complaint and RFQP documents fully reveal that Plaintiffs did not even have an agreement to acquire the Subject Property, let alone develop it. As a matter of law, they had nothing.

constitutionally protected property interest under Sixth Circuit precedent (Def's Br. at 37-39), and cannot create a legally enforceable "business expectancy" under Michigan law. (Def's Br. at 41-43).

Plaintiffs make little effort to rebut these points. Instead, they simply announce that they had an "exclusive right to negotiate" under the RFQP, and that this constitutes a legally enforceable contractual right. Setting aside the fact that these assertions are directly refuted by the RFQP, Plaintiffs have offered no response whatsoever to the binding Michigan case law cited by Defendants plainly stating that a "right to negotiate" is nothing more than a "contract to make a contract," which is "not a contract at all." (Def's Br. at 11, quoting *Hansen v. Catsman*, 123 N.W.2d 265, 266 (Mich. 1963).) Plaintiffs cannot avoid these unambiguous holdings by their bare assertion that a "right to negotiate" is a legally recognized contract and/or property interest. (Pls' Resp. at 41; *see also id*. at 13.)[2] Plaintiffs' argument flies in the face of binding Michigan Supreme Court precedent, and must be rejected.

Even if Plaintiffs had offered any legal authority to support this argument – which they have not – Plaintiffs' assertion that they obtained an "exclusive right to negotiate" under the RFQP is directly refuted by the unambiguous text of the RFQP. As Defendants have already established, Plaintiffs cannot avoid dismissal by contradicting documents referenced by the Amended Complaint. (Defs' Br. at 7-8.) Here, it cannot be disputed that the RFQP Response does not identify any of the named Plaintiffs as the developer. More importantly, nothing in the RFQP states that <u>any</u> selected developer would be granted a legally enforceable, "exclusive" right to negotiate with the public entities. To the contrary, the RFQP expressly reserves the Public Entities' right to "disqualify any development team member(s) found to be unacceptable,"

---

[2] Indeed, as Plaintiffs acknowledge, their failure to offer any authority to support their position means that Plaintiffs are "deemed to have abandoned the issue." (Pls' Resp. at 46-47, *citing U.S. v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008).)

to "negotiate with any developer," to "re-solicit or negotiate with any Developer," and to "reject any and all proposals."  (Defs' Ex. 1, RFQP at 10, 12.)  Plaintiffs attempt to ignore this language in their Response, but doing so cannot save their Amended Complaint.

Finally, Plaintiffs' make a half-hearted effort to address some of the disclaimers in the RFQP (*see* RFQP at 12), with a counter-textual argument that the RFQP granted a contract interest that was "encumbered by" and "subject to six reservations that the Public Entities could exercise to take the award away from Plaintiffs."  (Pls' Resp. at 12.)  Plaintiffs' contorted interpretation of the RFQP again begs the fundamental question: did the RFQP grant Plaintiffs a contractual right in the first place?  The answer is no – indeed, Defendants block quoted the following RFQP language twice in their initial brief:

> Acceptance of Proposal Content.  Notwithstanding the identification of a proposed Developer for purposes of further negotiations, such selection does not constitute acceptance of its proposal.

(Def's Br. at 3, 10.)  Plaintiffs do not even acknowledge this language in their Response, let alone offer any explanation as to how any developer could obtain an "encumbered property interest" under the RFQP in light of this language.  Plaintiffs' last-ditch attempt to claim contractual rights arising from the RFQP has no legal support, is contrary to controlling precedent and the unambiguous language of the RFQP, and fails as a matter of law.[3]

---

[3] With no legal leg to stand on, Plaintiffs resort to their wholly circular argument that the "Project Award" must be a valuable property right because Plaintiffs have made conclusory allegations in their Amended Complaint that Ferguson "stole" the valuable Project Award from them.  (Pl's Resp. at 13.)  These assertions do nothing to answer the critical legal question before the Court: is Plaintiffs' alleged interest in the Project Award a legally protected contract or property right? The answer is no, and Plaintiffs provide no authority to suggest otherwise.

2.     *Plaintiffs' desperate attempt to re-characterize their interest in the Project as intellectual property that is "separate and distinct" from the project fails as a matter of law.*

Because the unambiguous language of the RFQP so clearly dispels any notion that Plaintiffs obtained any rights thereunder, Plaintiffs have now shifted to their desperate argument that the Defendants "stole" what Plaintiffs label as Christopher Jerome's "different and distinct" interest in "intellectual property."  (Pl's Resp. Br. at 2.)  Plaintiffs have the gall to argue that "Defendants do not attempt to address" their "uncontroverted" property interest in Chris Jerome's so-called "intellectual property," (Pls' Resp. at 10), and then state that:

> Plaintiffs clearly pled that Christopher Jerome spent several hundred thousand actual dollars to develop Intellectual Property regarding the development of the vacant 8 acre Story Properties *and* the adjacent, potential development of the Red Cedar Golf Course.  This property interest is actual, not conjectural. [no citation provided by Plaintiffs.]

(Pls' Resp. Br. at 10.)  As with their Amended Complaint generally, Plaintiffs describe the so-called "intellectual property" in an utterly ambiguous and barely comprehensible manner. Plaintiffs provide two separate and inconsistent definitions of the term "Intellectual Property" in their Response Brief (*See* Pl's Resp. Br. at 2-3), and then offer a third definition in the affidavit that they attached from Christopher Jerome.  (*Id*. Ex. 4, ¶ 9.)  These definitions all vaguely describe Mr. Jerome spending "hundreds of hours" and "hundreds of thousands of dollars" in envisioning a development plan for the Project, and then Plaintiffs label those efforts his "intellectual property," without providing any legal authority whatsoever to so much as suggest that such efforts are actually recognized or protected by law as "intellectual property."  (*See id*., Pl's Resp. Br. at 2-3, Pl's Ex. 4 ¶ 9.)

It is obvious that, as with the so-called "Project Award," Plaintiffs have simply re-characterized their non-existent contract or property interest in the Project itself as Christopher Jerome's "intellectual property" in the Project.  It is telling that the portion of the Amended

Complaint that Plaintiffs block quoted as evidence that they sufficiently alleged the "theft and misappropriation of Plaintiff's intellectual property" as a "different and distinct" interest actually describes an injury to Plaintiffs' "proprietary intellectual property ... *related to developing the Project*." (Pls' Resp. at 3) (emphasis added).

It is also telling that Plaintiffs attempt to support their "intellectual property" theory by citing a letter from the parties' negotiations, where Joel Ferguson proposed a number of terms for a development partnership. The letter included a proposal that "Chris Jerome would be paid for development services he provided for the past three (3) years," by being "paid $300,000 out of project funding for these prior development services." (Am. Compl. Ex. 3, Dkt. No. 62-4, PageID.307, 309 (emphasis added).) "Development services" do not constitute "intellectual property" protected by state or federal law, and Plaintiffs offer no authority to suggest otherwise.

Indeed, Plaintiffs' "intellectual property" claim is just the latest effort by Plaintiffs to assert a business expectancy or some other ambiguous interest in the Project itself. In substance, it is nothing more than Chris Jerome's bare assertion that he had some undefined legal right to recover the costs that he incurred in pursuing the Project. What Plaintiffs cannot avoid is the RFQP language, which plainly advised every potential developer, in all caps, that:

> THE PUBLIC ENTITIES ARE NOT LIABLE FOR ANY COSTS INCURRED BY ANY PROPOSED DEVELOPER PRIOR TO THE SUCCESSFUL COMPLETION OF NEGOTIATIONS AND EXECUTION OF THE [COMPREHENSIVE DEVELOPMENT AGREEMENT] OR PRIOR TO CLOSING ON THE SALE AND PURCHASE OF THE PROPERTY.

(Defendants' Ex. 1, RFQP at 9.) Defendants quoted and discussed this language in their initial Brief (Defs' Br. at 4), but Plaintiffs completely ignore it in their Response Brief. Presumably, Plaintiffs wish to ignore this language because it completely undermines their argument that Christopher Jerome had a right to be compensated for the costs he incurred pursing the Project,

which they attempt to label as an "intellectual property" interest.  But once again, the terms of

the controlling documents cannot so easily be ignored. The RFQP makes clear that no developer

can claim any legal right to recover the costs they incurred in pursuing the development, and

Capital Gateway Project, LLC submitted the RFQP Response subject to this express language.

Plaintiffs' argument that they can recover their costs in the Project (by re-labeling them as

"intellectual property" or otherwise) flies in the face of this unambiguous language, and is not

supported by any legal authority whatsoever.

> 3. *To the extent Plaintiffs attempt to assert any "intellectual property" rights, they have failed to cite any authority to support that the rights they assert are legally recognized and protected property interests.*

Finally, even if Plaintiffs were actually referring to some interest other than their

nonexistent expectancy to recover the costs they incurred towards the Project – which they are

not – Plaintiffs fail to describe any legally recognized "intellectual property" in their Response

Brief.  The only authority that Plaintiffs cite to support their bare assertion that Christopher

Jerome owned "intellectual property" in the Project is a selectively edited Black's Law

Dictionary definition that Plaintiffs relegate to a footnote. (Pls' Resp. Br. at 10, n.6.)  The full

definition reads as follows, with the language omitted by Plaintiffs underlined:

> **1.** A category of intangible rights protecting commercially valuable products of the human intellect. • <u>The category comprises primarily trademark, copyright, and patent rights, but also includes trade-secret rights, publicity rights, moral rights, and rights against unfair competition.</u> **2.** A commercially valuable product of the human intellect, in a concrete or abstract form, <u>such as a copyrightable work, a protectable trademark, a patentable invention, or a trade secret</u>.

INTELLECTUAL PROPERTY, Black's Law Dictionary (10th ed. 2014).  The omitted language

recognizes a fundamental principle explained by the Supreme Court: "property interests ... are

created and their dimensions are defined by existing rules or understandings that stem from an

independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564,

577 (1972); *see also Taylor Acquisitions LLC v. City of Taylor*, 313 F. App'x 826, 830 (6th Cir. 2009).  Plaintiffs cannot avoid dismissal by describing Christopher Jerome's "abstract need" or "unilateral expectation;" rather, Plaintiffs must allege a property interest that is "a legitimate claim of entitlement."  *Id.*

Plaintiffs do not point to any allegations in the Amended Complaint specifically describing any "intellectual property," but more importantly they have not cited any intellectual property law that defines, recognizes, or protects any of the items that Plaintiffs have now labeled as "intellectual property."  *See Roth*, 408 U.S. at 577.  For example, Plaintiffs do not identify any specific copyrighted, trademarked, or patented work, and even if they had, Plaintiffs have not cited any source of law creating or defining the dimensions of their property rights in such work.[4]  *Id.*  The reason for this glaring deficiency is obvious: as discussed above, the so-called "intellectual property" is not intellectual property at all.  Plaintiffs' attempt to claim standing based on "intellectual property" fails for the simple reason that Christopher Jerome has not alleged any "legitimate claim of entitlement" to compensation for any of his alleged "intellectual property."  *See Taylor*, 313 Fed. App'x at 830.  At most, Plaintiffs have described Christopher Jerome's "abstract need or unilateral expectation" that his work would pay off if and when he eventually developed the Project.  *See id*.  The Amended Complaint fails to describe a legally recognized property interest as a matter of law.

---

[4] Plaintiffs vaguely refer to "architectural renderings," but nowhere does the Amended Complaint attach or specifically describe such renderings, nor does it allege any specific misappropriation of such renderings by any Defendant, or how any specific misappropriation gave rise to a legally actionable injury.

**B.** **Plaintiffs Fail to Meaningfully Distinguish the Controlling Sixth Circuit Case Law Demonstrating Plaintiffs' Failure to Allege any Constitutionally Recognized Property Interest**

For all of these reasons, Plaintiffs have not, and cannot, allege any constitutionally recognized property interest under the Amended Complaint as a matter of law.  Plaintiffs attempt distinguish the Sixth Circuit cases discussed by Defendants (*Taylor*, 313 Fed. App'x at 826 and *EJS Props.*, *LLC v. City of Toledo*, 698 F.3d 845 (6th Cir. 2012), but that discussion is nothing more than Plaintiffs repeating their bare and unsupported assertion that they have a legally recognized contract or property interest in the "Project Award."  (*see* Pls' Resp. at 39-42.)

First, Plaintiffs attempt to distinguish *Taylor* by conceding to Defendants' position, and admitting that they do not have "a constitutionally protected property interest in the eventual development of the subject property."  (Pls' Resp. at 40.)  Plaintiffs then argue that this case is different from *Taylor,* because Plaintiffs' theory is that they "won" the "exclusive right to negotiate with the public entities" which "should ultimately result" in a development agreement, and that this is a constitutionally protected property interest.  (Pls' Resp. at 40.)

Again, Plaintiffs merely beg the question of whether the RFQP granted any legally recognized property interest at all.  In *Taylor*, the Sixth Circuit recognized that a constitutionally recognized property interest must be firmly established by an independent source such as state law.  313 Fed. App'x at 830.  Plaintiffs do not cite a single case to support their claim that an agreement to "negotiate" is a recognized property interest, and the Michigan Supreme Court has stated that Michigan law does not recognize an "agreement to negotiate" as a contractual right.  (*See* Defs' Br. at 11 (discussing Michigan case law).)[5]  At least one federal court has found that

---

[5] *See also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005)) (plaintiff has the burden of establishing that it possessed a property interest for purposes of procedural due process claim); *Kingsley v. Brundige*, 513 F. App'x 492, 500 (6th Cir. 2013) (affirming district court's dismissal

an actual contract "to negotiate in good faith" that is a right enforceable under New York law (unlike under Michigan law) is nevertheless still not a constitutionally protected property interest.  *See Waltentas v. Lipper*, 636 F. Supp. 331, 334-36 (S.D.N.Y. 1986) (dismissing § 1983 lawsuit by developer that was conditionally designated as the developer of publicly owned land, finding that even if the developer had a contractual right to negotiate with the public entity in good faith under New York law, that right is not a constitutionally protected property interest).

Plaintiffs then attempt to distinguish *EJS Properties*, *LLC v. City of Toledo*, 698 F.3d 845 (6th Cir. 2012), by arguing that, unlike in *EJS*, the public entities' decision-making power was not entirely discretionary in this case.  (Pls' Resp. Br. at 39-42.)  Plaintiffs argue that they "had been awarded the Project Award subject to the public entities' specific and limited reservation of rights."  (*Id*. at 40.)  This is nonsense.  Plaintiffs describe the "Project Award" as their "exclusive right to negotiate with the public entities," which negotiations "should" result in a comprehensive agreement to develop the Project (Pl's Resp. at 12-13), but do not point to any language whatsoever in the RFQP that limits the public entities' discretion in these negotiations. More importantly, Plaintiffs flatly ignore the plain and unambiguous language of the RFQP, which among other things expressly reserves the Public Entities' discretion to negotiate with other developers and to refuse to work with any developer or development team member that the Public Entities find unacceptable.  (Def's Ex. 1, RFQP at 9, 10, 12.)  This wholly dispels any notion that any developer – let alone Plaintiffs – obtained "exclusive" rights.  Plaintiffs cannot avoid dismissal by relying on characterizations of the RFQP that are directly contrary to its express language.  (*See* case law discussed at pages 7-8 of Defs' Unified Br.)

---

of procedural due process claim because plaintiff cited no authority to support her possession of a property interest arising under state law).

### C.    Plaintiffs' Last-Ditch Effort to Assign the Claims of Capital Gateway Project, LLC Does Nothing to Support Their Amended Complaint.

Defendants' initial Brief discussed the simple and indisputable fact that none of the Plaintiffs were a "selected developer" under the RFQP and RFQP Award.  Now, in a desperate attempt to avoid the plain text of these documents, Plaintiffs have attached to their Response a document purporting to assign Capital Gateway Project, LLC's claims to themselves, which they executed one day before serving their Response Brief.  (*See* Pls' Resp. Br., Ex. 2 of Jerome Aff.)[6]  This is a meaningless farce.  Even if the RFQP granted any rights to Capital Gateway Project, LLC in the first place – which it plainly did not – Plaintiffs do not even argue that the "selected developer" had the right to assign its "exclusive" right to "negotiate with the public entities" to other developers.  Nor does anything in the RFQP authorize or permit any such "assignment." Indeed, the assignment itself flies in the face of Plaintiffs' entire argument that the Public Entities awarded "exclusive" rights to one "selected developer."  Plaintiffs' "assignment of claims" charade is ultimately meaningless, because neither Plaintiffs nor Capital Gateway Project, LLC obtained any legally recognized interest in any "Project Award" under the RFQP, and so had nothing to assign.  Nothing plus nothing is still nothing.

## III.    Plaintiffs' Response fails to Save their RICO Claims

As set forth fully in the Unified Motion, Plaintiffs have failed as a matter of law to state a

---

[6] The affidavit and attached documents are extraneous to the pleadings, and should be excluded by the Court in considering the 12(b)(6) Motion.  *See* Fed. R. Civ. P. 12(d); *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 392 (6th Cir. 1975) (noting the Court's discretion to exclude affidavits and proceed under 12(b)(6) instead of converting the motion to one under Fed. R. Civ. P. 56).  Although Defendants dispute the facts set forth in the affidavit and the validity of any purported assignment of claims, for purposes of this Motion the affidavit and attachments are irrelevant and do nothing to save Plaintiffs' Amended Complaint or establish standing thereunder.  Nothing in Exhibit 4 sets forth any facts that allow Plaintiffs to avoid the plain and unambiguous language of the RFQP and RFQP Response, or the controlling caselaw discussed in Defendants' Briefs.

claim under RICO, and Plaintiffs' strained characterizations of the facts in the Response are insufficient to breathe life into these claims.  The RICO claims should be dismissed.

**A.      Plaintiffs' Response Fails to Demonstrate that the Amended Complaint Sufficiently States a Claim for Violation of 18 U.S.C. § 1962(c).**

Count I of the Complaint alleges that the RICO Defendants violated 18 U.S.C. § 1962(c). To state a claim under this section, Plaintiffs "must plead the following elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 483 (6th Cir. 2013).  The failure to allege *just one* of the elements is fatal to Plaintiffs' RICO claim: "A plaintiff must allege each element to properly state a claim." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012).  Plaintiffs have failed to demonstrate that their Amended Complaint sufficiently alleges all of these elements, and Count I fails as a matter of law.

**1.      *The RICO Claim against Ferguson Development Must be Dismissed.***

Plaintiffs have not alleged that Ferguson Development is a RICO person and thus fail to state a claim against the company.  Under RICO, liability may only lie against a "person" operating through an "enterprise"—the enterprise itself is not liable.  *See In re ClassicStar*, 727 F.3d at 490.  Accordingly, "a corporation *may not* be liable under section 1962(c) for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members."  *Begala v. PNC Bank, Ohio Nat. Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000) (emphasis added).  As the Sixth Circuit has affirmed, plaintiffs cannot allege an association-in-fact "enterprise" consisting of a corporation and its agents/employees if those same individuals and

entities are also the named defendants (or "persons") in the case.[7] *Id.*, *see also Moes v. Woodward*, 2012 WL 5830596, at *9 (W.D. Mich. Nov. 16, 2012) ("[P]laintiff cannot create a RICO violation by characterizing the City and its employees as the 'enterprise' and 'person' engaged in the illegal conduct").

The Amended Complaint violates RICO's "distinction" requirement between the "persons" liable for the racketeering activity at issue and the "enterprise" that acts as the vehicle for conducting the racketeering activity. As alleged in the Amended Complaint, "Defendants Ferguson and Stralkowski are persons employed by or associated with Ferguson Development to commit racketeering acts." (Am. Compl., PageID.284, ¶ 155.) Plaintiffs describe the company not as a unique member of the purported enterprise but as the enterprise itself. (*Id.* PageID.255, ¶ 25 (describing Ferguson Development as "Ferguson's instrument of corruption and improper political influence for personal financial gain for over two decades").) In fact, Plaintiffs concede in their Response that Ferguson and Stralkowski are the only members of the alleged criminal enterprise, Ferguson Development: "Defendant Ferguson is the leader of the Ferguson Enterprise, which also includes his son-in-law, Defendant Stralkowski as his project manager, for Ferguson Development LLC." (Resp. Br. at 21.)

Plaintiffs also offer a bare argument that *In re ClassicStar* permits corporations to be held

---

[7] Federal courts around the country have reached similar conclusions, holding that plaintiffs cannot circumvent the distinction pleading requirement by alleging a RICO enterprise that consists of an association in fact of a corporate defendant and its agents. *See, e.g.*, *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("[Since] a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant [corporation] itself."); *Bates v. Northwestern Human Servs., Inc.*, 466 F. Supp. 3d 69, 86-87 (D. D.C. 2006) (plaintiff failed to adequately plead distinct "persons" and "enterprise" by essentially alleging that "the parent corporation … and its two subsidiaries … are each simultaneously a RICO person acting through the other entities in their roles as RICO enterprises and a RICO enterprise through which the other entities act as RICO persons.").

liable as "persons" committing racketeering activities when they "perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity." (Resp. Br. at 21-22.) But the Amended Complaint *never* alleges that Ferguson Development played any role distinct from Ferguson or Stralkowski, or that it used its separate legal incorporation to further racketeering activity. Tellingly, Plaintiffs' argument on this point only cites conclusory allegations that provide no substantive factual support for Plaintiffs' argument. (*See id*. at 22.)

As the alleged RICO enterprise, Ferguson Development cannot be liable for a RICO violation, and this claim must therefore be dismissed.

> 2. *Plaintiffs' Conclusory Allegations Fail to Establish a "Pattern" of Racketeering Activity.*

To establish a pattern of racketeering, Plaintiffs must allege predicate acts that are related and amount to or pose a threat of continued criminal activity: "It is this factor of *continuity plus relationship* which combines to produce a pattern." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 724 (6th Cir. 2006) (emphasis in original). Such continuity may be open-ended or closed-ended. *H.J., Inc. v. Nw. Bell Tele. Co.*, 492 U.S. 229, 241 (1989).

> a. Plaintiffs Have Abandoned Any Closed-Ended Continuity Argument.

In their initial Brief, Defendants demonstrated that the Amended Complaint fails to plead closed-ended continuity under controlling Sixth Circuit precedent. (Defs' Br. at 19-21.) Plaintiffs fail to even address, and therefore have abandoned, any claim under the theory of closed-ended continuity.

> b. The Amended Complaint Lacks Sufficient Factual Allegations of Open-Ended Continuity.

Plaintiffs' strained attempts to establish open-ended continuity fare no better. It is well-established that open-ended continuity cannot be demonstrated where, as here, the alleged

pattern of racketeering activity consists solely of a single scheme, targeting a single victim, with

a single injury.  Plaintiffs' reliance on *Brown v. Cassens Transportation Co.*, 546 F.3d 347 (6th

Cir. 2008) is misplaced.  As referenced in *Brown*, the Supreme Court has explained that the open

period of continuity is satisfied when "the predicates are a regular way of conducting defendant's

on-going legitimate business."  *Id.* at 355 (quoting *H.J. Inc., 492* U.S. at 243).  In *Brown*, the

plaintiffs had alleged a number of predicate acts targeting multiple victims— all of them

similarly situated employees fraudulently deprived of their worker's compensation benefits—

consistently over a period of years.  *Id.* at 355.  The Court found this sufficient to establish that

defendants regularly conducted their ongoing business in this manner.  *Id.*  In contrast, here, each

of the predicate acts alleged relate to a single scheme that Plaintiffs admit is complete—and thus

inherently terminable—not continuous.  (*See* Defs' Br. at 22.)

Recognizing that they have alleged only a single, completed scheme that is insufficient to

satisfy the continuity factor, Plaintiffs point to "facts external to the predicate acts" in an attempt

to broaden the alleged scheme and demonstrate an ongoing threat of repeated criminality.  (*See*

Response at 27.)  But the "facts" summarized by Plaintiffs in the Response do nothing to

demonstrate that the purported scheme threatened to or did extend indefinitely, or that these facts

are related to the conduct at issue.  *See Vild v. Visconsi*, 956 F.2d 560, 570 (6th Cir. 1992) ("A

civil plaintiff may not use one type of conduct (acts directed at him) to satisfy the relationship

test, and then invoke a second type of conduct (unrelated acts directed at others) to fulfill the

continuity test *absent similar types of conduct and victims who are essentially in the same

position*." (emphasis added)).[8]  Instead, the Plaintiffs vaguely characterize wholly innocuous

---

[8] Even the *Brown* Court recognized that the open-ended continuity asks whether "the
racketeering acts themselves include a specific threat of repetition extending indefinitely into the
future."  *Brown*, 546 F.3d at 354 (quoting *H.J.*, *Inc.*, 492 U.S. at 242.  This "specific threat of

facts in an effort to paint business negotiations as something sinister, when they simply are not.

For example, Plaintiffs' discussion of "Developer A" cannot support or establish open-ended continuity.  Indeed, Plaintiffs have conceded that they have not identified any predicate criminal acts of racketeering towards Developer A.  (Pls' Resp. Br. at 25.)  Instead, they argue that Ferguson's alleged interference with the Jeromes' vaguely defined business relationship with Developer A supports an open-ended racketeering scheme.  (*Id.*)  But the vague factual allegations regarding Developer A allegedly occurred years after the so-called "Project Award" was "stolen" from the Jeromes, and had nothing to do with that alleged scheme to "defraud" the Jeromes of their nonexistent interest in the Red Cedar Development Project.

Similarly, the idea that Lansing and/or Ingham County taxpayers are victims of the so-called "racketeering" described by the Amended Complaint is wholly unsupported.  (*see* Pls' Resp. Br. at 23.)  Plaintiffs appear to be arguing that taxpayers were harmed because Ferguson was awarded the project on a "no bid" basis,[9] and because Ferguson "has received at least $35 million in bonding of public monies from the City of Lansing and is currently seeking an additional $35 million bond from the Ingham County Boaard of Commissioners."  (Pls' Resp. Br. at 25-26 (citing Am. Compl. ¶ 162).)  Even accepting these allegations as true, nothing in the Amended Complaint alleges that the award of the Project to Ferguson or his receipt of public

---

repetition" language is consistent with the requirement that open-ended continuity be based on similar conduct and victims who are "essentially in the same position."  *Vild*, 956 F.2d at 570.

[9] It is telling that in their initial Brief, Defendants explained in detail why the Amended Complaint was wrong as a matter of law in alleging that the "no bid award" to Ferguson violated Chapter 206 of Lansing's Ordinance.  (Defs' Br. at 35, n.13.)  Plaintiffs have not even tried to refute this, and completely avoid any discussion of Chapter 206 in their Response.  Plaintiffs' failure to provide any authority whatsoever to support their bare assertion that the "no-bid" award was illegal results in Plaintiffs being "deemed to have abandoned the issue."  (Pls' Resp. at 46-47, *citing Williams*, 544 F.3d at 690.)

bonding was the product of <u>any</u> alleged criminal activity, let alone that it was somehow part of the alleged racketeering "scheme" to "steal" the Project from the Jeromes.

Apparently recognizing that they are unable to allege the requisite element of continuity, Plaintiffs no longer even try to argue that a pattern of racketeering based on a theory of closed-ended continuity exists.  Rather, Plaintiffs focus their efforts at trying to create a theory of open-ended continuity.  Yet, Plaintiffs allege, at most, a single scheme that terminated with the award of the Red Cedar Renaissance Project in December 2013, rendering open-ended continuity a legal impossibility.  (*See* Defs' Br. at 22.)  Accordingly, Plaintiffs fail to allege a "pattern" of ongoing criminal conduct, and the RICO claim must fail.

3.    *Plaintiffs Have not Adequately Pleaded Any Predicate Acts.*

Plaintiffs base their RICO claims on alleged "predicate acts" of mail/wire fraud and extortion.  (*See* Am. Compl. Ex. 7, PageID.323-329.)  Plaintiffs' Response offers nothing more than their repetition of conclusory accusations of criminal activity,[10] and does nothing to save the Amended Complaint.

a.    <u>Plaintiffs Have Failed to Plead Mail or Wire Fraud.</u>

Plaintiffs fail to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) necessary to plead mail or wire fraud as a predicate act.  Much like Plaintiffs' unsuccessful efforts to establish a "pattern" of racketeering activity, Plaintiffs again rely on

---

[10] The Amended Complaint vaguely alleges that Ferguson harmed Plaintiffs and the public by running a "pay-to-play" (Am. Compl. ¶ 24, PageID.254), "bribe infused racketeering scheme" (*id.* ¶ 159, PageID.285), but fails to allege any substantive facts of bribery whatsoever. Defendants observed in their Unified Brief that the Amended Complaint does not allege a single, specific act of bribery, (Defs' Br. at 28, n.10), which Plaintiffs have simply ignored.  But true to form, Plaintiffs insist on repeating their bald accusations of bribery in their Response – indeed they up the rhetorical ante by accusing Ferguson of <u>felony bribery,</u> without pointing to any substantive factual allegations whatsoever that support this accusation.  (*See* Pls' Resp. Br. at 24, 25 n.10.)  Because the Amended Complaint is devoid of any substantive factual allegations to establish the elements of bribery, the Court should ignore Plaintiffs' "bribery" rhetoric.

conclusory descriptions of the actual allegations in the Amended Complaint in a failed attempt to transform ordinary course contract negotiations into criminal fraud.

In the Response, Plaintiffs ignore the key element of any claim for fraud—that the statements specified actually be fraudulent.  "When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must (1) specify the statements that the plaintiffs contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Heinrich*, 668 F.3d at 404.  Plaintiffs claim that they "plead the contents, date, and place" of the alleged predicate statements (*see* Pls' Resp. Br. at 28), but neglect to explain how such alleged statements constitute fraud— which is perhaps *the most* essential element of this cause of action.

For example, Plaintiffs assert that Paragraph 78 pleads a predicate of wire fraud.  (*Id.*) Paragraph 78 states "On July 18, 2012, Ferguson's agent and attorney, Patrick Reid, used wire communications (email) to send a new draft operating agreement for the 'Capital Gateway Project, LLC' to Chris Jerome which contained new terms that essentially gave Ferguson control of the Project."  (Am. Compl. PageID.265, ¶ 78.)  This allegation only vaguely hints at the contents of the alleged statement by completely failing to identify any of the alleged "new terms."  Moreover, the allegation does not indicate how these "new terms" were fraudulent, instead merely describing Ferguson's alleged negotiating position at the time.  Such allegations are plainly deficient as a matter of law.  *See United States v. Weimert*, 819 F.3d 351, 370 (7th Cir. 2016) (stating that deception involving negotiating positions is not criminal fraud); *cf. Arrowood Indem. Co. v. City of Warren, Mich.*, 2015 WL 457739, at *1-2 (E.D. Mich. Feb. 3, 2015) ("In evaluating an action for fraud, 'courts must distinguish between misrepresentations of fact, i.e., false statements of past or existing facts, and mere negotiation of benefits, i.e., the

mutual discussion and bargaining preceding an agreement to pay.'" (quoting *Cooper v. Auto Club Ins. Ass'n*, 751 N.W.2d 443, 452 (Mich 2008))).

Similarly, in Paragraph 88, Plaintiffs describe a "memorandum [that] attacked a November counteroffer by Chris Jerome, while proposing a new operating agreement for Capital Gateway Project LLC with the 50% equity demand repeated."  (Am. Compl. PageID.268, ¶ 88.)  But there is no allegation of fraud—by affirmative misrepresentation or omission—in this paragraph, and Plaintiffs make no effort in the Response to explain how this, or other alleged statements made in the context of negotiation and supposedly constituting alleged predicate acts, are fraudulent.  (*See* Response at 28 (merely listing the paragraphs purportedly alleging predicate acts).)  These vague allegations fail to even arguably meet the heightened requirements of Rule 9(b).

As one last example, Plaintiffs point to a proposal from Ferguson where he "requested a 5% equity stake in the Project in exchange for his 'assistance'"(*see* Am. Compl. ¶ 71, PageID.264) - and then argue that "Ferguson's representation that he would provide assistance in exchange for 5% equity was false."  (*Id.* ¶ 72.)  This simply does not describe fraud.  Congress did not intend to criminalize common negotiation practices under the mail and wire fraud statutes.  (Defs' Br. at 25-26 (citing *Weimert*, 819 F.3d at 370.)  And under Michigan law, "[f]uture promises are contractual and do not constitute fraud."  *Bye v. Nationwide Mut. Ins. Co.*, 733 F. Supp. 2d 805, 820 (E.D. Mich. 2010) (quoting *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813 (Mich. 1976).)  Even if Plaintiffs believed the representation described in Paragraph 71 of the Amended Complaint, it was contractual in nature and cannot form the basis of fraud claim.

Finally, on a broader level the fraud theory proffered in the Amended Complaint and Response Brief is absurd on its face, and cannot survive the plausibility requirements of *Twombly* and *Iqbal*. Plaintiffs describe Chris Jerome as "a Harvard Business School graduate who worked in Silicon Valley managing investment funds with assets as much as $6 billion" (Am. Compl. ¶ 39), and who spent two to three years discussing the proposed Project with "developers, brokers, and financial institutions." (*Id*. ¶¶ 40-41.) Do Plaintiffs expect this Court to plausibly believe that Mr. Jerome was fraudulently induced to turn over his interest in the Project to Ferguson (whom Mr. Jerome knew to be a real estate developer), because Ferguson promised to partner with the Jeromes on a major, for-profit real estate development for free? (*See* Am. Compl. ¶ 55 ("Ferguson's representations ... that he would help the Jeromes 'free of charge' were false"). Plaintiffs' fraud theory is utterly implausible on its face, is contrary to the RFQP Response, which states that it was being submitted by "the Story and Ferguson families," (Defs' Ex. 2, RFQP Response at 2), and in any event is a nonstarter under well-established fraud jurisprudence stating that future promises do not constitute fraud. *Bye*, 733 F. Supp. 2d at 820. The Amended Complaint fails to allege mail or wire fraud, and the RICO claims must be dismissed as a matter of law.

b.  <u>Plaintiffs Have Not Sufficiently Alleged Extortion.</u>

In an extremely superficial fashion, Plaintiffs make two arguments regarding their allegations of predicate acts of extortion. Both arguments must fail.

First, Plaintiffs assert that the "Project Award" and "Intellectual Property" constitute property interests sufficient to state a claim for extortion under the Hobbs Act. (Response at 30-31.) For the reasons stated *supra* in Section II, Plaintiffs have failed to allege a property interest acquired by the RICO Defendants, and the Hobbs Act claim fails. (*See* Defs' Br. at 26-27.)

Second, Plaintiffs assert that they have adequately plead predicate acts of extortion under

23

Michigan law because "it is sufficient that the Defendants made . . . threats with the intent to

obtain" Plaintiffs' property. (*See* Pls' Resp. Br. at 31.) Plaintiffs fail, however, to identify in

their Response a single statement in the Amended Complaint that constitutes a malicious threat

of "injury to the person or property . . . of another" sufficient to satisfy Mich. Comp. Laws

§ 750.213. (*Id.*) Much like with Plaintiffs' vague allegations of mail and wire fraud, the only

"threats" allegedly made by the RICO Defendants are in fact statements related to the parties'

negotiating position. (*See* Am. Compl. PageID.272-273, ¶ 102.) These alleged "threats" are,

again, nothing more than negotiations. (*See, e.g.*, *id.* Extortion No. 4 ("Ferguson proposes a new

equity split with a tie-breaking vote to Chuck Clark, and threatens to block the Project if his

demands are not met.").) Plaintiffs cite no case law – because none exists – to support their

proposition that such alleged statements, admittedly made in the context of negotiations, could

possibly constitute a "communication maliciously threaten[ing] any injury to the person or

property . . . of another" in violation of Michigan law. (*See* Response at 31.)[11]

    For these reasons, Plaintiffs have failed to allege predicate acts of extortion under either

state or federal law.

    4.    *Plaintiffs Have Failed to State a RICO Violation Regarding Developer A.*

    Plaintiffs admit that their allegations regarding Developer A fail to conform to the

Court's Order permitting amendment, and for this reason alone Plaintiffs' claim as to Developer

A must fail. In the Court's February 10, 2017 Order, the Court directed Plaintiffs to "attach a

---

[11] The Michigan Supreme Court has recently recognized that Mich. Comp. Laws § 750.213 has a
high threshold, observing that when enacting this statute, "the legislature did not intend to punish
every minor threat." *People v. Harris*, 845 N.W.2d 477, 486 (Mich. 2014). By prohibiting
"malicious" threats, the Legislature criminalized "only those threats made with the intent to
commit a wrongful act without justification or excuse, or made in reckless disregard of the law
or of a person's legal rights." *Id.* at 487. Plaintiffs fail to cite this case, nor do they make any
attempt to cite any substantive factual allegations in their Amended Complaint that would even
come close to meeting this high standard.

chart concisely delineating *for each claim* the conduct of each Defendant in violation of the respective statute and/or establishing the Defendant's liability."  (Order, PageID.233) (emphasis added).  Plaintiffs admit that the "predicate acts [as to Developer A] were not pled with the 15 predicates listed in Exhibit 7 of the FAC."  (Pls' Resp. Br. at 32.)  No further inquiry into these allegations is therefore necessary.

But even putting aside Plaintiffs' failure to comply with the Court's Order, the Amended Complaint fails to state a claim as to Developer A.  The Amended Complaint does not contain any allegations sufficient to specifically plead predicate acts of mail or wire fraud, nor do Plaintiffs allege any threats sufficient to state a predicate act of extortion.  (*See* Defs' Br. at 27-28.)  The vague allegations as to Developer A clearly fail to state a claim under RICO, and the claim therefore must be dismissed.

### B.      Plaintiffs Fail to State a Claim for RICO Conspiracy.

In addition to the primary RICO claim discussed *supra*, Plaintiffs allege in Count II of the Amended Complaint that the ten Conspiracy Defendants conspired to violate RICO in violation of 18 U.S.C. § 1962(d).  The Amended Complaint fails, however, to adequately plead such a conspiracy, and the speculation and innuendo contained in the Response cannot overcome those pleading deficiencies.  The conspiracy claim therefore must also fail.

This claim fails for a simple reason: Plaintiffs have failed to state a claim for a violation of any RICO provision.  (*See supra*.)  "To state a RICO conspiracy claim, the plaintiff must *successfully allege all the elements of a RICO violation*, as well as allege 'the existence of an illicit agreement to violate the substantive RICO provision.'"  *American Biocare, Inc. v. Howard & Howard Attorneys, PLLC*, 2016 WL 5661583 (E.D. Mich. Sept. 30, 2016) (emphasis added) (quoting *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983)) (dismissing conspiracy claim because plaintiff "failed to make out a claim for a violation of RICO").  Because Count I

fails to state a substantive RICO violation, Count II must necessarily fail with it, and the Court

need look no further.

Moreover, Plaintiffs have failed to sufficiently allege that any of the Conspiracy

Defendants entered into "an illicit agreement to violate the substantive RICO provisions." *Id.* at

1260.  To plead the necessary agreement, Plaintiffs must show that "the defendant . . .

objectively manifested an agreement to participate directly or indirectly in the affairs of an

enterprise through the commission of two or more predicate crimes." *Id.* at 1261.[12]  In the Brief,

the Conspiracy Defendants described in great detail—organized by subgroups[13] of related

defendants—the fundamental deficiencies in the Amended Complaint, and Plaintiffs fail in the

Response to rebut these arguments.  (*See* Defs' Br. at 30-37.)  Instead, Plaintiffs rely on

speculation to convert innocent events—such as the participation in meetings related to the

Project (*see* Response at 34 (discussing a meeting in Bernero's office regarding the Project))—

into criminal conspiracy.  Plaintiffs cite no case law to support the argument that such passive,

innocuous participation in a legitimate business transaction can somehow constitute an objective

manifestation of an illicit agreement to commit a RICO violation.  Most notably, Plaintiffs fail to

---

[12] Plaintiffs urge this Court to depart from this Sixth Circuit case law to rely instead on what they suggest is a lower pleading standard set forth by the Second Circuit in *Baisch v. Galina*, 346 F.3d 366, 377 (2nd Cir. 2003).  But this Court is bound to follow Sixth Circuit precedent.  Moreover, the out-of-jurisdiction decision in *Baisch* is not only non-binding, it is wrong. The court in *Baisch* purportedly relied on *Salinas v. U.S.*, in which the Supreme Court held that to be liable for conspiracy, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." 522 U.S. 52, 53 (1997). This is consistent with the Sixth Circuit's discussion of RICO conspiracy in *Sinito*.  Finally, even if this Court followed the language Plaintiffs cite in *Baisch*, it requires Plaintiffs to allege that each Defendant had specific knowledge of the criminal scheme and affirmatively agreed to further it. Plaintiffs have not done that here.

[13] As discussed in Defendants' Unified Brief, the Court instructed Plaintiffs in amending their Complaint to chart out the specific, substantive allegations that form the basis of the various causes of action with respect to every single defendant, and Plaintiffs failed to do so.  (Defs' Br. at 30-37.)  Plaintiffs' Response offers nothing to save the Amended Complaint, presenting nothing more than vague and unsupported speculation of wrongdoing by the various defendants.

cite any case law that the mere fact of being carbon copied on an email—Plaintiffs' primary allegation to tie many of the Conspiracy Defendants to the alleged RICO conspiracy—is sufficient to establish an illicit agreement.  (*See* Pls' Resp. Br. at 32-38.)[14]  Plaintiffs' allegations clearly fail to state a claim under 18 U.S.C. § 1962(d).

## IV.    Plaintiffs' Tortious Interference Claims Must be Dismissed.

### A.    Plaintiffs' discussion of Count IV deviates from the Amended Complaint and does nothing to advance their tortious interference claim.

Defendants cited and discussed binding case law demonstrating that Plaintiffs had no business expectancy in the Project under Michigan law. (Defs' Br. at 41-43.)  In their Response, Plaintiffs now argue that Count IV has nothing to do with claiming a business expectancy in the Project, arguing that "the Count IV Defendants appear to be confused as to the substance of Count IV" because it does not allege an expectancy in the "Project."  (*See* Pls' Resp. Br. at 43.) Plaintiffs are apparently criticizing Defendants for reading the Amended Complaint, where Plaintiffs allege that: "as a result of the Count IV Defendants' actions, Plaintiffs lost not only their business relationship and expectancy with Ferguson, *but also their business expectancy related to being named 'selected Developer' and winning bidder for the Project*."  (Am. Compl. ¶ 207, PageID.295) (emphasis added).

---

[14] Defendants also demonstrated in their initial brief that Plaintiffs have pleaded themselves out of a RICO conspiracy claim against Ferguson/Continental Lansing LLC ("FCL") because the Amended Complaint acknowledges that FCL did not come into existence until *months after* the alleged RICO scheme concluded.  (*See* Def. Br. at 32.)  Plaintiffs have done nothing to address this fatal defect in their Response.  Instead, Plaintiffs argue that Frank Kass and Continental, who are part owners of FCL, participated in the alleged RICO conspiracy. (*See* Resp. Br. at 38.)  But the Amended Complaint does not contend that either Kass or Continental was involved in the alleged RICO conspiracy, nor are they listed as defendants under Count II (*see* Am. Compl. ¶ 167, PageID.287), and the law is clear that Plaintiffs have to allege that FCL, *as an entity*, agreed to further a RICO conspiracy—allegations that the owners of an entity agreed to further a conspiracy are not sufficient.  (*See* Defs' Br. at 32.)

Having conceded that they have no expectancy interest in the Project, Plaintiffs argue that Count IV is all about Kass, Continental and Hallmark (collectively, "Continental") interfering with Plaintiffs' "established business *relationship* with Ferguson (despite his ever-increasing extortionate equity demands) as evidenced by the seven months of negotiations and circulation of various offers and counteroffers between Plaintiffs and Ferguson."  (Pls' Resp. Br. at 43.)  This argument fails to describe a business expectancy for several reasons.

First, Plaintiffs' contention that they had a "reasonable likelihood" of a business relationship with Ferguson is flatly refuted by Plaintiffs' affirmative allegations in the Amended Complaint, which establish that a full five months after the city "awarded" the RFQP to Capital Gateway Project, LLC, Plaintiffs and Ferguson *still* could not agree on basic terms of an Operating Agreement between themselves.  (*See* Am. Compl. ¶ 100, PageID.271.)  Indeed, Plaintiffs found the January 10, 2013 offer from Ferguson to be so outrageous and unreasonable that they characterize it as a criminally extortionate "threat."  (Am. Compl. ¶¶ 100-101, PageID.271.)  In light of these allegations, Plaintiffs' argument that it was "reasonably likely" that they would reach an agreement with Ferguson is baseless.

Second, Plaintiffs fail to describe any business expectancy with Ferguson that is separate or distinct from an expectancy in the Project itself.  Plaintiffs superficially separate their admittedly nonexistent "business expectancy" in the Project from their alleged "business expectancy" to develop the Project *with Ferguson*, but this gets them nowhere.  Even if Plaintiffs *had* reached an agreement with Ferguson, an agreement between two developers to develop a project is worthless without a project to develop, and the Plaintiffs/Ferguson partnership had no business expectancy in developing the Project.  In *Cedroni* and *Mago* (*see* Defs' Br. at 41-43), Michigan courts found a business expectancy in a public works project lacking because of the

"highly discretionary" nature of such projects in which "too many factors were at play to be able to reasonably infer" that the plaintiff would have obtained the project. *Cedroni Ass'n*, *Inc. v. Tomblinson*, 821 N.W.2d 1, 3 (Mich. 2012) (citing *Mago Constr. Co. v. Anderson*, No. 183479, 1996 WL 33348794 (Mich. Ct. App. 1996).)  Here, any agreement with Ferguson would need to be in place before Ferguson/Plaintiffs could even begin to pursue the Project.  This simply adds another layer of uncertainty and demonstrates that Plaintiffs had no recognized business expectancy in pursuing this Project – with Ferguson or otherwise – as a matter of law.

This count also fails because Plaintiffs do not allege either that Continental committed any *per se* wrongful acts or that Continental caused Joel Ferguson to end his business relationship with Plaintiffs.  Plaintiffs allege that Continental interfered with their business relationship by "meeting and talking with Joel Ferguson after Ferguson and Plaintiffs had already met and agreed to work together on the Project, with the intent to divert Ferguson's efforts for Kass's and Continental's own gain." (Am. Compl. ¶ 206, PageID.295.) These alleged actions are not *per se* wrongful, especially because the RFQP expressly stated that the City could negotiate with other developers regarding revisions to the project. As a result, there was nothing *per se* wrongful about Kass' communications with Ferguson. *See Saab Auto. AB v. Gen. Motors Co.*, 953 F. Supp. 2d 782, 790-91 (E.D. Mich. 2013) (finding defendant did not act *per se* wrongfully by making disparaging comments about a pending agreement when it was contractually able to make such comments); *see also Dalley v. Dykema Gossett*, 788 N.W.2d 679, 696 (Mich. Ct. App. 2010) (finding *per se* wrongful act must be something "illegal, unethical or fraudulent"). Further, Plaintiffs fail to cite any specific affirmative acts indicating that Kass had any improper motive. The fact that Kass was motivated to compete against the Plaintiffs for the Project does not establish malicious intent. *See Trepel v. Eaton*, 354 N.W.2d

341, 348 (Mich. Ct. App. 1984); *see also Maiberger v. City of Livonia*, 724 F. Supp.2d 759, 778-79 (E.D. Mich. 2010) (dismissing amended complaint's tortious interference with business relationship claim when allegations merely showed that the defendant was competing with the plaintiff in bidding for the city's towing contract).

In addition, Plaintiffs argue that Continental tortiously interfered with their business relationship with Ferguson by breaching their nondisclosure agreement with Plaintiffs and using the intellectual property contained therein to create a new development plan. (*See* Pfs' Resp. Br. at 43-44). Plaintiffs fail to provide any authority that breaching a contract is *per se* wrongful.[15] And even if the Court were to find that that this could constitute a *per se* wrongful act, Plaintiffs would still be unable to show the required causal connection.

In order to sustain this claim, Plaintiffs must demonstrate that any alleged wrongful act induced or caused Ferguson to end his business relationship with Plaintiffs. *See, e.g.*, *Wausau Underwriters Ins. Co. v. Vulcan Development, Inc.*, 323 F.3d 396, 404 (6th Cir. 2003) (plaintiffs must show "an intentional interference *inducing or causing* a breach or termination of the relationship or expectancy") (emphasis added) (citations omitted); *see also Boike v. McLaren Health Care Corp.*, 2007 WL 1932029, at *2-3 (Mich. Ct. App. July 3, 2007) (affirming the trial court's order in favor of defendants because nothing indicated that plaintiff would have retained the business expectancy *but for* the defendants' interference). Here, Plaintiffs fail to allege what exactly the "plans" were that Continental allegedly misappropriated from them. Moreover, Plaintiffs fail to show *how* this alleged misappropriation caused Ferguson to end his supposed business relationship with Plaintiffs. In fact, the Amended Complaint alleges that Ferguson himself had been "working to cut [the Plaintiffs] out of the [Project]," and that Kass and

---

[15] Continental, of course, denies misappropriating anything from Plaintiffs; but must assume this fact for purposes of the Court's ruling on their motion to dismiss.

Continental were merely "Ferguson's partners in that effort." (Am. Compl. ¶¶ 108-109; 112, PageID.275-76.)

Also, based on the Amended Complaint, Continental would have had to have obtained Plaintiffs' confidential information prior to June 29, 2012 – the date Continental and Plaintiffs ended their business relationship. (*Id.* at ¶ 146.) According to the allegations raised in the Amended Complaint, however, Ferguson and Plaintiffs did not end their alleged business relationship until some time in December 2013, when the City removed the RFQP designation from Plaintiffs and awarded it instead to Continental and Ferguson. (*Id.* at ¶ 118, PageID.278.) Plaintiffs do not explain how Continental's alleged misuse of Plaintiffs' confidential material could have caused Ferguson to end his business relationship with Plaintiffs more than *a year and a half later*.[16]

Finally, Plaintiffs cannot recover against Continental for an alleged breach of their non-disclosure agreement through a tortious interference claim. *See Brock v. Consol. Biomedical Labs.*, 817 F.2d 24, 25 (6th Cir. 1987) ("The law in Michigan is well-settled that an action in tort requires a breach of duty separate and distinct from a breach of contract."). Under Michigan law, if the "operative allegations" underlying a plaintiff's tort claim "would not exist in the absence of the contract between the parties," then "such allegations cannot be maintained as tort-based claims." *QQC, Inc. v. Hewlett-Packard Co.*, 258 F. Supp. 2d 718, 722 (E.D. Mich. 2003) (citations omitted) (finding plaintiff could not bring a tort claim against defendant arising from plaintiff's allegations that defendant stole intellectual property that plaintiffs revealed through a

---

[16] Also, presumably the plans that Ferguson and Plaintiffs submitted for bidding on the RFQP relied on Plaintiffs' "confidential information." As a result, access to Plaintiffs' information could not have caused Ferguson to end his alleged business relationship with Plaintiffs, and the Court cannot plausibly make this inference.

development agreement).  Accordingly, Plaintiffs cannot pursue a tort claim against Continental based on an alleged breach of the non-disclosure agreement between the two parties.

### B.     Plaintiffs have abandoned Count V.

Defendants briefed in detail that the vague and ambiguous allegations in Count V fail to sufficiently allege any business expectancy, and fail to sufficiently allege any tortious acts towards Developer A, as a matter of law.  (Defs' Br. at 45-48.)  Plaintiffs have provided a non-response consisting of merely proclaiming that Count V is actionable, without citing a single case to support their argument.  (*See* Pls' Resp. Br. at 45-46.)   Plaintiffs' failure to support their position constitutes an abandonment of the same, (Pls' Resp. Br. at 46-47), and Count V must be dismissed.

## V.     Plaintiffs' Immunity Arguments Miss the Mark.

Plaintiffs argue that Defendants Bernero and Trezise cannot be entitled to qualified immunity, and that Bernero cannot be entitled to absolute immunity.[17]

Plaintiffs again rely on a bare argument that they had a "clearly established" property right in what they have labeled the "Project Award" and the "intellectual property."  But qualified immunity imposes an even heavier burden on Plaintiffs to establish that these "property interests" are "clearly established" and recognized by law.  Indeed, the Sixth Circuit has stated that "ordinarily, at least, in determining whether a right is "clearly established' this court will not look beyond Supreme Court and Sixth Circuit precedent."  *Cullinan v. Abramson*, 128 F.3d 301,

---

[17] Defendants have not "abandoned" arguments regarding LEAP.  The reason why Defendants' arguments focus on Trezise (rather than LEAP) is because the Amended Complaint does not contain any substantive allegations or claims that LEAP as an entity engaged in any wrongdoing. Rather, the Amended Complaint's allegations referred to actions taken by Trezise (see, e.g., Am. Compl. ¶ 105, 109, 114, PageID.275, 276), as an employee of LEAP (*id*. ¶ 7, PageID.252). Moreover, the Unified Brief makes clear that "Defendants Bernero, LEAP and/or Trezise are entitled to immunity" and that "Plaintiffs allege that ... LEAP acts as an agent of or on behalf of the Lansing city government and that Trezise is LEAP's CEO."  (Defs' Br. at 48.)

311 (6th Cir. 1997).  Here Plaintiffs have not cited *any* authority to support their bare assertion of a property interest in the "Project Award" or in the "intellectual property," let alone the Sixth Circuit or Supreme Court precedent demanded by the qualified immunity analysis.  Indeed, the only Sixth Circuit case law before the Court plainly demonstrates that Plaintiffs had no property interest in the Project whatsoever. (*see* Defs' Br. at 37-39.)  Thus, even if Plaintiffs had properly supported their latest assertions that they had "property rights" relating to the Project – which they have not – Plaintiffs cannot show the "clearly established" interest required to overcome qualified immunity.

Finally, Plaintiffs attempt to avoid Defendant Bernero's absolute legislative immunity by merely characterizing Bernero's actions as nefarious, and therefore not "legislative" in nature. (*See* Pls' Resp. Br. at 48.)  Plaintiffs miss the point.  The Amended Complaint takes issue with Bernero allegedly not treating Plaintiffs fairly in the RFQP process.  But the City's decision as to whether to enter into a development agreement with Plaintiffs, Ferguson, or any other developer, was legislative in nature, because among other things the City had to approve the sale of the property, the developer, the terms of development, and the various ordinance changes and legislative approvals needed for this type of project.  Defendant Bernero's involvement in identifying an acceptable developer is just one "step in [this] legislative process."  *See Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1988).  Defendant Bernero is entitled to absolute immunity.

## VI.    Dismissal is Proper and Further Amendment Would be Futile

Finally, Plaintiffs suggest that this Court should allow Plaintiffs to amend once again to join Capital Gateway Project, LLC as a plaintiff in this action.  (Pls' Resp. Br. at 18.)  "A motion to amend a complaint should be denied if the amendment would be futile."  *Runyon v. Glynn*, 64 F. App'x 924, 925 (6th Cir. 2003) (*citing Marx v. Centran Corp.*, 747 F.2d 1536, 1550 (6th Cir.1984)).  Allowing the suggested amendment would be futile because, like Plaintiffs, Capital

Gateway Project, LLC has no legally recognized property or contract interest to vindicate, and cannot state a claim upon which relief may be granted under any of the theories set forth in the Amended Complaint.

Allowing any amendment would be duplicative and futile here, where Plaintiffs had notice of the fatal defects raised by Defendants' Unified Motion prior to the first prehearing conference, and the Court then gave Plaintiffs the opportunity to amend their Complaint. The Court specifically instructed Plaintiffs to "revis[e] and refin[e] the complaint allegations in accordance with the Court's directives on the record and specifically addressing the requisites of each asserted legal claim ...." (Pls' Resp. Br. at 7 (quoting Dkt. No. 60).) Plaintiffs' then filed their Amended Complaint, which remains wholly deficient and reveals that allowing further amendment would be futile. *Berry v. Main St. Bank*, No. 13-13280, 2014 WL 806838, at *3 (E.D. Mich. Feb. 28, 2014) (granting motion to dismiss, noting that "despite having the opportunity to amend and the Court's prior Opinion and Order to serve as guidance in how to structure any amendments, Plaintiff's Amended Complaint remains wholly deficient.")

## CONCLUSION

True to form, Plaintiffs' Response offers nothing more than bare and conclusory assertions, paired with their wild, unsupported accusations that they were somehow the victim of some unexplained, "bribe infused" political corruption scheme. Plaintiffs cannot survive this Motion by attempting to create their own reality that has no basis in substantive allegations of the Amended Complaint, in the plain terms of the RFQP and RFQP Response on which the Amended Complaint is based, or in controlling law. Nothing in Plaintiffs' Response demonstrates that Plaintiffs have standing to pursue this action or that they have stated any claim upon which relief may be granted. Accordingly, for these reasons and the reasons stated in

Defendants' initial Unified Brief, Defendants respectfully request that this Court dismiss the Amended Complaint in its entirety and with prejudice.

Dated: October 19, 2017

/s/ Dean F. Pacific

Dean F. Pacific (P57086)
Jeffrey W. Bracken (P25648)
Thomas M. Amon (P72351)
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, N.W.
Grand Rapids, Michigan 49503-2487
616.752.2000

*Attorneys for Lansing Economic Area Partnership and Trezise, and lead counsel for purposes of Defendants' Unified Motion and Brief pursuant to Order dated May 5, 2017*

Counsel for Co-Defendants:

/s/ Patrick A. Facca
Patrick A. Facca
Facca Richter & Pregler PC
6050 Livernos
Troy, MI 48098
(248) 398-9900
Email: pfacca@frplaw.com
*Attorneys for Charles Clark and Clark Construction Services, LLC*

/s/ David K. Otis
David K. Otis
Plunkett Cooney (Lansing)
325 E Grand River, Ste. 250
East Lansing, MI 48823
(517) 333-6598
Email: dotis@plunkettcooney.com
*Attorneys for Virgil Bernero*

/s/ John D. Pirich
John D. Pirich
Andrea L. Hansen
Honigman Miller Schwartz and Cohn LLP
222 N Washington Sq., Ste. 400
Lansing, MI 48933-1800
(517) 377-0709
Email: jpirich@honigman.com
ahansen@honigman.com
*Attorneys for Joel Ferguson, Ferguson Development, LLC, Christopher Stralkowski, and Red Cedar Investor, LLC*

/s/ Todd J. Ohlms
Todd J. Ohlms
Freeborn & Peters LLP
311 S Wacker Dr., Ste. 3000
Chicago, IL 60606
(312) 360-6000
Email: tohlms@freeborn.com
*Attorneys for Frank Kass, Continental Development, Inc., Hallmark Campus Communities, and Ferguson/Continental Lansing, LLC*